# EXHIBIT 1

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| POLAROID CORPORATION, *et al.* | : | Case Number 01-10864 (PJW) |
| | : | |
| | : | Jointly Administered |
| Debtors | : | *Related Docket Nos. 1564, 1597, 1598, 1616, 1642, 1928 and 2261* |

## ORDER DIRECTING APPOINTMENT OF EXAMINER PURSUANT TO SECTIONS 1104 AND 1106 OF THE BANKRUPTCY CODE

Upon the October 30, 2002, November 17, 2002 and December 16, 2002 letters from Leonard Lockwood to the Court (docket numbers 1564, 1642 and 1928) and the November 10, 2002 letter from George Maiorelli to the Court (docket number 1598) requesting among other things the entry of an order pursuant to section 1104(c) of the Bankruptcy Code directing the appointment of an examiner (the "Requests"); and upon the responses thereto filed by Primary PDC, Inc., f/k/a Polaroid Corporation (the "Debtors"), the Official Committee of Unsecured Creditors (the "Committee"), the United States Trustee and other parties in interest; and the Court having considered the Requests at the hearing held on January 16, 2003; and the Court having found that the appointment of an examiner with the powers and duties set forth herein is in the interests of the estate; and after due deliberation and sufficient cause appearing therefor;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Requests are granted to the extent set forth below.

2. Pursuant to sections 1104(c), 1104(d) and 1106(b) of the Bankruptcy Code, the United States Trustee is directed to appoint, subject to the Court's approval, one disinterested person with significant forensic accounting experience to serve as examiner in these cases (the "Examiner"), who shall have the following duties, rights and powers:

(a)     with respect to the period between one year before the filing of the Debtors' chapter 11 petitions and one year after the date of such filings, investigate whether the accounting methods, accounting practices or accounting irregularities alleged in the Requests materially undervalued the assets of the Debtors and/or resulted in an inappropriate liquidation of the Debtors' assets (the "Investigation"); [*]

(b)     meet and confer with the Debtors, the Committee and other parties in interest, and their respective advisors and attorneys regarding the Investigation;

(c)     have reasonable access to the Debtors' facilities, offices, books and records, officers, management, employees, advisors, attorneys and accountants during regular business hours, in connection with the performance of the Investigation;

(d)     conduct any necessary examinations pursuant to Federal Rule of Bankruptcy Procedure 2004; and

(e)     electronically file a report with the Court which shall set forth the Examiner's findings, which report shall be available to all parties in interest through the Court's CM/ECF system.

3.     The Debtors and their officers, directors, management, employees and professionals, OEP Imaging Corporation ("OEP"), n/k/a Polaroid Corporation, and its officers, directors and professionals, and the Committee and its members and professionals shall cooperate with the Examiner and (a) provide to the Examiner access to all documents and information that the Examiner deems relevant to discharge his or her duties in connection with the Investigation, subject to the rights of the Debtors, OEP, the Committee and any other party in interest to object to such document requests on any and all grounds, and (b) subject to the

[*]     Paragraph 2(a) above shall not be read as a limitation on the Examiner's authority to take into consideration matters bearing on the Debtors' business and financial affairs which predate or postdate the two year period as defined above.

2

availability of space and personnel, provide to the Examiner at the Debtors' headquarters a secure office with telephone, secretarial and other appropriate office services.

4.      The Examiner shall have the standing of a "party in interest" with respect to the matters that are within the scope of the investigation, and shall be entitled to appear and be heard at hearings held in these cases.

5.      The examiner shall use best efforts to coordinate with the United States Department of Justice (DOJ), SEC, and other federal agencies in order to avoid unnecessary interference with, or duplication of, any investigations conducted by such federal agencies.

6.      The examiner shall report promptly to the DOJ any evidence of past or present criminal activity, and to the SEC any evidence of past or present civil securities law violations. The examiner shall also convey to the DOJ and SEC other information requested by those agencies.

7.      The Examiner shall appear at the omnibus hearing scheduled for February 18, 2003 at 9:30 a.m. to provide the Court with the Examiner's estimate of the amount of time required to perform the investigation. In forming such estimate, the Examiner shall review at a minimum the Requests, the transcripts of the January 16, 2003 hearing and the exhibits admitted into evidence at the January 16, 2003 hearing. Nothing herein shall be construed to limit the Examiner's access to other documents filed of record in these cases.

Dated: Wilmington, Delaware
       February _16_, 2003


_____
Honorable Peter J. Walsh
Chief United States Bankruptcy Judge

3

# EXHIBIT 2

October 30, 2002

FILED

2002 NOV -5 AH 9:16

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

Peter J. Walsh, Chief Judge
824 Market Street
6<sup>th</sup> Floor
Wilmington, Delaware 19801

Re: Polaroid Case #01-10864

To the Honorable Peter J. Walsh,

I am writing to update you of information I have from Polaroid's last Form 10-Q filing, bankruptcy filing, and failure to conduct an annual meeting in 2002. I have also attached a cash flow projection for the period of July 1, 2001 through December 31, 2001 based upon data taken from their last Form 10-Q filing with the Securities and Exchange Commission (SEC) for the period ending July 1, 2001.

During July 2001, Polaroid filed their last form 10-Q reflecting a net loss of $200 million for the first two quarters of 2001. On this filing they also informed the SEC of their intent to default on bond interest payments due in July and August 2001. By defaulting on these long-term debts to mature in 2006 and 2007, these obligations became due and payable during August and September 2001. By changing this long-term debt of approximately $500 million to short term, Polaroid could now file for bankruptcy for protection from its creditors. During October 2001, Polaroid filed for bankruptcy listing their short-term debts of approximately $948 million and assets of $1.81 billion and immediately began plans to auction off the company instead of presenting a proper organization plan to the bankruptcy court.

In analyzing Polaroid's last Form 10-Q filing with the SEC I have found during the first two quarters of 2001 the CFO recorded some one-time write offs amounting to $133 million, failed to report $40 million gain on the sale of real estate, and attributed the remaining loss of $27 million to an increase in the cost of goods produced to sales ratio. This ratio increased from 53 percent to 70 percent during the first two quarters of 2001 resulting in approximately $80 million in production costs overruns. If management had controlled production costs and creative write offs, they could have shown a profit. All but $27 million of the $200 million loss reported was one-time write offs or paper loss only. The $27 million can be attributed to extremely poor management, or fraudulent planning for bankruptcy.

Polaroid's CFO failed to submit the required Form 10-Q's to the SEC for the 3<sup>rd</sup> and 4<sup>th</sup> quarters of 2001. However, based upon their operation for the first two quarters of 2001, I, as a professional accountant and comptroller, would guess the company made a profit for the last two quarters of 2001. The CFO also failed to submit an annual report for 2001, and did not file Form 10-Q's for the first and second quarters of 2002. I believe Polaroid did not file any reports with the SEC after July 1, 2001, to conceal from potential bidders the true value of their operations. This belief is reinforced by Polaroid's

failure to report the fair market value of their assets in their bankruptcy filing, but instead only reported the deflated book values. As you are aware, the company was auctioned off during July 2002 for $255 million and the new owners acquired approximately $230 million in cash and cash equivalents along with all other assets with a fair market value of over $2 billion. The bottom line is the new secret owners received an ongoing profitable company for approximately $25 million with a net worth of over $2 billion.

As a comptroller for seventeen years, I had to prepare numerous Cash Flow Statements to ensure meeting cash demands for certain periods of time. Attached (Exhibit 1) is my projected cash flow for Polaroid for the period of July 1, 2001 through December 31, 2001 utilizing the worst case scenario of consistent poor management. As you can see, Polaroid would have had a positive cash flow and no need to default on the bond interest payments or declare bankruptcy even if the company did not reflect a profit for the period.

Polaroid conducted their last annual meeting on May 8, 2001. At this meeting ten (10) directors were elected to serve on the board of directors until the next annual meeting which should have been held during May 2002. However, Polaroid failed to conduct this meeting, which was in violation of their by-laws. I believe the 2002 meeting was not held because Polaroid's management was afraid of their stockholders and feared they would elect ten (10) new directors to replace the board of directors which had failed to safeguard the assets of the company. Also, I understand the directors who did not stand for election at a 2002 annual meeting are known to have taken preference payments just prior to the bankruptcy from a deferred compensation plan.

Based upon the above, I believe Polaroid's pattern of poor management, write-offs, and failure to report income on the sale of real estate was accomplished to reflect a $200 million loss for the first two quarters of 2001. By reflecting this large loss and not filing Form 10-Q's after July 1, 2001, Polaroid concealed the true value of their company from prospective bidders and limited the bidding at the auction.

In conclusion, I believe Polaroid's management committed fraud in their bankruptcy filing and subsequent actions. I request your assistance in appointing an equity committee or independent examiner to investigate all of Polaroid's accounting practices and reporting procedures. Based upon Polaroid's July 1, 2001 reporting to the SEC and my cash flow projection, an audit will show Polaroid had no need to default on bond interest payments or declare bankruptcy.

Respectfully yours,

Leonard Lockwood, Retired
28220 183rd Street
Leavenworth, Kansas 66048-7703

Enclosures: 4 Each

Exhibit 1
(Statement in millions)

Cash Flow Statement of Period July 1, 2001 through December 31, 2001

Balances as of July 1, 2001:

| | | |
|---|---|---|
| | Cash | $ 94 |
| | Accounts Receivable | 291 |

Projected Cash Increases through December 31, 2001:

| | | |
|---|---|---|
| | Sales to A/R to Cash* | 400 |
| | Interest Income | 50 |

Total Projected Cash Available — $835

Projected Expenditures for period July 1, 2001 through December 31, 2001**

| | | |
|---|---|---|
| | Cost of Goods Sold*** | $458 |
| | Marketing, research, etc.**** | 238 |
| | Interest Expense | 50 |

Total Projected Expenditures — $746

Projected Balances on December 31, 2001:

| | | |
|---|---|---|
| | Cash | $ 89 |
| | Accounts Receivable | 264 |

*Based upon $667 million sales and Accounts Receivable ending balance to Sales Ratio of 40 percent.

**Based upon prior six months.

***Includes the increase of Cost of Goods Produced to Sales Ratio amounting to approximately $80 million.

****Based upon prior six months less the one time write-offs of $133 million.



# THE RAPE OF POLAROID

*By CHRISTOPHER BYRON*



*July 22, 2002* -- GET ready for yet another 10-digit accounting scandal from the world of big business: The astonishing disappearance - behind the drawn curtains of a federal bankruptcy court in Delaware - of more than $1 billion of corporate assets from the books of Polaroid Corp., and the reappearance of most of it, free of charge, in the pockets of a Wall Street buyout fund.

*Corporate embalming's A-team will send Polaroid to its eternal reward.*

How this has happened stands as a cautionary reminder that bankruptcy courts are one of the riskiest places of all for investors. Yet as the economy weakens and more and more big companies keel over, that's where more and more shareholders are likely to wind up.

For what awaits them, check out the plight of bankrupted Polaroid Corp.'s shareholders, who are about to be shorn of $1.1 billion in balance sheet assets and $175 million of shareholder equity.

THE ploy? An accounting maneuver that is shifting the assets, seemingly free of charge, from Polaroid's books to the books of a Wall Street partnership that is set to take Polaroid private in a buyout for less than $24 million of actual cash money.

Some of the biggest names in high finance are involved in this stunt, from the fancy-pants law firm of Skadden, Arps, Slate, Meagher & Flom to the infamous Arthur Andersen crowd.

There are lawyers from Davis Polk & Wardwell in the game, along with attorneys from Aiken Gump, as well as advisers from Zolfo Cooper, Houlihan Lokey and Dresdner Kleinwort Wasserstein.

This is corporate embalming's A-team, and for months its members have been trudging up and down the courthouse steps of Wilmington, Del.'s federal bankruptcy court in preparation for the solemn and final act that will send Polaroid to its eternal reward.

That act will take place on July 29 in New York - most likely in the offices of one of the law firms involved - when the parties will sign on the dotted line to close the sale.

By doing so, they will convey 65 percent of Polaroid's reorganized common equity, including 65 percent of the value of those $1.1 billion worth of mysteriously missing assets, to the aforementioned Wall Street buyout fund.

According to a Polaroid spokesman, the purchase price for the shares will be $255 million. But court papers in the matter indicate that less than $24 million in net new cash will be all that the buyout fund actually hands over.

At that point, Polaroid will become a private entity and no longer required to issue public financial statements. So the company's ravaged public investors will never get to see those $1.1 billion of

balance sheet assets - including a priceless corporate art collection and the stock of all Polaroid's foreign subsidiaries - magically reappear.

In reality, the assets hadn't disappeared at all. They'd simply been valued at zero for the purposes of the bankruptcy proceedings, even though the company had valued them at more than $1 billion in a public financial filing only eight weeks before going bankrupt.

In this way, balance sheet assets that Polaroid had listed in an official financial statement with the Securities and Exchange Commission in August of 2001 as totaling $1.8 billion shrank by October to less than $715 million when the company entered bankruptcy.

In the process, shareholder equity - which totaled $176 million in the SEC filing - was wiped out entirely and replaced with a negative net worth of $385 million.

The chief beneficiary of these lowball numbers has of course been the aforementioned buyout fund, which bears the name One Equity Partners and is financed by Bank One Corp. of Chicago.

ONE Equity Partners, which was brought into the deal by the Dresdner Kleinwort Wasserstein bunch, turned out to be the only known bidder in a court-ordered auction of the company last month. As a result, its offer won, in effect, by default. "It's ridiculous," said one incredulous Wall Street analyst, speaking of the price. "Bank One is making out like bandits."

In fact, the fund could easily wind up getting the whole company for free.

For starters, Polaroid's most recent bankruptcy court filings show that as of June the company had more than $108 million of cash on its books as well as nearly $50 million of marketable receivables. On top of that, a creditor's committee report to the court late last month suggests that more cash has piled up from Polaroid's foreign operations and that the actual cash outlay of net new money by One Equity Partners will be $23.8 million.

And don't forget that once the fund is in control of the company, it will be able to recover even that money by borrowing against all those assets on Polaroid's books that had been valued at zero in the bankruptcy proceeding.

Not surprisingly, when I asked a Polaroid official to name the individual investors in One Equity Partners, he declined, saying, "It's private. We're not divulging that." When I next asked whether the fund's investors included members of Polaroid's management, he waffled and said only, "Not that I know of."

With closing day for the sale fast approaching and with so much money at stake, a cloak of secrecy and double-talk has enveloped the proceedings.

THUS, when I asked the Polaroid spokesman why the company's balance sheet assets had shrunk so dramatically between August and October, he answered only that it was because Polaroid's foreign operations were not part of the bankruptcy petition.

In reality, of course, the foreign assets *were* included - as they legally had to be - but were simply given no value on the submitted schedules.

When I asked why the assets had been assigned no values in the schedules, even though they'd previously been valued at more than $1 billion by the company in its SEC filings, I was told to read the company's press releases to get myself "up to speed." The press releases turned out to offer no explanation, either.

A similar request for enlightenment via Polaroid's outside public relations firm in New York brought a promise to produce a legal expert to answer questions. But no expert was produced. When I phoned back a day later for an explanation, the spokesman said, "No one is interested in talking."

Later, the man provided a transcript of some hearing testimony on the discrepancy as if it would clear everything up. It didn't.

AT the end of the hearing, the judge in the case, Peter Walsh, ruled that Polaroid's stated reasons for not having listed values for the foreign operations were reasonable because the foreign operations really only had a value as "going concerns" within Polaroid's overall global operations.

But that is simply to say that the assets of the foreign subsidiaries are entirely goodwill, which is hardly the case. Polaroid's latest annual report prior to bankruptcy lists company-owned facilities totaling more than 1 million square feet of manufacturing space in Scotland, Mexico, China and the Netherlands alone. As business failures skyrocket in the weakening economy, you can look for more of this sort of thing to come out of bankruptcy courts - especially when the money that is up for grabs is so huge.

At week's end, WorldCom was set to join Enron, Global Crossing, Adelphia and Williams Communications as the latest multi-billion-dollar behemoth to enter Chapter 11 bankruptcy. And there will doubtless be many more.

As for Polaroid, expect to see stock in the company offered by One Equity Partners to investors all over again, via an initial public offering, as Wall Street's endless cycle, from IPO to Chapter 11 and back again, repeats itself once more. It's the way Wall Street *really* works, and it's why, from cradle to grave, the tricks of accounting lurk at every turn.

Home

NEW YORK POST is a registered trademark of NYP Holdings, Inc.
NYPOST.COM, NYPOSTONLINE.COM, and NEWYORKPOST.COM
are trademarks of NYP Holdings, Inc.
Copyright 2001 NYP Holdings, Inc. All rights reserved.

October 17, 2002


Kiplinger's Personal Finance
1729 H Street, N.W.
Washington, D. C. 20006

Re: Polaroid's Article published August 2001, Page 37

Dear Editor,

In your above-mentioned article you advised stockholders to hold their stock in Polaroid. This would have been sound advice if Polaroid's intentions had been honorable; however, by the time your article was published, Polaroid's CEO, CFO, and board of directors had already made the decision and taken action to ensure that Polaroid would go bankrupt and become a private company with secret investors/owners. The decision to go bankrupt was made prior to July 1, 2001.

During July 2001, Polaroid filed their last Form 10-Q with the Securities and Exchange Commission (SEC) reflecting a net loss of $200 million for the first two quarters of 2001. They also informed the SEC of their intent to default on bond interest payments due in July and August 2001. By defaulting on this long-term debt to mature in 2006 and 2007, these long-term obligations became due and payable during August and September 2001. By changing this long term debt of approximately $500 million to short term, Polaroid could now qualify for bankruptcy by listing their short-term debts of approximately $ 948 million and assets of $1.81 billion. During October 2001, Polaroid filed bankruptcy and began plans to auction off the company instead of presenting a proper reorganization plan to the bankruptcy court in Delaware.

By publishing your article in your August 2001 issue, you became a pawn in Polaroid's plan to become a privately-owned company. Polaroid used your magazine and the Federal Bankruptcy System to assist them in ridding their company of disabled employees, retirees, and common stockholders.

Several months ago I requested by email that your magazine do a follow-up article on Polaroid's bankruptcy. If you had investigated the financial reports submitted to the SEC for the first two quarters of 2001, you would have found that $133 million of the reported $200 million net loss was attributable to one-time write offs by the CFO, and another $40 million was attributable to the CFO's failure to report the gain on the sale of real estate. The remaining $27 million loss on operations can be attributed to management's failure

by allowing their cost of goods produced to sales ratio to increase from 53 percent to 70 percent during the first two quarters of 2001. This increase in the cost of goods sold amounted to $80 million for the first two quarters of 2001. If management had controlled their costs, they would have shown a profit.

Polaroid's CFO failed to submit the required Form 10-Q's for the 3rd and 4th quarters of 2001. However, based upon their operations for the first two quarters of 2001, I, as a professional accountant and comptroller, would guess the company made a profit for the last two quarters of 2001. The CFO also failed to submit an annual report for 2001, and did not file Form 10-Q's for the first and second quarters of 2002. I believe Polaroid did not file any reports with the SEC after July 1, 2001, to conceal from potential bidders the true value of their operations. This belief is reinforced by Polaroid's failure to report the fair market value of their assets in their bankruptcy filing, but instead only reported the deflated book values. The company was auctioned off during July 2002 for $255 million and the new owners acquired approximately $230 million in cash and cash equivalents along with all other assets with a fair market value of over $2 billion. The bottom line is the new secret owners received an ongoing profitable company for approximately $25 million with a net worth of over $2 billion.

Based upon the above, I believe Polaroid's pattern of poor management, write offs, and failure to report income on the sale of real estate was accomplished to reflect a $200 million loss for the first two quarters of 2001. By reflecting this large loss and not filing Form 10-Q's after July 1, 2001, Polaroid concealed the true value of their company from prospective bidders and limited the bidding at the auction.

It should also be noted that Polaroid never submitted a proper reorganization plan as required by the bankruptcy court, but planned from the start to become a privately-owned company free of all debt, pension plan, disabled employees, and common stockholders.

In conclusion, I believe Polaroid committed fraud in their bankruptcy filing and subsequent actions. At this time I request your assistance in having the SEC and/or Justice Department investigate all of Polaroid's accounting practices and reporting procedures. Based upon your article and advice, numerous investors are losing their life savings.

Respectfully yours,

*Leonard Lockwood*

Leonard Lockwood, Subscriber
28220 183rd Street
Leavenworth, Kansas 66048-7703

From: Office of the President
Sent: Thursday, August 15, 2002 2:35 PM
To: DL-Non-US Sites; DL-US Sites
Subject: Organizational Announcements
Importance: High

MEMORANDUM

To: All Polaroid Employees

From: The Office of the President - Bill Flaherty and Neal Goldman

Date: August 15, 2002

Subject: Organizational announcements

Following the closing of our transaction with One Equity Partners, we announced a new corporate strategy focused on: (1) rejuvenating the core instant imaging business; (2) accelerating commercialization of our Instant Digital Printing technology; and (3) leveraging the Polaroid brand and our distribution network.

In order to execute this strategy and drive our business forward, we are announcing the following organizational changes, effective immediately.

-Arthur Braunstein is promoted to Vice President and General Manager - Instant Digital Printing, reporting to Neal Goldman. Sandy Lawrence will be leaving Polaroid. We thank Sandy for her numerous contributions to the Company.

-Bernice Cramer is assuming responsibility for Corporate Marketing and succeeds Arthur as Divisional Vice President - Marketing, reporting to Bill Flaherty.

-Terry Carlson is promoted to Vice President - North America, reporting to Bill Flaherty.

-Connie McGilvray is promoted to Vice President - Manufacturing Operations and Logistics, reporting to Bill Flaherty.

-We have elevated our brand and technology licensing programs to operate as a separate business unit. Janet Cramer is assuming responsibility for those programs as Divisional Vice President - Technology and Brand Licensing, reporting to Neal Goldman.

-Julie Petrini is promoted to Vice President - General Counsel and Secretary, reporting to Neal Goldman.

We believe these appointments strengthen our ability to move Polaroid forward and to execute our new corporate strategy. We are very excited about this team's ability to lead the new Polaroid. Please join us in congratulating and wishing the team members success in their new roles.

sells at just 12 times the consensus earnings estimate for 2001.

AFTER PRODUCING record earnings in 1999, 102-year-old Federal-Mogul lost money last year and is expected to generate red ink in 2001 as well. The stock has crashed, dropping from $72 in 1998 to $3 recently.

Federal-Mogul, which makes everything from brake pads to pistons to camshafts, is suffering from soft demand from both its auto and heavy-duty-truck customers. The company also faces huge asbestos claims, which in 2000 cost it $351 million, or more than the company's total market value today. Meanwhile, the arrival of new management in January adds to the uncertainty.

Still, the shares, which trade at a mere 4% of sales, could easily be worth far more someday. Standard & Poor's likens the stock to a call option "offering significant upside potential but with the risk of becoming worthless." On the positive side, banks continue to lend the company money. A reviving economy is bound to help, too. And, just as with Campbell, it's fair to give new CEO Frank Macher, a 30-year Ford veteran, a chance to turn the company around.

FOR MOST OF the 1990s, shares of Hasbro essentially marched in lock step with Standard & Poor's 500-stock index.

## Clorox slashed its ad budget for years—a mistake, it admits, that cost it market share.

They ran up in early 1999 with the revival of Star Wars, and then, just as suddenly, blew up like the Galactic Empire's Death Star. CEO Alan Hassenfeld (his grandfather co-founded the company) has asked shareholders and analysts to forgive a disastrous, money-losing 2000 because "there were no major product drivers."

Until Hasbro comes up with a new monster hit, it can subsist on sales of such standards as Scrabble and Tonka trucks. Hasbro is a long way from duplicating its record profit of $1.45 per share in 1999, but analysts expect to see an improvement this year, to 33 cents per share, and a jump to 69 cents in 2002. The stock, recently at $15, sports a modest price-to-sales ratio of 0.73.

John Miller, assistant manager of Ariel fund, says he thinks Hasbro will become less volatile and more of a steady grower in the years ahead as the company emphasizes its core products. Along the way, "once in a while, it may get lucky," he adds. There's just no telling when.

IN A WORLD of digital photography, throwaway cameras and one-hour film processing, instant photography loses some of its allure. That explains why sales by Polaroid, the originator of the 60-second snapshot, have been trending down since 1994. Its stock, which hit $60 in 1997, now trades for less than $5.

Polaroid is hardly ignoring the digital age. Its low-priced digital cameras have made a splash at supermarkets and mass-merchandise retail outlets. It also plans later this year to ship a new line of digital printers that will allow users to "develop" high-quality prints in minutes from images on their cameras. Polaroid, which will be able to license the technology to other companies, says the new ventures could add $1 billion a year in new sales by 2005.

Meanwhile, the company is frantically trying to bolster its finances. It recently suspended its dividend and trimmed its workforce. It is selling some of its Boston-area properties, whose real values aren't reflected in the company's financial statements. The question is whether Polaroid can hang in until sales of its new products kick into high gear. No one can answer that with any certainty, which is why the stock is speculative. But it is dirt-cheap, trading at just 12% of revenues, which suggests that most of the damage has already been done.

## Sayonara

CLOROX, WHICH owns a hodgepodge of slow- and no-growth lines, such as cleansers, plastic bags and, of course, bleach, hasn't been able to avoid the brand-name blues. Sales have been stagnant since 1999, and Clorox's stock, at $35, is off 50% from its early-1999 high.

The company depends on loyalty to its brand names. But Clorox slashed advertising for years. That, it now admits, was a mistake because it lost market share.

CEO Craig Sullivan has called for an 18-month program to reexamine the company's strategy. Management





# EXHIBIT 3

November 17, 2002

RECEIVED

NOV 2 6 2002

JUDGE WALSH

United States Bankruptcy Court
District of Delaware
824 Market Street
Wilmington, DE 19801

Re: Polaroid Corporation
    Case No. 01-10864

To the Honorable Judge Peter J. Walsh,

I apologize to the court for not being able to attend the hearing in person and have asked Stephen J. Morgan to be my spokesman and speak for me. I am retired with a fixed income and a very tight budget. A flight ticket with such short notice was too costly for me to attend.

I received a Bachelor of Science in Business Degree from Kansas State College of Pittsburg in 1968 with a major in accounting. I was a professional accountant for 11 years and a Comptroller/Business Manager for an Industrial Operation employing over 1,000 workers in seven different factories or locations. I became very adept at reviewing financial statements and being able to find accounting procedural errors or mistakes in reporting. Using these skills, I discovered inappropriate accounting and reporting in Polaroid's last Form 10-Q filing with the SEC. Following are nine (9) of the most obvious cases listed by page and paragraph or line number in their last Form 10-Q filing with the SEC on August 9, 2001, and transcripts from the Omnibus Hearing of June 12, 2002 and the Sale Hearing conducted on June 28, 2002. I have attached a copy of the Form 10-Q filing with the SEC (See Attachment 1) for your convenience.

Page 9 of 34, Paragraph 5. Income taxes (Continued)
The valuation allowance on July 1, 2001 includes a write off of $53 million which was recorded in the second quarter of 2001 because the Company determined it was "more likely than not" that some portion of the deferred tax assets would not be realized over a reasonable period of time. I believe this adjustment would have been more appropriately made during the fourth quarter of 2001 because additional valuation allowances may have been required before the close of the fiscal year. Posting at this time increases the reported loss by $53 million and since no additional filings were made with the SEC, prospective bidders would not know if the amount reported was correct or not.

Page 12 of 34, Paragraph 9. Restructuring and other charges (Continued)
In the first quarter of 2001, the Company recorded restructuring and other charges of $80 million which consisted of estimated severance costs for involuntary separations, impairment charges related to certain long-lived assets, and an intangible asset.

Approximately $50 million of the $80 million charges recorded related to an involuntary severance program under which 950 employees were expected to be separated from the Company. However, as of June 30, 2001 approximately 600 had left the Company or 63% of the projection. Based upon the 63%, approximately $18 to $20 million should not have been included in the loss reported on July 1, 2001. The entire $80 million should have been placed in a deferred asset account and amortized/reduced as actual costs were incurred. The remaining $60 million was reported correctly, if the assets involved were physically disposed prior to June 30, 2001.

## Page 13 of 34, Paragraph 10. Sale of Real Estate

In the second quarter of 2001 the Company sold real estate for $69 million with a net book value of $11 million. Selling expenses connected to the sale totaled $18 million leaving a reportable gain of $40 million.

As part of the sales agreement, the Company entered into a lease agreement for up to seven years. The Company deferred $22 million of the reportable gain which it will realize or receive ratably over the life of the lease. This deferred $22 million should have been recorded as accrued revenue at the time of the lease agreement and a deferred asset account established and reduced as the $22 million was received ratably over the life of the lease. As a result of the inappropriate reporting, profit was understated $22 million during the second quarter of 2001.

## Page 17 of 34, Paragraph. Profit/(Loss) from Operations

In the second quarter of 2001, the Company's gross profit margin decreased to 28% of net sales compared with 46% in the second quarter of 2000. This 18% increase in the cost of goods sold was attributed to the impact of higher manufacturing costs caused by reduction in the Company's production schedules, liquidation of certain slow-movers or discontinued models and product lines. Prospective bidders would need to see additional Form 10-Q filings with the SEC to monitor the gross profit margin in order to determine what value to place on the Company's manufacturing operations.

## Page 34 of 34, By / s / William L. Flaherty

William L. Flaherty joined Polaroid in June 2001 as Executive Vice President and Chief Financial Officer to help lead the Company's restructuring program. Mr. Flaherty came to the Company with excellent credentials having an MBA from The Tuck School of Business, having served as CFO and Treasurer for such companies as Gibson Greetings, FMR Corporation, and the James River Corporation. He also held several financial management positions at DuPont. In February 2002, Mr. Flaherty gave a lecture at his alma mater entitled "Bankruptcy: Who's In Charge? Navigating Polaroid through Chapter 11". With his background and knowledge, Bill Flaherty appeared to be the man to get Polaroid back into being the company it once was.

Having such good credentials and knowledge in bankruptcy laws and regulations, I am unable to understand why Mr. Flaherty failed to file required Form 10-Q's with the SEC after the second quarter of 2001. He surly must have realized how important up-to-date financial information was needed by the public if the company was to be auctioned to the highest bidder. By his failure to make required filings with the SEC, and not listing fair market values on the original or amended bankruptcy filings, he limited the number of

bidders, and with the up-to-date financial information not being reported they could not submit quality bids or a bid at all. With Mr. Flaherty's experience and knowledge, one would have to believe he intentionally did not make any of the required filings or list fair market values when filing for bankruptcy.

## Page 41, Line 12 thru 16 (June 12, 2002 Transcript)

Mr. Flaherty states he would not utilize any professional appraisals in valuing assets when he prepared schedules and statements for the bankruptcy filing with the court. He also states "They're subjective and there is a wide range with regards to those appraisals and it's - - for those particular assets, it is something that each individual party that is looking to value those particular assets, they need to assess their assumptions and criteria." Later in his testimony (page 62, line 17 thru 21) Mr. Flaherty states if he/they believed the actual value of an asset would be higher than the nominal value (book value) he/they listed the asset with an undetermined value.

Mr. Flaherty is not being consistent; first he/they refused to utilize professional appraisals for an asset due to subjectivity and then utilized his/their own amateur appraisals to list assets with undetermined values. By this inconsistency, Mr. Flaherty is able to conceal the value of numerous assets from the court. If Mr. Flaherty did indeed have the best interests of obtaining the highest bid for the Company, he would have been consistent by listing at least the current nominal or book values for all of the assets reported.

## Page 74, Line 14 (June 12, 2002 Transcript)

Mr. Flaherty states he did not recall the exact value of cash deferred on the sale of the Winter Street Campus during May 2001. This hearing was conducted on June 12, 2002, but on August 9, 2001 in his reporting to the SEC, Mr. Flaherty explained in detail (See above paragraph titled: Page 13 of 34, Paragraph 10. Sale of Real Estate). By not remembering, Mr. Flaherty is concealing from the court the failure to report $22 million in accrued revenue for the second quarter of 2001.

## Page 98, Line 1 thru 5, Treasury Stock. (June 12, 2002 Transcript)

Mr. Gossells asks Mr. Flaherty about selling some of the Company's treasury stock to obtain additional equity. Question: "didn't you have treasury stock at this time?" Answer: "I don't recall."

In Mr. Flaherty's last filing with the SEC on August 9, 2001, Mr. Flaherty listed Treasury Stock with a book value (purchase cost) of approximately $1.1 billion which reduced the stockholders' equity to $175.6 million. The balance of treasury stock ($1.1 billion) represents such a significant role in the Balance Sheet reporting that Mr. Flaherty's answer of "I don't recall" could not have been very truthful. Mr. Flaherty is concealing from the court the ability of management to obtain additional equity during 2000 and 2001 by selling all or part of the 29,895,575 shares of treasury stock the Company owned. This treasury stock represented approximately 42% of the total shares issued by the Company.

From 11/10/2000 thru 11/09/2001 management watched their treasury stock market value decline from $258 million to approximately $8 million. During the first two quarters of 2001 (See Attachment 2) approximately 70.5 million shares were traded on the Stock Market. Polaroid's stock was still very active on the market, which could have given management an opportunity to sell their treasury stock to increase cash and stockholders' equity.

Page 95, Line 1 thru 6 (June 28, 2002 Transcript)

Mr. Flaherty mentioned "certain contingent assets which may generate some cash subsequently to the closing." He further states "we believe the amount of cash which they might generate is very, very de minimis." Mr. Flaherty is alluding to cash or cash equivalents which will be derived sometime in the future for the highest bidder. These would include Deferred Tax Assets of $280 million and Prepaid Expenses of approximately $100 million he listed on his last filing with the SEC on August 9, 2001. I regret I can not provide the court with more current amounts for these accounts, but Mr. Flaherty failed to file Polaroid's financial information with the SEC after the period ended July 1, 2001. Mr. Flaherty is concealing from the court the potential cash or cash equivalent value of its intangible assets.

In conclusion, based upon Polaroid's pattern of inappropriate accounting practices, reporting procedures and practices, and failure to make required financial information available to the public, I again request the court's assistance in appointing an equity committee or independent examiner to investigate all of Polaroid's accounting practices and reporting procedures.

Respectfully Yours,

Leonard Lockwood, Retired
28220 183rd Street
Leavenworth, Kansas 66048-7703

Attachments: 2 Each

Treasury Stock
29,895,578 shares

PRD

Prices from 11/17/00 through 11/09/01

| Date | Volume | Ask/High | Bid/Low | Close | Shares traded | Treasury Stock Market Value |
|------|--------|----------|---------|-------|---------------|------------------------------|
| 11/10/00 | 1,451,400 | 9.81 | 8.50 | 8.62 | | |
| 11/17/00 | 1,576,400 | 9.12 | 8.31 | 8.50 | | |
| 11/24/00 | 1,002,100 | 8.62 | 7.87 | 8.12 | | on 11/10/00 |
| 12/01/00 | 1,829,700 | 8.75 | 7.31 | 7.62 | | |
| 12/08/00 | 4,830,700 | 7.62 | 6.18 | 7.18 | 24,054,100 | $ 259,499,882.40 |
| 12/15/00 | 7,476,100 | 9.37 | 6.37 | 6.56 | | |
| 12/22/00 | 3,472,600 | 7.43 | 5.43 | 5.87 | | |
| 12/29/00 | 2,715,100 | 6.25 | 5.12 | 5.81 | | |
| 01/05/01 | 3,604,800 | 6.31 | 5.56 | 5.81 | | |
| 01/12/01 | 3,847,500 | 6.37 | 5.50 | 6.12 | | |
| 01/19/01 | 6,934,700 | 8.75 | 6.18 | 7.56 | | on 12/29/00 |
| 01/26/01 | 3,075,200 | 8.00 | 6.50 | 6.81 | | |
| 02/02/01 | 1,675,100 | 7.10 | 6.62 | 6.72 | | $ 173,493,308.20 |
| 02/09/01 | 1,464,400 | 7.05 | 6.43 | 6.50 | | |
| 02/16/01 | 1,852,500 | 6.84 | 6.07 | 6.13 | 31,665,400 | |
| 02/23/01 | 1,649,200 | 6.30 | 5.05 | 5.32 | | |
| 03/02/01 | 2,712,100 | 5.45 | 4.60 | 5.05 | | |
| 03/09/01 | 1,112,800 | 5.64 | 4.90 | 5.46 | | |
| 03/16/01 | 1,504,200 | 5.45 | 4.70 | 4.75 | | |
| 03/23/01 | 1,178,700 | 5.03 | 4.40 | 4.70 | | |
| 03/30/01 | 1,054,200 | 4.80 | 4.25 | 4.26 | | on 3/31/01 |
| 04/06/01 | 2,600,600 | 4.34 | 3.14 | 3.25 | | |
| 04/12/01 | 2,479,300 | 3.90 | 3.00 | 3.72 | | $ 127,355,162.30 |
| 04/20/01 | 3,206,100 | 4.12 | 3.31 | 3.64 | | |
| 04/27/01 | 1,651,500 | 3.75 | 3.22 | 3.54 | | |
| 05/04/01 | 1,920,900 | 4.38 | 3.45 | 4.35 | | |
| 05/11/01 | 3,528,300 | 5.85 | 4.45 | 4.60 | 38,905,500 | |
| 05/18/01 | 1,737,400 | 4.99 | 4.33 | 4.80 | | |
| 05/25/01 | 2,872,300 | 6.10 | 4.80 | 5.77 | | |
| 06/01/01 | 2,846,800 | 5.99 | 4.51 | 4.60 | | |
| 06/08/01 | 2,519,100 | 4.60 | 3.99 | 4.02 | | |
| 06/15/01 | 6,817,600 | 4.03 | 3.14 | 3.43 | | |
| 06/22/01 | 4,199,500 | 3.41 | 2.50 | 2.86 | | |
| 06/29/01 | 2,526,100 | 2.94 | 2.45 | 2.60 | | on 6/30/01 |
| 07/06/01 | 2,229,700 | 3.03 | 2.55 | 2.97 | | |
| 07/13/01 | 10,952,600 | 3.15 | 1.41 | 1.46 | | $ 77,728,502.80 |
| 07/20/01 | 7,587,700 | 1.47 | 0.91 | 1.20 | | |
| 07/27/01 | 2,074,700 | 1.30 | 1.11 | 1.17 | | |
| 08/03/01 | 4,761,300 | 1.60 | 1.15 | 1.59 | | |
| 08/10/01 | 7,360,900 | 2.24 | 1.20 | 1.46 | | |
| 08/17/01 | 1,856,900 | 1.63 | 1.35 | 1.41 | | |
| 08/24/01 | 1,688,100 | 1.55 | 1.32 | 1.42 | | |
| 08/31/01 | 1,958,700 | 1.51 | 1.36 | 1.37 | 84,798,800 | |
| 09/07/01 | 1,772,600 | 2.71 | 1.10 | 1.14 | | |
| 09/10/01 | 1,550,400 | 1.38 | 1.03 | 1.02 | | |
| 09/28/01 | 2,485,100 | 1.09 | 0.52 | 0.52 | | |
| 10/05/01 | 3,486,500 | 0.60 | 0.42 | 0.48 | | |
| 10/12/01 | 6,826,200 | 0.45 | 0.27 | 0.28 | | |
| 10/19/01 | 7,946,500 | 0.40 | 0.27 | 0.28 | | on 11/09/01 |
| 10/26/01 | 7,946,500 | 0.40 | 0.27 | 0.28 | | |
| 11/02/01 | 7,946,500 | 0.40 | 0.27 | 0.28 | | $ 8,370,761.84 |
| 11/09/01 | 4,767,900 | 0.40 | 0.27 | 0.28 | | |

Total 179,423,800 shares traded from 11/10/00 thru 11/09/01

Friday, November 15, 2002

America Online: LLOCK715

Page 1

| Date | | | | |
|---|---|---|---|---|
| 11/10/00 | 1,451,400 | 9.81 | 8.50 | 8.62 |
| 11/17/00 | 1,576,400 | 9.12 | 8.31 | 8.50 |
| 11/24/00 | 1,002,100 | 8.62 | 7.87 | 8.12 |
| 12/01/00 | 1,829,700 | 8.75 | 7.31 | 7.62 |
| 12/08/00 | 4,630,700 | 7.62 | 6.18 | 7.18 |
| 12/15/00 | 7,476,100 | 8.37 | 6.37 | 6.56 |
| 12/22/00 | 3,472,600 | 7.43 | 5.43 | 5.87 |
| 12/29/00 | 2,715,100 | 6.25 | 5.12 | 5.81 |
| 01/05/01 | 3,604,800 | 6.31 | 5.56 | 5.81 |
| 01/12/01 | 3,847,500 | 6.37 | 5.50 | 6.12 |
| 01/19/01 | 6,934,700 | 8.75 | 6.18 | 7.56 |
| 01/26/01 | 3,075,200 | 8.00 | 6.50 | 6.81 |
| 02/02/01 | 1,675,100 | 7.10 | 6.62 | 6.72 |
| 02/09/01 | 1,464,400 | 7.05 | 6.43 | 6.50 |
| 02/16/01 | 1,852,500 | 6.84 | 6.07 | 6.13 |
| 02/23/01 | 1,649,200 | 6.38 | 5.05 | 5.32 |
| 03/02/01 | 2,712,100 | 5.45 | 4.60 | 5.05 |
| 03/09/01 | 1,112,800 | 5.64 | 4.90 | 5.46 |
| 03/16/01 | 1,504,200 | 5.43 | 4.70 | 4.75 |
| 03/23/01 | 1,178,700 | 5.03 | 4.40 | 4.70 |
| 03/30/01 | 1,054,200 | 4.80 | 4.25 | 4.26 |
| 04/06/01 | 2,600,600 | 4.34 | 3.14 | 3.25 |
| 04/12/01 | 2,479,300 | 3.90 | 3.00 | 3.72 |
| 04/20/01 | 3,206,100 | 4.12 | 3.31 | 3.64 |
| 04/27/01 | 1,651,500 | 3.75 | 3.22 | 3.54 |
| 05/04/01 | 1,920,900 | 4.38 | 3.45 | 4.35 |
| 05/11/01 | 3,528,300 | 5.85 | 4.45 | 4.60 |
| 05/18/01 | 1,737,400 | 4.99 | 4.33 | 4.80 |
| 05/25/01 | 2,872,300 | 6.10 | 4.80 | 5.77 |
| 06/01/01 | 2,846,800 | 5.99 | 4.51 | 4.60 |
| 06/08/01 | 2,519,100 | 4.60 | 3.99 | 4.02 |
| 06/15/01 | 6,817,600 | 4.03 | 3.14 | 3.43 |
| 06/22/01 | 4,199,500 | 3.41 | 2.50 | 2.86 |
| 06/29/01 | 2,526,100 | 2.94 | 2.45 | 2.60 |
| 07/06/01 | 2,229,700 | 3.03 | 2.55 | 2.97 |
| 07/13/01 | 10,952,600 | 3.15 | 1.41 | 1.46 |
| 07/20/01 | 7,587,700 | 1.47 | 0.91 | 1.20 |
| 07/27/01 | 2,074,700 | 1.30 | 1.11 | 1.17 |
| 08/03/01 | 4,761,300 | 1.60 | 1.15 | 1.59 |
| 08/10/01 | 7,360,900 | 2.24 | 1.20 | 1.46 |
| 08/17/01 | 1,856,900 | 1.63 | 1.35 | 1.41 |
| 08/24/01 | 1,688,100 | 1.55 | 1.32 | 1.42 |
| 08/31/01 | 1,558,700 | 1.51 | 1.36 | 1.37 |
| 09/07/01 | 1,772,600 | 2.71 | 1.10 | 1.14 |
| 09/10/01 | 1,550,400 | 1.38 | 1.01 | 1.02 |
| 09/28/01 | 2,485,100 | 1.09 | 0.52 | 0.52 |
| 10/05/01 | 3,486,500 | 0.60 | 0.42 | 0.40 |
| 10/12/01 | 6,826,200 | 0.45 | 0.27 | 0.28 |
| 10/19/01 | 7,946,500 | 0.40 | 0.27 | 0.28 |
| 10/26/01 | 7,946,500 | 0.40 | 0.27 | 0.28 |
| 11/02/01 | 7,946,500 | 0.40 | 0.27 | 0.28 |
| 11/09/01 | 4,767,900 | 0.40 | 0.27 | 0.28 |

Treasury Stock Market Value
as of 11/10/00  $ 257.70 million

29,895,578
X    8.62
$257,699,882.40

Treasury Stock Market Value
as of 12/31/00  $ 173,693million

29,895,578  shares
X $5.81
$173,693,308.20

Treasury Stock Market Value
as of 3/31/01  $ 127.35million

29,895,578  Shares
X $4.26
$127,355,162.30

Treasury Stock Market Value
as of 6/30/01  $ 77.73million

29,895,578  Shares
X   $2.60

$77,736,302.80

Treasury Stock Market Value
as of 11/09/01  $8.37 million

29,895,578  shares
X $0.28
$ 8,370,761.84

Page 2 of 2

Filed 8/09/01

```
<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>a2054895z10-q.txt
<DESCRIPTION>10-Q
<TEXT>
<PAGE>
```

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

(Mark One)

[X]   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
      SECURITIES EXCHANGE ACT OF 1934

      For the quarterly period ended        JULY 1, 2001
                                      -----------------------------------.

                                    OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
      SECURITIES EXCHANGE ACT OF 1934

      For the transition period from               to
                                    ----------------    ---------------

Commission File Number 1-4085

POLAROID CORPORATION
------------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)

DELAWARE                                        04-1734655
-------------------------                ------------------------------
(State or other jurisdiction of             (I.R.S. Employer
incorporation or organization)              Identification No.)

784 MEMORIAL DRIVE, CAMBRIDGE, MASSACHUSETTS 02139
------------------------------------------------------------------------------
(Address of principal executive offices) (Zip Code)

781-386-2000
------------------------------------------------------------------------------
(Registrant's telephone number, including area code)

    Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities and Exchange Act
of 1934 during the preceding 12 months, and (2) has been subject to such filing
requirements for the past 90 days Yes [X] No [ ]

Shares of Common Stock, $1 par value,
Outstanding at August 6, 2001: 47,855,390

This document contains 45 pages.
Exhibit Index appears on page 44.

<PAGE>

PART I - FINANCIAL INFORMATION

ITEM 1.    FINANCIAL STATEMENTS

CONDENSED CONSOLIDATED STATEMENT OF EARNINGS

Periods ended July 2, 2000 and July 1, 2001

<TABLE>
<CAPTION>

| POLAROID CORPORATION AND SUBSIDIARY COMPANIES (IN MILLIONS, EXCEPT PER SHARE DATA) | SECOND QUARTER | | SIX MONT | |
|---|---|---|---|---|
| | 2000 | 2001 | 2000 | 2001 |
| <S> | | (UNAUDITED) | | |
| NET SALES | <C> | <C> | <C> | |
| | $ 485.6 | $ 333.5 | $ 887.9 | $ 664.3 |
| Cost of goods sold | 262.0 | 241.9 | 486.3 | 455.1 |
| Marketing, research, engineering and administrative expenses | 172.9 | 143.4 | 341.7 | 299.0 |
| Restructuring and other charges | -- | -- | -- | 80.0 |
| | ------- | ------- | ------- | ------- |
| TOTAL COSTS | 434.9 | 385.3 | 828.0 | 834.1 |
| PROFIT/(LOSS) FROM OPERATIONS | 50.7 | (51.8) | 59.9 | (169.8) |
| Other income | 11.6 | 25.2 | 20.2 | 26.5 |
| Interest expense | 21.3 | 24.8 | 41.2 | 47.9 |
| | ------- | ------- | ------- | ------- |
| PROFIT/(LOSS) BEFORE INCOME TAX EXPENSE | 41.0 | (51.4) | 38.9 | (191.2) |
| Federal, state and foreign income tax expense | 14.4 | 58.5 | 13.7 | 9.6 |
| | ------- | ------- | ------- | ------- |
| NET EARNINGS/(LOSS) | $ 26.6 | $(109.9) | $ 25.2 | $(200.8) |
| | ======= | ======= | ======= | ======= |
| BASIC EARNINGS/(LOSS) PER COMMON SHARE | $ 0.59 | $ (2.36) | $ 0.56 | $ (4.35) |
| DILUTED EARNINGS/(LOSS) PER COMMON SHARE | $ 0.59 | $ (2.36) | $ 0.56 | $ (4.35) |
| CASH DIVIDENDS PER COMMON SHARE | $ 0.15 | -- | $ 0.30 | $ -- |
| Weighted average common shares used for basic earnings/(loss) per common share calculation (in thousands) | 44,826 | 46,605 | 44,749 | 46,211 |
| Weighted average common shares used for diluted earnings/(loss) per common share calculation (in thousands) | 45,176 | 46,605 | 45,102 | 46,211 |
| Common shares outstanding at end of period (in thousands) | 44,912 | 47,036 | 44,912 | 47,036 |

</TABLE>

See accompanying notes to condensed consolidated financial statements

<PAGE>                                                                1

CONDENSED CONSOLIDATED BALANCE SHEET

<TABLE>
<CAPTION>

| POLAROID CORPORATION AND SUBSIDIARY COMPANIES (IN MILLIONS) | DECEMBER 31, 2000 | JULY 1, 2001 |
|---|---|---|
| <S> | <C> | (UNAUDITED) <C> |
| ASSETS | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | | |
| Receivables | $ 97.2 | $ 94.0 |
| Inventories: | 435.4 | 291.6 |
| Raw materials | 86.6 | 89.1 |
| Work-in-process | 164.0 | 148.8 |
| Finished goods | 231.9 | 202.5 |
| | ------- | ------- |
| Total inventories | 482.5 | 440.4 |

| | | |
|---|---|---|
| Prepaid expenses and other current assets | 103.5 | 113.5 |
| TOTAL CURRENT ASSETS | 1,118.6 | 939.5 |
| PROPERTY, PLANT AND EQUIPMENT: | | |
| Total property, plant and equipment | 1,967.5 | 1,924.0 |
| Less accumulated depreciation | 1,398.3 | 1,413.4 |
| NET PROPERTY, PLANT AND EQUIPMENT | 569.2 | 510.6 |
| DEFERRED TAX ASSETS | 279.5 | 281.8 |
| OTHER ASSETS | 75.7 | 78.1 |
| TOTAL ASSETS | $2,043.0 | $1,810.0 |
| | | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| CURRENT LIABILITIES: | | |
| Short-term debt | $ 363.7 | $ 524.5 |
| Payables and accruals | 334.1 | 259.6 |
| Compensation and benefits | 76.7 | 96.7 |
| Federal, state and foreign income taxes | 18.8 | 20.8 |
| TOTAL CURRENT LIABILITIES | 793.3 | 901.6 |
| LONG-TERM DEBT | 573.5 | 423.9 |
| ACCRUED POSTRETIREMENT BENEFITS | 222.7 | 221.2 |
| OTHER LONG-TERM LIABILITIES | 78.3 | 87.7 |
| COMMON STOCKHOLDERS' EQUITY: | | |
| Common stock, $1 par value | 75.4 | 75.4 |
| Additional paid-in capital | 363.1 | 396.0 |
| Retained earnings | 1,219.5 | 1,018.7 |
| Accumulated other comprehensive income | (68.9) | (76.6) |
| Less: Treasury stock, at cost | 1,213.8 | 1,138.5 |
| Deferred compensation | .1 | -- |
| TOTAL COMMON STOCKHOLDERS' EQUITY | 375.2 | 175.6 |
| TOTAL LIABILITIES AND COMMON STOCKHOLDERS' EQUITY | $2,043.0 | $1,810.0 |

  </TABLE>

See accompanying notes to condensed consolidated financial statements.


<PAGE>                                              2


CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS
Six month period ended July 2, 2000 and July 1, 2001

<TABLE>
<CAPTION>

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
(IN MILLIONS)

| | SIX MONTHS | |
|---|---|---|
| | 2000 | 2001 |
| | (UNAUDITED) | |
| <S> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net earnings/(loss) | $ 25.2 | $(200.8) |
| Depreciation of property, plant and equipment | 52.0 | 55.0 |
| Gain on the sale of real estate | (12.9) | (18.5) |
| Other non-cash items | 9.4 | 42.4 |
| Decrease in receivables | 62.0 | 144.3 |
| Decrease/(increase) in inventories | (70.2) | 33.9 |
| Increase in prepaids and other assets | (13.7) | (12.3) |
| Decrease in payables and accruals | (39.8) | (104.9) |
| Increase/(decrease) in compensation and benefits | (60.2) | 28.6 |
| Increase/(decrease) in federal, state and foreign income taxes payable | 8.1 | (.4) |

| | | |
|---|---|---|
| Net cash used by operating activities | (39.3) | (32.7) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Decrease/(increase) in other assets | 4.7 | (1.2) |
| Additions to property, plant and equipment | (67.4) | (33.4) |
| Proceeds from the sale of property, plant and equipment | 49.0 | 54.2 |
| Net cash provided/(used) by investing activities | (13.7) | 19.6 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Net increase in short-term debt (maturities of 90 days or less) | 47.3 | 12.1 |
| Proceeds from issuance of stock incentives | .1 | -- |
| Cash dividends paid | (13.5) | -- |
| Net cash provided by financing activities | 33.9 | 12.1 |
| **EFFECT OF EXCHANGE RATE CHANGES ON CASH** | (4.8) | (2.2) |
| **NET DECREASE IN CASH AND CASH EQUIVALENTS** | (23.9) | (3.2) |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD** | 92.0 | 97.2 |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ 68.1 | $ 94.0 |

</TABLE>

See accompanying notes to condensed consolidated financial statements.


<PAGE>                                                                      3


POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)
Periods Ended July 2, 2000 and July 1, 2001


1.  BASIS OF PRESENTATION

The accompanying condensed consolidated financial statements include the
accounts of Polaroid Corporation and its domestic and foreign subsidiaries, all
of which are either wholly owned or majority owned (collectively, "the
Company"). Intercompany transactions have been eliminated. This is an interim
unaudited report that is subject to year-end audit adjustments. The information
furnished, however, reflects all adjustments (consisting of normal recurring
accruals) which, in the opinion of management, are necessary for a fair
presentation of the results of the interim period. The information included in
the interim financial statements and notes in this Form 10-Q should be read in
conjunction with the audited consolidated financial statements and notes thereto
included in the Company's 2000 Annual Report on Form 10-K which was filed with
the Securities and Exchange Commission on April 2, 2001. Certain prior year
information has been reclassified to conform with the current year presentation.

2.  DEBT RESTRUCTURING

On July 16, 2001, the Company did not make scheduled interest payments
totaling $10.5 million on its 6 3/4% Notes due January 15, 2002 (the "2002
Notes") and its 7 1/4% Notes due January 15, 2007 (the "2007 Notes") and, on
August 15, 2001, will not make a scheduled interest payment of $15.8 million
on its 11 1/2% Notes due February 15, 2006 (the "2006 Notes" and, with the
2002 Notes and the 2007 Notes, collectively, the "Notes"). The failure to
make the interest payments on the 2002 Notes and 2007 Notes constituted
defaults under the indenture pursuant to which the 2002 Notes and 2007 Notes
were issued. Under the indenture governing the 2002 Notes and 2007 Notes,
because the defaults will not be cured within 30 days of their occurrence,
the defaults will become events of default under the indenture, which will
give the holders of the 2002 Notes and the 2007 Notes the right to accelerate
the maturity of all principal and past due interest on the 2002 Notes and the
2007 Notes, which aggregated $310.5 million at July 15, 2001. The failure to
cure the default under the 2006 Notes within 30 days of August 15, 2001 will
similarly give rise to an event of default under the indenture pursuant to
which the 2006 Notes were issued, which will give the holders of the 2006

Notes the right to accelerate the maturity of all principal and past due interest on the 2006 Notes, which aggregated $286.2 million at July 15, 2001. Holders of the Notes also have the right to sue the Company to collect interest that is accrued and unpaid when due and payable. When the defaults regarding the 2002 Notes and 2007 Notes become events of default, these payment defaults will also result in events of default under the indenture pursuant to which the 2006 Notes were issued, the Company's domestic credit agreement (as amended, the "Amended Credit Agreement") and the credit agreement of the Company's wholly-owned subsidiary, Polaroid U.K. Limited, for which the Company acts as a guarantor (as amended, the "U.K. Credit Agreement") under cross-default provisions in those agreements. While these defaults under the Amended Credit Agreement and U.K. Credit Agreement have been waived by the lenders thereunder through October 12, 2001, the holders of the 2006 Notes may accelerate the maturity of their obligations. In addition, the indenture governing the 2006 Notes, the Amended Credit Agreement and the U.K. Credit Agreement contain certain cross-acceleration provisions, allowing these holders or lenders, under certain circumstances, to accelerate the maturity of the obligations owed to them if other holders or lenders do the same. The Company has not received notice that any holder of the Notes has taken action or notified

<PAGE>                                                                                    4

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

2.  DEBT RESTRUCTURING (CONTINUED)

the Company that it will take action, to enforce its rights or remedies against the Company as a result of the defaults described above.

The Company has announced its intent to negotiate with the holders of the Notes regarding a potential restructuring of the Company's debt with the objective of developing a capital structure that is more consistent with and will better support the Company's long-term business objectives. The Company is pursuing this debt restructuring plan but is unable to predict when or if it will be accepted by the holders of the Notes and, if applicable, the lenders under the Amended Credit Agreement and the U.K. Credit Agreement. If either (1) the Company makes any of the July 15, 2001 or August 15, 2001 interest payments or (2) the trustee under the indentures pursuant to which any series of the Notes were issued or if persons purporting to constitute holders of at least 25% of the outstanding principal amount of any series of Notes accelerate the maturity of their Notes and unpaid interest on the Notes or seek legal action to collect the unpaid interest, then the waivers to the Amended Credit Agreement and the U.K. Credit Agreement would lapse. In that event, the Company does not expect it could meet its accelerated payment obligations. The Amended Credit Agreement, the U.K. Credit Agreement and the waivers under these agreements are discussed below in Note 3, Short-Term Debt.

3.  SHORT-TERM DEBT

At July 1, 2001, the Company had $524.5 million outstanding in short-term debt. The amount of short-term debt outstanding was comprised of $310.0 million under the Amended Credit Agreement, $46.6 million under the U.K. Credit Agreement, $149.8 million under the 2002 Notes and $18.1 million under uncommitted short-term lines of credit.

The Amended Credit Agreement initially provided for a maximum commitment of $350.0 million on a revolving basis and is scheduled to mature on December 31, 2001. In connection with the Amended Credit Agreement and the waivers to it, which are summarized below, the Company granted the lenders under the Amended Credit Agreement a first security interest in substantially all of the Company's domestic personal property and mortgages on certain real estate, except for principal properties, in each case, as permitted by the indentures pursuant to which the Notes were issued. Funds borrowed under the Amended Credit Agreement initially bore interest, at the Company's option, at either the prime rate of J.P. Morgan Chase & Co. ("Prime") plus a margin or LIBOR on prime based loans plus a margin. The margins ranged from 0% to 1.275% for prime based loans and from .190% to 2.275% for euro-dollar loans based on the Company's credit rating. In addition, the Company has paid the lenders a

facility fee ranging from .085% to .725% depending on the Company's credit rating, a

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

3. SHORT-TERM DEBT (CONTINUED)

commitment fee on unused commitments ranging from 0% to .025% depending on the Company's credit rating and a fee to the administrative agent.

The U.K. Credit Agreement initially provided for a maximum commitment of 72.5 million euros and is scheduled to mature on December 31, 2001. In connection with the U.K. Credit Agreement and the waivers to it, which are summarized below, Polaroid U.K. Limited granted the lenders a security interest in certain of its and the Company's other subsidiaries' accounts receivable and inventories. Funds borrowed under the U.K. Credit Agreement initially bore interest at approximately 25 basis points higher than that paid for euro-dollar loans under the Amended Credit Agreement. In addition, the Company initially paid a facility fee ranging from .085% to .75% depending on the Company's credit rating, an arrangement fee and a fee to the administrative agent.

The Amended Credit Agreement and the U.K. Credit Agreement require the Company to maintain financial ratios related to the maximum level of debt to earnings before interest, taxes, depreciation and amortization (as defined in the Amended Credit Agreement) of 3.30 to 1 (the "Debt/EBITDA Ratio") and minimum interest coverage (as defined in the Amended Credit Agreement) of 3.00 to 1 (the "Interest Coverage Ratio"). In addition to financial ratios, the Amended Credit Agreement and the U.K. Credit Agreement contain covenants that restrict, among other things, the Company's ability to do the following: make certain capital expenditures; make certain payments for the repurchase of stock or dividends to shareholders; incur additional debt; incur certain liens; make certain investments; enter into certain sale and leaseback transactions; enter into certain transactions with affiliates; and merge, consolidate, sell or transfer all or substantially all of the Company's assets subject to certain financial conditions.

On February 16, 2001, the Company entered into a waiver with the lenders under the Amended Credit Agreement and the U.K. Credit Agreement, each of which has been amended and supplemented a number of times since then, most recently on July 12, 2001. The waivers, as extended by the amendments and supplements, expire on October 12, 2001. The waivers waive, until their expiration date, existing defaults and potential defaults of the Debt/EBITDA Ratio and Interest Coverage Ratio and any events of default under the Amended Credit Agreement and the U.K. Credit Agreement that will result from the Company's failure to make the scheduled interest payments on any series of Notes (see Note 2), so long as either (1) the Company does not make any of the July 15, 2001 or August 15, 2001 interest payments or (2) the trustee under the indentures pursuant to which the Notes were issued or persons purporting to constitute holders of at least 25% of the outstanding principal amount of any series of Notes do not accelerate the maturity of the Notes or commence legal proceedings to collect unpaid interest on their Notes.

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

3. SHORT-TERM DEBT (CONTINUED)

Under the waiver to the Amended Credit Agreement:

o    The maximum available borrowings are limited to $316 million, but the Company expects the limit will increase by approximately $800,000 per month, not to exceed $7 million, as the Company makes payments on the lease it entered into in connection with the sale of its 56-acre reservoir site in Waltham, Massachusetts less any cash the Company receives from the buyer in connection with the deferred portion of the purchase price (see Note 10);

o    additional covenants restrict, among other things, the Company's ability to make certain capital expenditures, make certain payments for the repurchase of stock or dividends to shareholders, make certain interest payments, enter into certain hedging transactions and make certain acquisitions and investments;

o    additional covenants also require the Company to maintain certain minimum cash flow amounts, increase the Company's reporting obligations to the lenders, provide security interests in substantially all of the Company's domestic personal property and mortgages on certain real estate, except for principal properties, in each case, as permitted by the indentures pursuant to which the Notes were issued and require the Company to commence preparation of a plan of restructuring of its capital structure; and

o    during the waiver period of July 12, 2001 through October 12, 2001, borrowings will bear interest, at the Company's option, at either Prime plus 2.525% or LIBOR plus 3.525% regardless of the Company's credit rating and, the Company will pay the lenders a facility fee of .725%, a commitment fee on unused commitment of .025% and a fee to the administrative agent.

Under the waiver to the U.K. Credit Agreement:

o    the maximum available borrowings are limited to 57 million euros or approximately $49 million at July 1, 2001;

o    many of the additional covenants contained in the waiver to the Amended Credit Agreement were incorporated into the waiver under the U.K. Credit Agreement and the Company expects to provide a security interest in substantially all of the personal property and real estate of Polaroid U.K. Limited; and

<PAGE>                                                                    7

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

3.    SHORT-TERM DEBT (CONTINUED)

o    during the waiver period of July 12, 2001 through October 12, 2001, borrowings will bear interest at LIBOR plus 3.5% regardless of the Company's credit rating and the Company will pay the lenders a facility fee of .75%, an arrangement fee and a fee to the administrative agent.

At July 1, 2001, the weighted average interest rate on amounts outstanding under the Amended Credit Agreement was approximately 7.9% and the weighted average interest rate on amounts outstanding under the U.K. Credit Agreement was approximately 6.9%.

The Company is involved in on-going discussions with its bank lenders to extend the existing waivers to the Amended Credit Agreement and the U.K. Credit Agreement beyond their current expiration date of October 12, 2001, to allow the Company more time to develop and seek agreement from its creditors regarding a debt restructuring plan and to refinance and/or restructure the Amended Credit Agreement and the U.K. Credit Agreement. If the Company is unsuccessful in its negotiations with its existing bank lenders, the lenders will have the right to

demand repayment of their loans when the waivers expire, because the Company will then be in default under the Amended Credit Agreement and the U.K. Credit Agreement. There can be no assurance that the Company's existing bank lenders will agree to extend the waivers beyond October 12, 2001 or that the trustee or the holders of any series of Notes will not accelerate the maturity of their Notes or seek legal action to collect the unpaid interest as described above. If either (1) the holders of any series of Notes were to accelerate the maturity of their Notes or seek legal action to collect interest or (2) the Company were to make any of the July 15, 2001 or August 15, 2001 interest payments, the waivers to the Amended Credit Agreement and the U.K. Credit Agreement would lapse. In its current financial condition, the Company does not expect that it could raise the required funds to repay outstanding borrowings under or refinance the Amended Credit Agreement and the U.K. Credit Agreement if the lenders demand repayment of their loans under those agreements.

The Company has retained financial and legal advisors to assist it in conducting the negotiations described in Notes 2 and 3, considering its refinancing or restructuring options and exploring a number of strategic alternatives, including the sale of assets, a merger or sale of the Company and/or a strategic partnership. See "Financial Liquidity and Capital Resources" within "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information regarding the Company's financial condition.

<PAGE>                                                                        8

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

4.  DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES

In June 1998, the Financial Accounting Standards Board ("FASB") issued Financial Accounting Standards Board Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities," which was subsequently amended by Financial Accounting Standards Board Statement No. 137, "Accounting for Derivative Instruments and Hedging Activities - Deferral of the Effective Date of FASB Statement No. 133," and Financial Accounting Standards Board Statement No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities - an amendment of FASB Statement No. 133" (collectively, "FAS 133"). FAS 133 establishes accounting and reporting requirements for derivative instruments and for hedging activities. FAS 133 requires companies to recognize all derivatives as either assets or liabilities in the statement of financial position at fair value. If certain conditions are met, a derivative may be specifically designated as a hedge of the exposures to changes in fair value of recognized assets or liabilities or unrecognized firm commitments, a hedge of the foreign currency exposure of a net investment in a foreign operation, unrecognized firm commitments, an available-for-sale security or a foreign-currency denominated forecasted transaction. The accounting for changes in fair value of the derivative and the resulting designation.

The Company generates a substantial portion of its revenues in international markets, which subjects its operations and cash flows to the exposure of currency exchange fluctuations. Because the impact of currency exchange rate movement can be positive or negative in any given period, the Company seeks to minimize the risk associated with currency exchange fluctuations by entering into derivative contracts. The Company adopted FAS 133 effective January 1, 2001, and the related transition adjustments resulted in a non-cash, pre-tax charge of $.7 million recorded in other income/expense, and an unrealized gain of $.9 million (net of tax of $.5 million) recorded in other comprehensive income, in each case, related to marking outstanding derivative contracts to fair value.

The Company enters into U.S. dollar call/foreign currency put options that are designated as cash flow hedges with the objective of minimizing the impact of exchange rate risk related to a portion of its forecasted foreign-currency denominated intercompany sales. The notional value of the Company's outstanding option contracts at July 1, 2001, all of which will expire in the next twelve months, totaled $132.6 million and consisted of $66.6 million of options contracts denominated in euros and $66.0 million of options contracts

denominated in Japanese yen. At July 1, 2001, the fair value of outstanding
option contracts, which was reported in other current assets, was $5.2 million.

<PAGE>                                                                    9


POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001


## 4. DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES (CONTINUED)

The Company measures hedge effectiveness based on the changes in intrinsic value
of its option contracts relative to the changes in the cash inflows of the
anticipated transaction. Unrealized gains on these contracts are deferred in
other comprehensive income until the option contract is exercised and the
anticipated transaction occurs. At exercise date of an option contract, the
Company reclassifies gains related to the contract from other comprehensive
income to cost of goods sold. Changes in the time value of its option contracts,
which the Company considers to be ineffective, are recorded in other
income/expense. The Company reclassified $1.9 million and $2.3 million of
realized gains from other comprehensive income to cost of goods sold during the
second quarter of 2001 and the first half of 2001, respectively. Pre-tax gains
of $2.8 million, as of July 1, 2001, could be reclassified to cost of goods sold
over the next twelve months; however, that amount can increase or decrease over
time depending on movements in the underlying exchange rates. Hedge
ineffectiveness, including changes in the time value of option contracts, was
not material to the Company's results of operations or financial position in the
second quarter of 2001 or in the first half of 2001.

The Company enters into forward exchange contracts to minimize the impact of
currency fluctuations on its net monetary assets denominated in currencies other
than the relevant functional currency ("nonfunctional currencies"). The Company
does not apply hedge accounting to these contracts. Forward exchange contracts
are remeasured at fair value monthly with changes in fair value recorded in net
earnings at the same time the net monetary assets denominated in nonfunctional
currencies are remeasured. Both the change in fair value of forward exchange
contracts and the remeasurement of net monetary assets denominated in
nonfunctional currencies are recorded in other income/expense. The notional
value of the Company's outstanding foreign exchange contracts at July 1, 2001,
all of which expire in the next three months, totaled $35.1 million and
consisted of $11.5 million of forward exchange contracts denominated in euros
and $23.6 million of forward exchange contracts denominated in other foreign
currencies. At July 1, 2001, the fair value of outstanding forward exchange
contracts was not material to the Company's financial position.

## 5. INCOME TAXES

Prepaid income taxes and deferred income taxes result from future tax benefits
and expenses related to the difference between the tax basis of assets and
liabilities and the amounts reported in the financial statements. These
differences predominantly relate to U.S. operations. Carryforwards and tax
credits are also included in prepaid income taxes. The net of prepaid income tax
assets, deferred income tax liabilities and valuation allowances against
deferred tax assets reflected in the condensed consolidated balance sheet was a
net asset of approximately $331.0 million at July 1, 2001.


<PAGE>                                                                   10


POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001


## 5. INCOME TAXES (CONTINUED)

A valuation allowance of approximately $61.0 million was reflected in the
condensed consolidated balance sheet at July 1, 2001. The valuation allowance at
July 1, 2001 includes a charge of approximately $53.0 million that was recorded

*Note: Write-off of a deferred tax asset should be considered an intangible assets and write offs be listed as extra ordinary charges on the Income statement*

in the second quarter of 2001 because the Company determined it was "more likely than not" that some portion of the deferred tax assets will not be realized over a reasonable period of time.

6. EARNINGS PER SHARE

<TABLE>
<CAPTION>

| (IN MILLIONS, EXCEPT PER SHARE AMOUNTS) | NET EARNINGS/ (LOSS) | SHARES | PER SHARE AMOUNT |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Quarter ended July 2, 2000 | | | |
| Basic earnings per share | $ 26.6 | 44.8 | $ .59 |
| Diluted earnings per share | 26.6 | 45.2 | .59 |
| | | | |
| Six Months ended July 2, 2000 | | | |
| Basic earnings per share | 25.2 | 44.8 | .56 |
| Diluted earnings per share | 25.2 | 45.1 | .56 |
| | | | |
| QUARTER ENDED JULY 1, 2001 | | | |
| BASIC LOSS PER SHARE | (109.9) | 46.6 | (2.36) |
| DILUTED LOSS PER SHARE | (109.9) | 46.6 | (2.36) |
| | | | |
| SIX MONTHS ENDED JULY 1, 2001 | | | |
| BASIC LOSS PER SHARE | (200.8) | 46.2 | (4.35) |
| DILUTED LOSS PER SHARE | (200.8) | 46.2 | (4.35) |

</TABLE>

The calculation of earnings/(loss) per share for the quarters and six month periods ended July 2, 2000 and July 1, 2001 does not include the effects of outstanding options for shares of common stock totaling 5.8 million and 4.6 million, respectively, because the effects were anti-dilutive. In addition, the effect of .4 million and 2.4 million of other potentially dilutive shares, which include performance accelerated restricted stock and other performance based stock award programs under which shares have not been issued, for the quarters and six month periods ended July 2, 2000 and July 1, 2001, respectively, were not included because the effects were anti-dilutive or because the performance criteria had not been satisfied.

<PAGE>

11

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

7. COMPREHENSIVE INCOME

The Company's total comprehensive income/(loss) was as follows:

<TABLE>
<CAPTION>

| (IN MILLIONS) | QUARTER ENDED | | SIX MONTH PERIOD ENDED | |
|---|---|---|---|---|
| | JULY 2, 2000 | JULY 1, 2001 | JULY 2, 2000 | JULY 1 2001 |
| <S> | <C> | <C> | <C> | <C> |
| Net earnings/(loss) | $26.6 | $(109.9) | $ 25.2 | $(200. |
| | | | | |
| Other comprehensive income: | | | | |
| Currency translation adjustment | (8.7) | .1 | (15.3) | (9. |
| Unrealized gain on derivative instruments, net of tax | -- | (1.1) | -- | 1. |
| Unrealized gain/(loss) on available-for-sale securities, net of tax | .1 | .3 | (.5) | (. |
| Total comprehensive income/(loss) | $18.0 | $(110.6) | $ 9.4 | $(208. |

</TABLE>

</TABLE>

8. SEGMENTS

The following is a summary of information related to the Company's segments:

<TABLE>
<CAPTION>

| (IN MILLIONS) | QUARTER ENDED | | SIX MONTH PERIOD ENDED | |
| | JULY 2, 2000 | JULY 1, 2001 | JULY 2, 2000 | JULY 1, 2001 |
| <S> | <C> | <C> | <C> | <C> |
| Net sales to customers: | | | | |
| Americas Region | $310.9 | $225.3 | $549.1 | $449.9 |
| European Region | 99.8 | 62.1 | 185.9 | 123.6 |
| Asia Pacific Region | 74.9 | 46.1 | 152.9 | 90.8 |
| Global Operations | -- | -- | -- | -- |
| Research and Development | -- | -- | -- | -- |
| Segment net sales to customers | 485.6 | 333.5 | 887.9 | 664.3 |
| Corporate | -- | -- | -- | -- |
| Total net sales to customers | $485.6 | $333.5 | $887.9 | $664.3 |

</TABLE>

<PAGE>                                                                12

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

8. SEGMENTS (CONTINUED)

<TABLE>
<CAPTION>

| (IN MILLIONS) | QUARTER ENDED | | SIX MONTH PERIOD ENDED | |
| | JULY 2, 2000 | JULY 1, 2001 | JULY 2, 2000 | JULY 1, 2001 |
| <S> | <C> | <C> | <C> | <C> |
| Profit/(loss) from operations: | | | | |
| Americas Region | $102.8 | $ 39.3 | $166.1 | $ 88.3 |
| European Region | 14.9 | 2.4 | 25.2 | .7 |
| Asia Pacific Region | 20.0 | 10.1 | 41.5 | 15.1 |
| Global Operations | (25.7) | (50.8) | (50.3) | (79.2) |
| Research and Development | (19.2) | (16.8) | (40.0) | (39.3) |
| Segment profit/(loss) from operations | 92.7 | (15.8) | 142.5 | (14.4) |
| Corporate | (42.0) | (36.0) | (82.6) | (155.4) |
| Total profit/(loss) from operations | $ 50.7 | $(51.8) | $ 59.9 | $(169.0) |

</TABLE>

9. RESTRUCTURING AND OTHER CHARGES

In June 2001, the Company announced a major global restructuring designed to reduce its costs and improve its cash flows. This announcement was in addition to the 2001-Q1 Program (defined below) under which the Company recorded $80 million of restructuring and other charges. In connection with its latest announcement, the Company expects to record a series of pre-tax restructuring and other charges beginning in the third quarter of 2001 and continuing through 2002. The series of charges (collectively, the "June 2001 Program") will be allocated to the non-segment Corporate category and are expected to range between $150 million and $175 million. The June 2001 Program will consist of

severance costs related to an involuntary severance program under which the Company will eliminate approximately 2,000 positions, asset write-offs primarily related to the reconfiguration of the Company's Global Operations segment and exit costs related to certain of the Company's operations that will be restructured. The Company believes approximately 50% of the positions to be eliminated under the June 2001 Program will be from the Global Operations segment, approximately 33% from the regional sales and marketing segments and the remainder from the Research and Development segment and the non-segment Corporate category.

<PAGE>                                                                    13

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

9.  RESTRUCTURING AND OTHER CHARGES (CONTINUED)

In the first quarter of 2001, the Company recorded restructuring and other charges of $80 million which consisted of severance costs and impairment charges related to certain long-lived assets and an intangible asset. These charges (collectively, the "2001-Q1 Program") were allocated to the non-segment Corporate category and were undertaken to reduce overhead costs and realign the Company's resources.

Approximately 550 million of the charges recorded in the first quarter of 2001 for the 2001-Q1 Program related to an involuntary severance program under which approximately 950 employees (consisting of sales and marketing employees in the regional segments: Americas - 14%; European - 6%; Asia Pacific - 3%; manufacturing employees in Global Operations - 49%; research and engineering employees in Research and Development - 14%; and administrative employees in the non-segment Corporate category - 14%), are expected to leave the Company. Approximately 600 of the expected 950 terminations under the 2001-Q1 Program had occurred in the first half of 2001 with the remaining terminations expected to be substantially complete by the end of 2001. The major impact of the 2001-Q1 Program on the Company's segments and the non-segment Corporate category will be the reduction in the number of employees and, as a result, streamlined overhead structures and a reduction in the Company's excess manufacturing capacity.

In addition to severance costs, the asset impairment portion of the 2001-Q1 Program totaled approximately $30 million in the first quarter of 2001. Of this amount, approximately $12 million related to assembly equipment that was used to produce other core products but will be scrapped because the Company has decided to out-source the manufacture of these products. Approximately $11 million of the write-offs related to surplus instant film assembly equipment, primarily related to certain newer core products, that will either be abandoned in place or scrapped based on a strategic decision to consolidate manufacturing operations. The write-offs also included approximately $7 million of goodwill that related to a non-strategic software company that was determined to be impaired.

*[handwritten margin notes]:*
*Note: 63% of involuntary separations had been completed under this program by 7/1/01. $18.5 million had yet to be incurred.*

*One time write-offs of $30 million*

<PAGE>                                                                    14

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

9.  RESTRUCTURING AND OTHER CHARGES (CONTINUED)

The reserves established for the 2001-Q1 Program and the related cash and non-cash charges are as follows:

<TABLE>
<CAPTION>

| (IN MILLIONS) | SEVERANCE | PENSION CURTAILMENT | ASSET IMPAIRMENTS | TOTA |
|---|---|---|---|---|

| <S> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|
| Balance at January 1, 2001 | $ -- | $ -- | $ -- | $ .. |
| Restructuring and other charges | 50.0 | -- | 30.0 | 80. |
| Cash charges | (1.3) | -- | -- | (1. |
| Reclassification of pension curtailment | (3.9) | 3.9 | -- | - |
| Non-cash charges | -- | (3.9) | (30.0) | (33. |
| Balance at April 1, 2001 | 44.8 | -- | -- | 44. |
| Cash charges | (11.9) | .-- | -.- | (11. |
| Balance at July 1, 2001 | $ 32.9 | $ -- | $ -.. | $ 32. |

</TABLE>

## 10. SALE OF REAL ESTATE

In the second quarter of 2001, the Company sold its 56-acre reservoir site in Waltham, Massachusetts, with a net book value of approximately $11 million, for approximately $69 million. In connection with this sale, the Company accrued approximately $18 million of costs directly related to the decision to sell this site that related primarily to relocating certain manufacturing operations and administrative functions located at this site to other locations. As part of the sale agreement, the Company entered into a lease for certain portions of the reservoir site for periods of up to seven years. The Company has deferred approximately $22 million of gains on the sale which it will realize ratably over the term of the lease because it leased back a major portion of the reservoir site. As a condition to the lease, the receipt of approximately $15 million of the sales price was deferred and will be released to the Company, over the term of the lease, as certain conditions are met.

<PAGE>                                                                    15

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

## 11. NEW ACCOUNTING STANDARDS

In May 2000, the Emerging Issues Task Force ("EITF") reached a consensus on Issue No. 00-14, ACCOUNTING FOR CERTAIN SALES INCENTIVES ("EITF 00-14") which applies to the recognition, measurement and income statement classification of sales incentives offered to customers such as discounts, coupons, rebates and free product or services. The Company adopted the provisions of EITF 00-14 effective January 1, 2001 and, as a result, immaterial amounts of sales incentives that had been recorded as marketing expenses in prior years were reclassified primarily as sales adjustments. The adoption of EITF 00-14 did not have any impact on the Company's results of operations or financial position.

In April 2001, the EITF reached a consensus on Issue No. 00-25, VENDOR INCOME STATEMENT CHARACTERIZATIONS OF CONSIDERATION TO A PURCHASER OF THE VENDOR'S PRODUCTS OR SERVICES ("EITF 00-25") which addresses the statement of earnings classification of slotting fees, cooperative advertising arrangements and buydowns. The consensus will require certain payments made by the Company to customers related to promotions that are currently classified as marketing expenses be classified as reductions of revenue. The Company is still evaluating the impact of the adoption of EITF 00-25 on its consolidated financial statements. The adoption of EITF 00-25 will have no impact on the Company's profit from operations or net earnings. The Company will adopt EITF 00-25 no later than January 1, 2002.

In July 2001, the Financial Standards Accounting Board ("FASB") issued Financial Accounting Standards Board Statement No. 141, BUSINESS COMBINATIONS ("FAS 141") and Financial Accounting Standards Board Statement No. 142, GOODWILL AND OTHER INTANGIBLE ASSETS ("FAS 142"). FAS 141 requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. FAS 141 also specifies the criteria that intangible assets acquired in a purchase method business combination must meet to be recognized and reported apart from goodwill. FAS 142 requires that goodwill and intangible assets with

indefinite useful lives no longer be amortized, but instead be tested for impairment, at least annually, in accordance with the provisions of FAS 142. FAS 142 will also require that intangible assets with definite useful lives be amortized over their respective estimated useful lives to their estimated residual values, and be reviewed for impairment in accordance with Financial Accounting Standards Board Statement No. 121, ACCOUNTING FOR THE IMPAIRMENT OF LONG-LIVED ASSETS AND LONG-LIVED ASSETS TO BE DISPOSED OF.

<PAGE>                                                                    16

POLAROID CORPORATION AND SUBSIDIARY COMPANIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) (CONTINUED)
Periods Ended July 2, 2000 and July 1, 2001

11.  NEW ACCOUNTING STANDARDS (CONTINUED)

The provisions of FAS 141 are effective immediately, except with regard to business combinations initiated prior to July 1, 2001. FAS 142 will be effective as of January 1, 2002. Goodwill and other intangible assets acquired in business combinations completed before July 1, 2001, will continue to be amortized prior to the adoption of FAS 142. The Company is currently evaluating the effect that the adoption of FAS 141 and FAS 142 will have on its results of operations and its financial position.

12.  LEGAL PROCEEDINGS

The Company is involved in various legal proceedings and claims arising in the ordinary course of business. The Company believes that the disposition of these matters will not have a materially adverse effect on its results of operations or financial condition. Legal proceedings are discussed in Part II, Item 1 of this filing on Form 10-Q.

13.  INDEPENDENT ACCOUNTANTS' REVIEW REPORT

The July 2, 2000 and July 1, 2001 condensed consolidated financial statements included in this filing on Form 10-Q have been reviewed by KPMG LLP, independent certified public accountants, in accordance with established professional standards and procedures for such review. The report by KPMG LLP commenting upon their review of the condensed consolidated financial statements appears on the following page.

<PAGE>                                                                    17

                     INDEPENDENT ACCOUNTANTS' REVIEW REPORT

The Board of Directors
Polaroid Corporation:

We have reviewed the condensed consolidated balance sheet of Polaroid Corporation and subsidiary companies as of July 1, 2001 and the related condensed consolidated statement of earnings for the three and six month periods ended July 2, 2000 and July 1, 2001 and the condensed consolidated statement of cash flows for the six month periods then ended. These condensed consolidated financial statements are the responsibility of the Company's management.

We conducted our review in accordance with standards established by the American Institute of Certified Public Accountants. A review of interim financial information consists principally of applying analytical procedures to financial data and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the condensed consolidated financial statements referred to above for them to be in conformity with accounting principles generally accepted in the

United States of America.

We have previously audited, in accordance with auditing standards generally
accepted in the United States of America, the consolidated balance sheet of
Polaroid Corporation and subsidiary companies as of December 31, 2000, and the
related consolidated statements of earnings, cash flows and changes in common
stockholders' equity for the year then ended (not presented herein); and in our
report dated January 22, 2001, except as to Note 6, Note 15 and Paragraph 6 of
Note 14 which are as of March 27, 2001, we expressed an unqualified opinion on
those consolidated financial statements. In our opinion, the information set
forth in the accompanying condensed consolidated balance sheet as of December
31, 2000 is fairly stated, in all material respects, in relation to the
consolidated balance sheet from which it has been derived.

The accompanying financial statements have been prepared assuming that the
Company will continue as a going concern. As discussed in Note 2 to the
financial statements, the Company did not make its July 16, 2001 interest
payments on its 2002 Notes and 2007 Notes and will not make its scheduled
August 15, 2001 interest payment on its 2006 Notes. The failure to make the
interest payments on the 2002 and 2007 Notes constituted a default under the
indenture pursuant to which the 2002 Notes and 2007 Notes were issued and
because the defaults will not be cured within 30 days of their occurrence,
the defaults will become events of default under the indenture and will give
the holders of the 2002 Notes and 2007 Notes the right to accelerate the
maturity of all principal and past due interest, which aggregated $310.5
million at July 15, 2001. Management's plans in regard to these matters are
described in Notes 2 and 3. The financial statements do not include any
adjustments that might result from the outcome of this uncertainty.

/S/ KPMG LLP

Boston, Massachusetts
July 16, 2001, except as to Notes 2 and 3 which are as of August 8, 2001

18

&lt;PAGE&gt;

ITEM 2.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
          OF OPERATIONS

GENERAL.

The Company is managed in five primary segments: the Americas Region; the
European Region; the Asia Pacific Region; Global Operations; and Research and
Development. The Americas Region is comprised of all the countries in North and
South America. The European Region includes all the countries of continental
Europe, the United Kingdom, Russia, the Middle-Eastern countries and the African
continent. The Asia Pacific Region includes Japan, Australia and the Asian
continent, excluding Russia. Each of these regions consist of sales and
marketing operations. Global Operations consists of worldwide activities
associated with manufacturing, logistics, procurement, developing manufacturing
processes for new products and inventory management. Research and Development is
comprised of corporate research and engineering activities.

The Company has one category called Corporate, which it does not consider to be
a segment. This category consists of general and administrative functions,
including central marketing and centralized information systems, and certain
other corporate functions. Corporate also includes costs related to
restructuring activities and certain other non-operating items.

The Company evaluates the performance of its segments based on profit from
operations with consideration of assets employed. In the regional sales and
marketing segments, profit from operations is based on standard product costs
excluding intercompany margins and therefore reflects contribution to worldwide
Company profits from third party sales. Non-standard manufacturing costs along
with the costs of procurement, developing manufacturing processes for new
products, regional warehousing and distribution are reported as incurred in the
Global Operations segment. Costs related to research and engineering activities
are reported as incurred in the Research and Development segment.

The Company discusses sales and profit from operations in terms of its core
instant business, digital products, other core products and non-core businesses.
The core instant business consists of traditional instant camera and film

products and newer instant camera and film products. The traditional camera and film products are larger instant formats consisting primarily of the 600 and Spectra series of instant cameras and film and other instant film formats used primarily for commercial applications while the newer camera and film formats are medium and smaller instant formats consisting primarily of JoyCam and I-Zone instant cameras and film. Digital products consist primarily of the PHOTOMAX line of digital cameras and other digital products. Other core products consist of unique ID products, medical imaging products, sunglasses, videotapes and conventional 35mm cameras and film. Non-core businesses consist of businesses exited by the Company.

19

<PAGE>

The Company periodically evaluates its products to determine their relevance to the Company's long-term strategy. As a result of these evaluations, certain products may be reclassified among core products, other core products and non-core businesses. The Company has reclassified certain prior year information to conform with the current year presentation.

WORLDWIDE RESULTS FOR THE SECOND QUARTER OF 2001
 COMPARED WITH THE SECOND QUARTER OF 2000

NET SALES

In the second quarter of 2001, on a unit basis, worldwide shipments to customers of traditional cameras decreased approximately 10% and worldwide shipments to customers of traditional film decreased approximately 20% compared with the same period of 2000. In addition, worldwide shipments to customers of newer cameras decreased approximately 45% and worldwide shipments to customers of newer film decreased approximately 25% in the second quarter of 2001 compared with the second quarter of 2000. Worldwide shipments to customers of digital cameras increased approximately 5% in the second quarter of 2001 compared with the same period of 2000.

Worldwide net sales to customers decreased 31% to $333 million in the second quarter of 2001 from $486 million in the second quarter of 2000. The decrease was due to lower sales of traditional film and, to a lesser degree, newer cameras, other core products, digital products, newer film and traditional cameras. In addition, but to a lesser degree, the unfavorable impact of foreign exchange also contributed to the decrease in worldwide net sales. The decrease in sales of traditional and newer camera and film products in the second quarter of 2001 was caused by weakening economics and the negative impact of growing demand for digital and other media formats that compete with the Company's traditional camera and film products in all of the Company's Regions. The combination of these factors resulted in lower customer demand for the Company's products and retailers reducing their inventories of the Company's products. Worldwide net sales in the second quarter of 2000 included the impact of new instant camera and film product introductions in the Americas and European Regions.

In the Americas Region, on a unit basis, shipments to customers of traditional cameras and film each decreased approximately 15% in the second quarter of 2001 compared with the second quarter of 2000. In addition, shipments to customers of newer cameras decreased approximately 40% and shipments to customers of newer film decreased approximately 20% in the second quarter of 2001 compared with the same period of 2000. Shipments to customers of digital cameras were essentially the same in the second quarters of 2001 and 2000.

20

<PAGE>

Net sales in the Americas Region decreased 28% to $225 million in the second quarter of 2001 from $311 million in the second quarter of 2000. The decrease in sales was due to lower sales of traditional film and, to a lesser degree, newer cameras, digital products, other core products, traditional cameras and newer film. The decrease in sales of traditional and newer camera and film products was caused by lower customer demand for these products. In addition to lower shipments, the Company liquidated, at lower prices, certain slow-moving or discontinued models and product lines.

In the European Region, on a unit basis, shipments to customers of traditional cameras decreased approximately 10% and film decreased approximately 30% in the second quarter of 2001 compared with the second quarter of 2000. In addition, shipments to customers of newer cameras decreased approximately 60% and shipments to customers of newer film decreased approximately 20% in the second quarter of 2001 compared with the same period of 2000.

Net sales in the European Region decreased 38% to $62 million in the second quarter of 2001 from $100 million in the second quarter of 2000. The decrease was due to lower sales of traditional film and, to a lesser degree, other core products and newer cameras. In addition, but to a lesser degree, the unfavorable impact of foreign exchange also contributed to the decrease in sales in the Region. The decrease in sales of traditional and newer camera and film products was caused by lower customer demand for these products and retailers reducing their inventories of these products.

In the Asia Pacific Region, on a unit basis, shipments to customers of traditional cameras decreased approximately 15% and shipments to customers of traditional film decreased approximately 20% in the second quarter of 2001 compared with the second quarter of 2000. In addition, shipments to customers of newer cameras decreased approximately 50% and shipments to customers of newer film decreased approximately 40% in the second quarter of 2001 compared with the same period of 2000.

Net sales in the Asia Pacific Region decreased 38% to $46 million in the second quarter of 2001 from $75 million in the second quarter of 2000. The decrease was due to lower sales of traditional film and, to a lesser degree, newer cameras and film. In addition, but to a lesser degree, the unfavorable impact of foreign exchange also contributed to the decrease in sales in the Region. The decrease in sales of traditional and newer camera and film products was caused by lower customer demand for these products and retailers reducing their inventories of these products.

PROFIT/(LOSS) FROM OPERATIONS

Worldwide loss from operations in the second quarter of 2001 was $52 million compared with profit from operations of $51 million in the second quarter of 2000. The decrease was due to the impact of lower sales of traditional film products and digital products, higher manufacturing costs and, to a lesser degree, the impact of lower sales of newer cameras and film. The decreases were offset, in part, by lower spending on advertising and promotional activities and selling, general and administrative expenses.

<PAGE>                                                                  21

In the second quarter of 2001, the Company's gross margin decreased to 28% of net sales compared with 46% of net sales in the second quarter of 2000. The decrease was caused by the impact of higher manufacturing costs in the second quarter of 2001 that were driven by reductions in the Company's production schedules, the impact of the Company liquidating certain slow-moving or discontinued models and product lines and the mix of products sold in the quarter.

Profit from operations in the Americas Region was $39 million in the second quarter of 2001 compared with $103 million in the second quarter of 2000. The decrease was due to the impact of lower sales of traditional film and digital products and, to a lesser degree, newer cameras and film. In addition to the impact of lower shipments, the Company liquidated, at lower prices, certain slow-moving or discontinued models and product lines. The decreases were offset, in part, by lower spending on selling, general and administrative expenses and advertising and promotional activities.

Profit from operations in the European Region was $2 million in the second quarter of 2001 compared with $15 million in the second quarter of 2000. The decrease was due to the impact of lower sales of traditional film and, to a lesser degree, the unfavorable impact of foreign exchange. The decreases were offset, in part, by lower spending on advertising and promotional activities and selling, general and administrative expenses.

Profit from operations in the Asia Pacific Region was $10 million in the second quarter of 2001 compared with $20 million in the second quarter of 2000. The

decrease was due to the impact of lower sales of traditional film and, to a lesser degree, newer cameras and film. The decreases were offset, in part, by lower spending on selling, general and administrative expenses and advertising and promotional activities.

Global Operations costs were $51 million in the second quarter of 2001 compared with $26 million in the second quarter of 2000. The increase in Global Operations costs related to higher manufacturing costs in the second quarter of 2001 that were driven by the inefficiencies of reduced production schedules.

Research and Development costs were $17 million in the second quarter of 2001 compared with $19 million in the second quarter of 2000.

Corporate costs were $36 million in the second quarter of 2001 compared with $42 million in the second quarter of 2000. The decrease was due primarily to lower general and administrative expenses.

Other income was $25 million in the second quarter of 2001 compared with $12 million in the same period of 2000. In the second quarter of 2001, other income included gains of approximately $18 million related to the sale of the Company's 56-acre reservoir site in Waltham, Massachusetts and approximately $7 million related to a distribution on the Company's investment in a joint venture developing certain real estate in Cambridge, Massachusetts. In the second quarter of 2000, other income included $10 million of gains on the sale of real estate.

<PAGE>                                                                            22

Interest expense increased to $25 million in the second quarter of 2001 compared with $21 million in the second quarter of 2000. The increase was due to higher average amounts of debt outstanding during the period offset, in part, by lower average interest rates.

Income tax expense in the second quarter of 2001 was $59 million on a reported loss before income taxes of $51 million. Income tax expense recorded in the second quarter of 2001 included a charge of approximately $53 million for the establishment of a valuation allowance against certain deferred tax assets. The valuation allowance, which reduced the deferred tax asset, was recorded because the Company has determined that it is "more likely than not" that some portion of the deferred tax benefits will not be realized over a reasonable period of time. In the second quarter of 2000, the Company recorded income tax expense of $14 million or 35% of reported earnings before income taxes of $41 million.

In the second quarter of 2001, the Company recorded a net loss of $110 million, or $2.36 basic loss per common share compared with a net earnings of $27 million or $.59 basic earnings per common share in the second quarter of 2000. Diluted earnings/loss per common share was the same as basic earnings/loss per common share in the first quarter of 2001 and 2000.

WORLDWIDE RESULTS FOR THE FIRST SIX MONTHS OF 2001
  COMPARED WITH THE FIRST SIX MONTHS OF 2000

NET SALES

In the first half of 2001, on a unit basis, worldwide shipments to customers of traditional cameras decreased approximately 4% and worldwide shipments to customers of traditional film decreased approximately 20% compared with the same period of 2000. In addition, worldwide shipments to customers of newer cameras decreased approximately 30% and worldwide shipments to customers of newer film decreased approximately 5% in the first half of 2001 compared with the first half of 2000. Worldwide shipments to customers of digital cameras increased approximately 3% in the first half of 2001 compared with the same period of 2000.

Worldwide net sales to customers decreased 25% to $664 million in the first half of 2001 from $886 million in the first half of 2000. The decrease was due to lower sales of traditional film and, to a lesser degree, newer cameras, other core products, digital products, and traditional cameras. In addition, but to a lesser degree, the unfavorable impact of foreign exchange also contributed to the decrease in worldwide sales. The decrease in sales of traditional and newer camera and film products in the first half of 2001 was caused by weakening economies and the negative impact of growing demand for digital and other media

formats which compete with the Company's traditional camera and film products in all of the Company's Regions. The combination of these factors resulted in lower customer demand for the Company's products and retailers reducing their inventories of the Company's products.

<PAGE>                                                                    23

In the Americas Region, on a unit basis, shipments to customers of traditional cameras increased approximately 3% and shipments of instant film decreased approximately 15% in the first half of 2001 compared with the first half of 2000. In addition, shipments to customers of newer cameras decreased approximately 10% and shipments to customers of newer film increased approximately 15% in the first half of 2001 compared with the same period of 2000. Shipments to customers of digital cameras decreased approximately 3% in the first half of 2001 compared to the same period in 2000.

Net sales in the Americas Region decreased 18% to $450 million in the first half of 2001 from $549 million in the first half of 2000. The decrease was due to lower sales of traditional film and, to a lesser degree, other core products, digital products, newer cameras and traditional cameras. These decreases were offset, to a lesser degree, by higher sales of newer film. The decrease in sales of traditional camera and film products and newer cameras was caused by lower customer demand for these products. In addition to lower shipments, the Company liquidated, at lower prices, certain slow-moving or discontinued models and product lines.

In the European Region, on a unit basis, shipments to customers of traditional cameras decreased approximately 5% and shipments to customers of traditional film decreased approximately 30% in the first half of 2001 compared with the first half of 2000. In addition, shipments to customers of newer cameras decreased approximately 60% and shipments to customers of newer film decreased approximately 20% in the first half of 2001 compared with the same period of 2000.

Net sales in the European Region decreased 34% to $124 million in the first half of 2001 from $186 million in the first half of 2000. The decrease was due to lower sales of traditional film and, to a lesser degree, newer cameras and other core products. In addition, but to a lesser degree, the unfavorable impact of foreign exchange also contributed to the decrease in sales in the Region. The decrease in sales of traditional film and newer camera and film products was caused by lower customer demand for these products and retailers reducing their inventories of these products.

In the Asia Pacific Region, on a unit basis, shipments to customers of traditional cameras and film decreased approximately 25% in the first half of 2001 compared with the first half of 2000. In addition, shipments to customers of newer cameras decreased approximately 40% and shipments to customers of newer film decreased approximately 30% in the first half of 2001 compared with the same period of 2000.

Net sales in the Asia Pacific Region decreased 41% to $91 million in the first half of 2001 from $153 million in the first half of 2000. The decrease was due to lower sales of traditional film and, to a lesser degree, newer cameras and film, other core products and traditional cameras. In addition, but to a lesser degree, the unfavorable impact of foreign exchange also contributed to the decrease in sales in the Region. The decrease in sales of traditional and newer camera and film products was caused by lower customer demand for these products and retailers reducing their inventories of these products.

<PAGE>                                                                    24

PROFIT/(LOSS) FROM OPERATIONS

Worldwide loss from operations in the first half of 2001 was $170 million compared with profit from operations of $60 million in the first half of 2000. Worldwide loss from operations in the first half of 2001 included $80 million for restructuring and other charges recorded in the first quarter of 2001. Refer to the section titled "Restructuring and Other Charges" for information concerning these charges. In addition to restructuring and other charges, the

decrease in profit from operations was due primarily to the impact of lower sales of traditional film products and, to a lesser degree digital products. Higher manufacturing costs and the impact of lower sales of newer camera and film products and traditional cameras also contributed to the decrease in profit from operations. The decreases were offset, in part, by lower spending on selling, general and administrative expenses and advertising and promotional activities.

In the first half of 2001, the Company's gross margin decreased to 31% of net sales compared with 45% of net sales in the first half of 2000. The decrease was caused by the impact of higher manufacturing costs in the first half of 2001 that were driven by reductions in the Company's production schedules, the mix of products sold in the quarter and, to a lesser degree, the impact of the Company liquidating certain slow-moving or discontinued models and product lines.

Profit from operations in the Americas Region was $88 million in the first half of 2001 compared with $166 million in the first half of 2000. The decrease was due to the impact of lower sales of traditional film and, to a lesser degree, digital products and traditional and newer cameras. In addition the impact of lower shipments, the Company liquidated, at lower prices, certain slow-moving or discontinued models and product lines. The decreases were offset, in part, by lower spending on advertising and promotional activities and selling, general and administrative expenses.

<span style="float:right">88</span>

Profit from operations in the European Region was $1 million in the first half of 2001 compared with $25 million in the first half of 2000. The decrease was due to the impact of lower sales of traditional film and, to a lesser degree, the unfavorable impact of foreign exchange. The decreases were offset, in part, by lower spending on selling, general and administrative expenses and advertising and promotional activities.

<span style="float:right">1</span>

Profit from operations in the Asia Pacific Region was $15 million in the first half of 2001 compared with $42 million in the first half of 2000. The decrease was due to the impact of lower sales of traditional film and, to a lesser degree, newer film and cameras. The decreases were offset, in part, by lower spending on selling, general and administrative expenses and advertising and promotional activities.

<span style="float:right">15</span>

Global Operations costs were $79 million in the first half of 2001 compared with $50 million in the first half of 2000. The increase in Global Operations costs related to higher manufacturing costs in the first half of 2001 that were driven by the inefficiencies of reduced production schedules.

<span style="float:right">(79)</span>

25

<PAGE>

Research and Development costs were $39 million in the first half of 2001 compared with $40 million in the first half of 2000.

<span style="float:right">(39)</span>

Corporate costs were $155 million in the first half of 2001 compared with $83 million in the first half of 2000. The increase was due to restructuring and other charges of $90 million recorded in the first quarter of 2001 offset, in part, by lower general and administrative expenses.

<span style="float:right">(75)</span>

Other income was $27 million in the first half of 2001 compared with $20 million in the same period of 2000. In the first half of 2001, other income included gains of approximately $18 million on the sale of real estate and approximately $7 million related to a distribution on the Company's investment in a joint venture developing certain real estate in Cambridge, Massachusetts. In the first half of 2000, other income included $13 million of gains on the sale of real estate and, to a lesser degree, gains on the sale of investments.

<span style="float:right">(89) loss</span>
<span style="float:right">0 IC</span>

Interest expense increased to $48 million in the first half of 2001 compared with $41 million in the first half of 2000. The increase was due to higher average amounts of debt outstanding during the period offset, in part, by lower average interest rates.

Income tax expense in the first half of 2001 was $10 million on a reported loss before income taxes of $191 million. Income tax expense recorded in the first half of 2001 included a charge of approximately $53 million for the establishment of a valuation allowance against certain deferred tax assets. The valuation allowance, which reduced the deferred tax asset, was recorded because the Company has determined that it is "more likely than not" that some portion

<span style="float:right">0 IC  ?</span>

of the deferred tax benefits will not be realized over a reasonable period of time. In the first half of 2000, the Company recorded income tax expense of $14 million or 35% of reported earnings before income taxes of $39 million.

In the first half of 2001, the Company recorded a net loss of $201 million, or $4.35 basic loss per common share compared with a net earnings of $25 million or $.56 basic earnings per common share in the first half of 2000. Diluted earnings/loss per common share was the same as basic earnings/loss per common share in the first half of 2001 and 2000.

<PAGE>                                                                    26

RESTRUCTURING AND OTHER CHARGES

In June 2001, the Company announced a major global restructuring designed to reduce its costs and improve its cash flows. This announcement was in addition to the 2001-Q1 Program (defined below) under which the Company recorded $80 million of restructuring and other charges. In connection with its latest announcement, the Company expects to record a series of pre-tax restructuring and other charges beginning in the third quarter of 2001 and continuing through 2002. The series of charges (collectively, the "June 2001 Program") will be allocated to the non-segment Corporate category and are expected to range between $150 million and $175 million. The June 2001 Program will consist of severance costs related to an involuntary severance program under which the Company will eliminate approximately 2,000 positions, asset write-offs primarily related to the reconfiguration of the Company's Global Operations segment and exit costs related to certain of the Company's operations that will be restructured. The Company believes approximately 50% of the positions to be eliminated under the June 2001 Program will be from the Global Operations segment, approximately 33% from the regional sales and marketing segments and the remainder from the Research and Development segment and the non-segment Corporate category.

In the first quarter of 2001, the Company recorded restructuring and other charges of $80 million which consisted of severance costs and impairment charges related to certain long-lived assets and an intangible asset. These charges (collectively, the "2001-Q1 Program") were allocated to the non-segment Corporate category and were undertaken to reduce overhead costs and realign the Company's resources.

Approximately $50 million of the charges recorded in the first quarter of 2001 for the 2001-Q1 Program related to an involuntary severance program under which approximately 950 employees (consisting of sales and marketing employees in the regional segments: Americas - 14%; European - 6%; Asia Pacific - 3%; manufacturing employees in Global Operations - 49%; research and engineering employees in Research and Development - 14%; and administrative employees in the non-segment Corporate category - 14%), are expected to leave the Company. Approximately 600 of the expected 950 terminations under the 2001-Q1 Program had occurred in the first half of 2001 with the remaining terminations expected to be substantially complete by the end of 2001. Approximately $13 million of cash payments had been made to employees that left the Company under the 2001-Q1 Program in the first half of 2001, with the remaining cash severance payments of approximately $33 million expected to be substantially complete by the end of the first quarter of 2002. Of the total amount provided for severance approximately $4 million related to pension curtailment costs. The major impact of the 2001-Q1 Program on the Company's segments and the non-segment Corporate category will be the reduction in the number of employees and, as a result, streamlined overhead structures and a reduction in the Company's excess manufacturing capacity.

<PAGE>                                                                    27

In addition to severance costs, the asset impairment portion of the 2001-Q1 Program totaled approximately $30 million in the first quarter of 2001. Of this amount, approximately $12 million related to assembly equipment that was used to produce other core products but will be scrapped because the Company has decided to out-source the manufacture of these products. Approximately $11 million of the write-offs related to surplus instant film assembly equipment, primarily related to certain newer core products, that will either be abandoned in place

or scrapped based on a strategic decision to consolidate manufacturing operations. The write-offs also included approximately $7 million of goodwill that related to a non-strategic software company that was determined to be impaired.

Under the 2001-Q1 Program, the Company expects to realize cost savings of approximately $60 million on an annualized basis after the savings are fully realized. The Company expects to realize additional cost savings of between $175 million and $200 million after the savings are fully realized under the June 2001 Program. The Company has begun to realize some of the savings under the 2001-Q1 Program and expects to realize the full savings from the 2001-Q1 Program by the end of 2002 and the full savings from the June 2001 Program by the end of 2003.

FINANCIAL LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents were $94 million at July 1, 2001 and $97 million at December 31, 2000. Net cash used in operating activities was $33 million in the first half of 2001. The net loss, adjusted for non-cash items (i.e. depreciation, gains on the sale of real estate and other non-cash items) and restructuring charges decreased cash flow from operations by $72 million, and a decrease in accounts payable and accruals reduced cash flow from operations by an additional $105 million. The decreases were offset, in part, by a $144 million decrease in accounts receivable and a $34 million decrease in inventories. Net cash provided by investing activities was $20 million in the first half of 2001 and related to $54 million of proceeds from the sale of property, plant and equipment offset by $33 million of capital spending. Net cash provided by financing of $12 million in the first half of 2001 related to an increase in the amount of short-term debt outstanding.

Working capital, defined as current assets less current liabilities, was $38 million at July 1, 2001 and $325 million at December 31, 2000. Excluding the restructuring charges recorded in the first quarter of 2001 and the reclassification of $150 million of debt from long-term to short-term because it is due in less than twelve months, working capital, as adjusted, was $238 million at July 1, 2001. The decrease in working capital, as adjusted, relates to decreases in accounts receivable and inventory offset, in part, by decreases in accounts payable and accruals and compensation and benefits.

28

The decrease in accounts receivable was the result of lower sales in the first half of 2001 compared with the first half of 2000 and the Company's focused collection efforts during the first half of 2001. Inventories, which are also part of the Company's focus to improve cash flow, decreased because of reductions in production schedules and the liquidation of certain slow-moving or discontinued models and product lines. The decrease in accounts payable and accruals relates to cost cutting initiatives and reduced production schedules implemented in the first half of 2001. The decrease in compensation and benefits, excluding the impact of restructuring charges, relates to reduced headcount caused by employees that left the Company in the first half of 2001 under the 2001-Q1 Program.

In the second quarter of 2001, the Company sold its 56-acre reservoir site in Waltham, Massachusetts for approximately $69 million. As part of the sale agreement, the Company entered into a lease for certain portions of the reservoir site for periods of up to seven years. As a result, receipt of approximately $15 million of the sales price was deferred and will be released to the Company, over the term of the lease, as certain conditions are met. A portion of the net cash proceeds from the sale were used by the Company to repay outstanding borrowings under the Amended Credit Agreement. In addition, the Company received a cash distribution of approximately $12 million from a real estate joint venture developing certain real estate in Cambridge, Massachusetts.

In the first half of 2001, capital spending totaled $33 million compared with $67 million for the same period of 2000. The decrease, which is consistent with the Company's goal to reduce capital spending from $129 million in 2000 to approximately $80 million in 2001, was due to lower spending on manufacturing capacity related to the Company's newer camera and film products and the Company's enterprise-wide software system.

At July 1, 2001, the Company had $525 million outstanding in short-term debt and

$424 million outstanding in long-term debt. The amount of short-term debt outstanding was comprised of $330 million under the Amended Credit Agreement, $47 million under the U.K. Credit Agreement, $150 million under its 6 3/4% Notes due January 15, 2002 (the "2002 Notes") and $18 million under uncommitted short-term lines of credit. The amount of long-term debt outstanding was comprised of $275 million under its 11 1/2% Notes due February 15, 2006 (the "2006 Notes") and $149 million under its 7 1/4% Notes due January 15, 2007 (the "2007 Notes" and, with the 2002 Notes and the 2006 Notes, collectively, the "Notes").

<PAGE>                                                                29

The Company's domestic credit agreement (as amended, the "Amended Credit Agreement") initially provided for a maximum commitment of $350 million on a revolving basis and is scheduled to mature on December 31, 2001. In connection with the Amended Credit Agreement and the waivers to it, which are summarized below, the Company granted the lenders under the Amended Credit Agreement a first security interest in substantially all of the Company's domestic personal property and mortgages on certain real estate, except for principal properties, in each case, as permitted by the indentures pursuant to which the Notes were issued. Funds borrowed under the Amended Credit Agreement initially bore interest, at the Company's option, at either the prime rate of J.P. Morgan Chase & Co. ("Prime") plus a margin or LIBOR on euro-dollar loans plus a margin. The margins ranged from 0% to 1.275% for prime based loans and from .190% to 2.275% for euro-dollar loans based on the Company's credit rating. In addition, the Company has paid the lenders a facility fee ranging from .085% to .725% depending on the Company's credit rating, a commitment fee on unused commitments ranging from 0% to .025% depending on the Company's credit rating and a fee to the administrative agent.

The credit agreement of the Company's wholly-owned subsidiary, Polaroid U.K. Limited, for which the Company acts as a guarantor (as amended, the "U.K. Credit Agreement") initially provided for a maximum commitment of 72.5 million euros and is scheduled to mature on December 31, 2001. In connection with the U.K. Credit Agreement and the waivers to it, which are summarized below, Polaroid U.K. Limited granted the lenders a security interest in certain of its and the Company's other subsidiaries' accounts receivable and inventories. Funds borrowed under the U.K. Credit Agreement initially bore interest at approximately 25 basis points higher than that paid for euro-dollar loans under the Amended Credit Agreement. In addition, the Company initially paid a facility fee ranging from .085% to .75% depending on the Company's credit rating, an arrangement fee and a fee to the administrative agent.

The Amended Credit Agreement and the U.K. Credit Agreement require the Company to maintain financial ratios related to the maximum level of debt to earnings before interest, taxes, depreciation and amortization (as defined in the Amended Credit Agreement) of 3.30 to 1 (the "Debt/EBITDA Ratio") and minimum interest coverage (as defined in the Amended Credit Agreement) of 3.00 to 1 (the "Interest Coverage Ratio"). In addition to financial ratios, the Amended Credit Agreement and the U.K. Credit Agreement contain covenants that restrict, among other things, the Company's ability to do the following: make certain capital expenditures; make certain payments for the repurchase of stock or dividends to shareholders; incur additional debt; incur certain liens; make certain investments; enter into certain sale and leaseback transactions; enter into certain transactions with affiliates; and merge, consolidate, sell or transfer all or substantially all of the Company's assets subject to certain financial conditions.

<PAGE>                                                                30

On February 16, 2001, the Company entered into a waiver with the lenders under the Amended Credit Agreement and the U.K. Credit Agreement, each of which has been amended and supplemented a number of times since then, most recently on July 12, 2001. The waivers, as extended by the amendments and supplements, expire on October 12, 2001. The waivers waive, until their expiration date, existing defaults and potential defaults of the Debt/EBITDA Ratio and Interest Coverage Ratio and any events of default under the Amended Credit Agreement and the U.K. Credit Agreement that will result from the

Company's failure to make the scheduled interest payments on any series of Notes (described below), so long as either (1) the Company does not make any of the July 15, 2001 or August 15, 2001 interest payments or (2) the trustee under the indentures pursuant to which any series of Notes were issued or persons purporting to constitute holders of at least 25% of the outstanding principal amount of any series of the Notes do not accelerate the maturity of their Notes or commence legal proceedings to collect unpaid interest on their Notes.

Under the waiver to the Amended Credit Agreement:

o    the maximum available borrowings are limited to $316 million, but the Company expects the limit will increase by approximately $800,000 per month, not to exceed $7 million, as the Company makes payments on the lease it entered into in connection with the sale of its 56-acre reservoir site in Waltham, Massachusetts less any cash the Company receives from the buyer in connection with the deferred portion of the purchase price;

o    additional covenants restrict, among other things, the Company's ability to make certain capital expenditures, make certain payments for the repurchase of stock or dividends to shareholders, make certain interest payments, enter into certain hedging transactions and make certain acquisitions and investments;

o    additional covenants also require the Company to maintain certain minimum cash flow amounts, increase the Company's reporting obligations to the lenders, provide security interests in substantially all of the Company's domestic personal property and mortgages on certain real estate, except for principal properties, in each case, as permitted by the indentures pursuant to which the Notes were issued and require the Company to commence preparation of a plan of restructuring of its capital structure; and

o    during the waiver period of July 12, 2001 through October 12, 2001, borrowings will bear interest, at the Company's option, at either Prime plus 2.525% or LIBOR plus 3.525% regardless of the Company's credit rating and, the Company will pay the lenders a facility fee of .725%, a commitment fee on unused commitment of .025% and a fee to the administrative agent.

Under the waiver to the U.K. Credit Agreement:

o    the maximum available borrowings are limited to 57 million euros or approximately $49 million at July 1, 2001;

o    many of the additional covenants contained in the waiver to the Amended Credit Agreement were incorporated into the waivers under the U.K. Credit Agreement and the Company expects to provide a security interest in substantially all of the personal property and real estate of Polaroid U.K. Limited; and

o    during the waiver period of July 12, 2001 through October 12, 2001, borrowings will bear interest at LIBOR plus 3.5% regardless of the Company's credit rating and the Company will pay the lenders a facility fee of .75%, an arrangement fee and a fee to the administrative agent.

At July 1, 2001, the weighted average interest rate on amounts outstanding under the Amended Credit Agreement was approximately 7.9% and the weighted average interest rate on amounts outstanding under the U.K. Credit Agreement was approximately 6.8%.

The indenture, pursuant to which the 2006 Notes were issued, contains covenants that restrict, among other things, the Company's ability to do the following: make certain payments for the repurchase stock or dividends to shareholders;

incur additional debt or issue preferred stock; incur certain liens; make certain investments; enter into certain sale and leaseback transactions; enter into certain transactions with affiliates; and merge, consolidate, sell or transfer all or substantially all of the Company's assets subject to certain financial conditions.

On July 16, 2001, the Company did not make scheduled interest payments totaling $10.5 million on its 2002 Notes and its 2007 Notes and, on August 15, 2001, will not make a scheduled interest payment of $15.8 million on its 2006 Notes. The failure to make the interest payments on the 2002 Notes and 2007 Notes constituted defaults under the Indenture pursuant to which the 2002 Notes and 2007 Notes were issued. Under the Indenture governing the 2002 Notes and 2007 Notes, because the defaults will not be cured within 30 days of their occurrence, the defaults will become events of default under the indenture, which will give the holders of the 2002 Notes and the 2007 Notes the right to accelerate the maturity of all principal and past due interest on the 2002 Notes and the 2007 Notes, which aggregated $310.5 million at July 15, 2001. The failure to cure the default under the 2006 Notes within 30 days of August 15, 2001 will similarly give rise to an event of default under the indenture pursuant to which the 2006 Notes were issued, which will give the holders of the 2006 Notes the right to accelerate the maturity of all principal and past due interest on the 2006 Notes, which aggregated $288.2 million at July 15, 2001. Holders of the Notes also have the right to sue the Company to collect interest that is accrued and unpaid when due and payable. When the defaults regarding the 2002 Notes and 2007 Notes become events of default, these payment defaults will also result in events of default under the indenture pursuant to which the 2006 Notes were issued, the Amended Credit Agreement and the U.K. Credit Agreement under the cross-default provisions in those agreements. While these defaults under the Amended Credit Agreement and U.K. Credit Agreement have been waived by the lenders thereunder through October 12, 2001, the holders of the 2006 Notes may accelerate the maturity of their obligations.

<PAGE>                                                                        32

In addition, the indenture governing the 2006 Notes, the Amended Credit Agreement and the U.K. Credit Agreement contain certain cross-acceleration provisions, allowing these holders or lenders, under certain circumstances, to accelerate the maturity of the obligations owed to them if other holders or lenders do the same. The Company has not received notice that any holder of the Notes has taken action or notified the Company that it will take action, to enforce its rights or remedies against the Company as a result of the defaults described above.

The Company has announced its intent to negotiate with the holders of the Notes regarding a potential restructuring of the Company's debt with the objective of developing a capital structure that is more consistent with and will better support the Company's long-term business objectives. The Company is pursuing this debt restructuring plan but is unable to predict when or if it will be accepted by the holders of the Notes and, if applicable, the lenders under the Amended Credit Agreement and the U.K. Credit Agreement. If either (1) the Company makes any of the July 15, 2001 or August 15, 2001 interest payments or (2) the trustee under the indentures pursuant to which any series of the Notes were issued or if persons purporting to constitute holders of at least 25% of the outstanding principal amount of any series of Notes accelerate the maturity of their Notes and unpaid interest on the Notes or seek legal action to collect the unpaid interest, then the waivers to the Amended Credit Agreement and the U.K. Credit Agreement would lapse. In that event, the Company does not expect it could meet its accelerated payment obligations.

The Company is involved in on-going discussions with its bank lenders to extend the existing waivers to the Amended Credit Agreement and the U.K. Credit Agreement beyond their current expiration date of October 12, 2001, to allow the Company more time to develop and seek agreement from its creditors regarding a debt restructuring plan and to refinance and/or restructure the Amended Credit Agreement and the U.K. Credit Agreement. If the Company is unsuccessful in its negotiations with its existing bank lenders, the lenders will have the right to demand repayment of their loans when the waivers expire, because the Company will then be in default under the Amended Credit Agreement and the U.K. Credit Agreement. There can be no assurance that the Company's existing bank lenders will agree to extend the waivers beyond

October 12, 2001 or that the trustee or the holders of any series of Notes will not accelerate the maturity of their Notes or seek legal action to collect the unpaid interest as described above. If either (1) the holders of the any series of Notes were to accelerate the maturity of their Notes or seek legal action to collect unpaid interest or (2) the Company were to make any of the July 15, 2001 or August 15, 2001 interest payments, the waivers to the Amended Credit Agreement and the U.K. Credit Agreement would lapse. In its current financial condition, the Company does not expect that it could raise the required funds to repay outstanding borrowings under or refinance the Amended Credit Agreement and the U.K. Credit Agreement if the lenders demand repayment of their loans under these agreements.

At this time, the Company is considering all of its options regarding how to refinance and/or restructure its outstanding debt and capital structure, including by a consensual, negotiated restructuring and/or other possible methods, and is exploring a number of strategic alternatives that could include the sale of assets, a merger of sale of the Company and/or a strategic partnership. On July 11, 2001, the Company announced that it has retained financial and legal advisors to assist it in conducting these negotiations.

33

<PAGE>

The following is a summary of the Company's credit ratings as of August 5, 2001:

<TABLE>
<CAPTION>

| | CORPORATE CREDIT RATING | SENIOR UNSECURED DEBT RATING |
|---|---|---|
| <S> | <C> | <C> |
| Fitch Inc. | DDD | D |
| Moody's Corporation | Caa1 | Ca |
| Standard & Poor's Rating Service | D | D |

</TABLE>

In 2001, the Company's corporate credit ratings were downgraded four times by Fitch Inc. ("Fitch") from BB to DDD, twice by Moody's Corporation ("Moody's") from Ba2 to Caa1 and four times by Standard & Poor's Rating Service ("S&P") from BB- to D. In addition, the Company's senior unsecured debt ratings were downgraded four times by Fitch from BBB- to D, three times by Moody's from Ba3 to Ca and four times by S&P from B+ to D. Each of the rating agencies noted above have a negative outlook for the Company's corporate credit rating and its senior unsecured debt rating.

FOREIGN CURRENCY EXCHANGE

The Company generates a substantial portion of its revenues in international markets, which subjects its operations to the exposure of currency exchange fluctuations. The impact of currency exchange rate movement can be positive or negative in any given period. The Company's ability to counteract currency exchange rate movement is primarily dependent on pricing in local markets and, to a lesser degree, in the short-term, on hedging through nonfunctional currency denominated borrowings, forward exchange contracts and the purchase of currency options.

34

<PAGE>

The Company maintains a Monetary Control Center (the "MCC") which operates under written policies and procedures that define its day-to-day operating guidelines. In addition, the MCC is subject to random independent audits and reports to a supervisory committee comprised of members of the Company's senior management. The MCC publishes regular reports to the supervisory committee detailing foreign currency activities. Exposure limits for nonfunctional currency denominated borrowings and forward exchange contracts are outlined in the MCC's policies and procedures. Currency option purchases require approval from the Company's senior management.

To minimize the impact of currency fluctuations on its net monetary assets

denominated in currencies other than the relevant functional currency
("nonfunctional currencies") the Company engages in nonfunctional currency
denominated borrowings. The Company determines the aggregate amount of such
borrowings based on forecasts of each entity's nonfunctional currency
denominated net monetary asset position and the relative strength of the
functional currencies compared with the nonfunctional currencies. These
borrowings create nonfunctional currency denominated liabilities that hedge the
Company's nonfunctional currency denominated net monetary assets. Upon receipt
of the borrowed nonfunctional currency denominated funds, the Company converts
those funds to the functional currency at the spot exchange rate. Exchange gains
and losses on the nonfunctional currency denominated borrowings are recognized
in earnings as incurred. The amount of the Company's outstanding short-term debt
incurred for hedging purposes was $65 million at July 1, 2001.

Alternatively, the Company may use forward exchange contracts to minimize the
impact of currency fluctuations on its net monetary assets denominated in
nonfunctional currencies. The term of these contracts typically does not exceed
six months and the Company does not enter into forward exchange contracts for
trading purposes. The notional value of the Company's outstanding forward
exchange contracts at July 1, 2001, all of which expire in the next three
months, totaled $35 million and consisted of $11 million of forward exchange
contracts denominated in euros and $24 million of forward exchange contracts
denominated in other foreign currencies.

The Company has limited flexibility to increase prices in local currencies and
offset the adverse impact of foreign exchange. As a result, the Company
purchases U.S. dollar call/foreign currency put options with the objective of
minimizing the impact of exchange rate risk related to a portion of its
forecasted foreign-currency denominated intercompany sales. The term of
purchased options typically does not exceed 18 months and all of the option
contracts outstanding at July 1, 2001 will expire in the next twelve months. The
Company does not write options or purchase options for trading purposes. At July
1, 2001, the notional value of the Company's outstanding option contracts
totaled $133 million, consisting of $67 million of option contracts denominated
in euros and $66 million of option contracts denominated in Japanese yen.

<PAGE>                                                                    35

IMPACT OF INFLATION

Inflation continues to be a factor in many of the countries in which the Company
does business. The Company's pricing strategy and continuing efficiency
improvements have offset inflation and normal cost increases to a considerable
degree. The overall inflationary impact on the Company's earnings has not been
material.

EURO CONVERSION

On January 1, 1999, eleven of the fifteen member countries of the European Union
established fixed conversion rates between their existing sovereign currencies
(the "legacy currencies") and one common currency (the "euro"). The
participating countries adopted the euro as their common currency on January 1,
1999. The euro is now traded on currency exchanges and may be used in business
transactions. On January 1, 2002, new euro-denominated bills and coins will be
issued by the participating countries. The legacy currencies will then be
withdrawn and will cease to be legal tender effective June 30, 2002. During the
period from January 1, 1999 to June 30, 2002, parties may use either the euro or
a participating country's legacy currency as legal tender.

In 1998, the Company formed an Economic and Monetary Union Steering Committee
and Project Team (the "EMU Committee"). The EMU Committee has analyzed the
impact of the euro conversion on the Company in a number of areas, including the
Company's information systems, product pricing, finance and banking resources,
foreign exchange management, contracts and accounting and tax departments. While
the Company is in the process of making certain adjustments to its business and
its operations to accommodate the euro conversion, the EMU Committee believes,
based on information available at this time and on several assumptions, that the
euro conversion process will not have a material adverse impact on the Company's
results of its operations or financial position.

FACTORS THAT MAY AFFECT FUTURE RESULTS

Some statements in this report, including those under "Financial Liquidity and Capital Resources" above, may be forward looking in nature, or "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995 (the "Act"). These statements may be identified by the use of forward-looking words or phrases such as "expect", "anticipate", "plan", "intend", "will", "estimate", "potential", "strategy" and "forecast" among others. The Company desires to take advantage of the "safe harbor" provisions of the Act. Many of the important factors below have been discussed in prior filings by the Company with the Securities and Exchange Commission. The Company therefore cautions shareholders and investors that actual results may differ materially from those projected in or implied by any forward-looking statement as a result of a wide variety of factors which include, but are not limited to the Company's ability:

<PAGE>
36

o     to refinance, restructure and/or extend the maturities of its existing credit facilities, which mature on December 31, 2001, and the Company's outstanding Notes and, to negotiate new terms of these facilities and Notes to allow the Company to operate with less debt, but with sufficient liquidity and operating flexibility, so that it can continue to implement its business strategy;

o     to cure the events of default under the indenture governing the 2002 Notes and 2007 Notes, which will arise in the third quarter of 2001 from the Company's failure to make scheduled interest payments on these Notes, and to cure the event of default under the indenture governing the 2006 Notes which will likely arise on September 15, 2001, following the Company's failure to make a scheduled interest payment on the 2006 Notes, which will give the trustee and the holders of the Notes the right to accelerate the maturity of the Notes and commence legal proceedings to collect the unpaid interest on the Notes, which cause the waivers of these agreements to lapse;

o     to manage the Company's relationships with its creditors, including the holders of the Notes, bank lenders, and vendors, employees and customers given its current financial condition;

o     to access alternative sources of financing if it is unable to refinance, restructure and/or renegotiate the Amended Credit Agreement and the U.K. Credit Agreement in order to finance the implementation of its business strategy and short-term liquidity needs;

o     to limit the amount of time that the Company's senior management must devote to negotiating the restructuring, refinancing and/or extending the maturities of its debt agreements and pursuing strategic alternatives so that management will have time to focus on the implementation of the Company's financial and business strategies;

o     to retain a number of key senior managers and other employees and to be able to attract and retain qualified senior managers and other employees who can implement the Company's financial and business strategies;

o     to avoid continuing periods of net losses which could require the Company to find additional sources of financing to fund operations, implement its financial and business strategies, meet anticipated capital expenditures, research and development costs and financing commitments;

<PAGE>
37

o     to implement its business strategies of reducing costs and improving cash flow; manage the instant imaging business for cash and profitability and develop its instant digital

printing and other digital products, which will require, among other things:

- further reducing costs, which may prove challenging for several reasons, including the fact that the Company has already undergone several restructurings and several quarters in which it has already realized significant efficiencies, while continuing to support the development of its instant digital printing business;
- maximizing the profitability of and cash flow from the Company's instant imaging business, which includes anticipating which of its current and new instant imaging products will be most profitable in the short-term and phasing out less profitable instant imaging products; and
- continuing to develop and market instant digital printing products profitably, including the development of partnerships and alliances with other companies, which may prove challenging given the Company's financial condition, and by anticipating and responding to trends in the rapidly changing, competitive and costly digital imaging market;

o to compete successfully in the instant imaging market against larger and stronger competitors like Fuji Photo Film Co., Ltd. ("Fuji"), and in the digital imaging market against competitors like Eastman Kodak Company, Fuji, Hewlett-Packard Company, Cannon U.S.A., Inc. and Sony Corporation;

o to retain its top customers and limit the Company's vulnerability to general adverse economic conditions, particularly the current economic slow-down, and the impact of digital and other competing media formats which has resulted in lower customer demand for the Company's products and retailers reducing their inventories;

o to increase its ability to compete with competitors that are less leveraged and have greater financial and other resources; increase its ability to fund future working capital needs, capital expenditures, research and development costs and other general corporate requirements; and increase its flexibility to react to changes in the businesses and industry in which it operates;

o to sell and market its products worldwide particularly in light of the major risks associated with worldwide operations such as various local laws and customs and the Company's exposure to fluctuation of foreign exchange rates, particularly the Japanese yen and euro;

<PAGE>                                                                  38

o to retain certain sole source suppliers, or find timely alternatives, for raw materials, supplies and finished goods necessary for the manufacture and sale of its products, including chemicals, polyester film base, specialty paper and certain components;

o to find suitable manufacturers to which the Company can outsource the manufacture of certain products;

o to develop and continue to protect ownership of, and license as appropriate, valuable intellectual property rights; and

o to comply with the large number of federal, state and local environmental laws and regulations that govern, among other things, the discharge of hazardous materials into the air and water as well as the handling, storage and disposal of such materials.

There can be no assurance that the Company will be successful in accomplishing

its objectives and meeting the challenges summarized above. If the Company is
not successful, the Company's business and results of operations could be
materially, negatively impacted.

<PAGE>                                                                          39

                           PART 11 - OTHER INFORMATION


ITEM 1.  LEGAL PROCEEDINGS

The Company owns and operates facilities that are subject to certain federal,
state and local laws and regulations relating to environmental protection,
including those governing the investigation and remediation of contamination
resulting from past or present releases of hazardous substances. Certain of
these laws and regulations may impose joint and several liability on the Company
for the costs of investigation or remediation of such contamination, regardless
of fault or the legality of original disposal.

The Company, together with other parties, is currently designated a Potentially
Responsible Party ("PRP") by the United States Environmental Protection Agency
and certain state agencies with respect to the response costs for environmental
remediation at several sites. The Company believes that its potential liability
with respect to any site and with respect to all sites in the aggregate will not
have a materially adverse effect on the financial condition or operating results
of the Company.

Due to a wide range of estimates with regard to response costs at those sites
and various other uncertainties, the Company cannot firmly establish its
ultimate liability concerning those sites. In each case in which the Company is
able to determine the likely exposure, such amount has been included in the
Company's reserve for environmental liabilities. Where a range of comparably
likely exposures exists, the Company has included in its reserve at least the
minimum amount of the range. The Company's aggregate reserve for these
liabilities was $.8 million as of July 1, 2001 and the Company currently
estimates that the majority of the reserve will be payable over the next two to
three years. The Company reviews the analysis of the data that supports the
adequacy of this reserve on a quarterly basis. The reserve for such liability
does not provide for associated litigation costs, which, if any, are expected to
be inconsequential in comparison with the amount of the reserve. The Company
will continue to accrue in its reserve appropriate amounts from time to time as
circumstances warrant. This reserve does not take into account potential
recoveries from third parties.

Federal law provides that PRPs may be held jointly and severally liable for
response costs. Based on current estimates of those costs and after
consideration of the potential estimated liabilities of other PRPs with respect
to those sites and their respective estimated levels of financial
responsibility, the Company does not believe its potential liability will be
materially enlarged by the fact that liability is joint and several.

The Company reviews its recurring internal expenditures on environmental
matters, as well as capital expenditures related to environmental compliance, on
a monthly basis and reviews its third-party expenditures on environmental
matters on a quarterly basis. The Company believes that these expenditures have
not had and will not have a materially adverse effect on the financial condition
or operating results of the Company.

                                                                               40

<PAGE>

The Company is involved in various legal proceedings and claims arising in the
ordinary course of business. The Company believes that the disposition of these
matters will not have a materially adverse effect on its results of operations
or financial condition.

ITEM 2.  CHANGES IN SECURITIES AND USE OF PROCEEDS

a) Not applicable.

b) Not applicable.

c) Not applicable.

d) Not applicable.

ITEM 3.  DEFAULTS UPON SENIOR SECURITIES

On July 16, 2001, the Company did not make scheduled interest payments totaling $10.5 million on its 6 3/4% Notes due January 15, 2002 (the "2002 Notes") and its 7 1/4% Notes due January 15, 2007 (the "2007 Notes") and, on August 15, 2001, will not make a scheduled interest payment of $15.8 million on its 11 1/2% Notes due February 15, 2006 (the "2006 Notes" and, with the 2002 Notes and the 2007 Notes, collectively, the "Notes"). The failure to make the interest payments on the 2002 Notes and 2007 Notes constituted a default under the indenture pursuant to which the 2002 Notes and 2007 Notes were issued. Under the indenture governing the 2002 Notes and 2007 Notes, because the defaults will not be cured within 30 days of their occurrence, the defaults will become events of default under the indenture, which will give the holders of the 2002 Notes and the 2007 Notes the right to accelerate the maturity of all principal and past due interest on the 2002 Notes and the 2007 Notes, which aggregated $310.5 million at July 15, 2001. The failure to cure the default under the 2006 Notes within 30 days of August 15, 2001 will similarly give rise to an event of default under the indenture pursuant to which the 2006 Notes were issued, which will give the holders of the 2006 Notes the right to accelerate the maturity of all principal and past due interest on the 2006 Notes, which aggregated $288.2 million at July 15, 2001. Holders of the Notes also have the right to sue the Company to collect interest that is accrued and unpaid when due and payable. When the defaults regarding the 2002 Notes and 2007 Notes become events of default, these payment defaults will also result in events of default under the indenture pursuant to which the 2006 Notes were issued, the Company's domestic credit agreement (as amended, the "Amended Credit Agreement") and the credit agreement of the Company's wholly-owned subsidiary, Polaroid U.K. Limited, for which the Company acts as a guarantor (as amended, the "U.K. Credit Agreement") under the cross-default provisions in those agreements. While these defaults under the Amended Credit Agreement and U.K. Credit Agreement have been waived by the lenders thereunder through October 12, 2001, the holders of the 2006 Notes may accelerate the maturity of their obligations. In addition, the indenture governing the 2006 Notes, the Amended Credit Agreement and the U.K. Credit Agreement contain certain cross-acceleration provisions, allowing these holders or lenders, under certain circumstances, to accelerate the maturity of the obligations owed to them if other holders or lenders do the same. The Company has not received notice that any holder of the Notes has taken action or notified the Company that it will take action, to enforce its rights or remedies against the Company as a result of the defaults described above.

<PAGE>

41

The Company has announced its intent to negotiate with the holders of the Notes regarding a potential restructuring of the Company's debt with the objective of developing a capital structure that is more consistent with and will better support the Company's long-term business objectives. The Company is pursuing this debt restructuring plan but is unable to predict when or if it will be accepted by the holders of the Notes and, if applicable, the lenders under the Amended Credit Agreement and the U.K. Credit Agreement. If either (1) the Company makes any of the July 15, 2001 or August 15, 2001 interest payments or (2) the trustee under the indentures pursuant to which any series of the Notes were issued or if persons purporting to constitute holders of at least 25% of the outstanding principal amount of any series of Notes accelerate the maturity of their Notes and unpaid interest on the Notes or seek legal action to collect the unpaid interest, then the waivers to the Amended Credit Agreement and the U.K. Credit Agreement would lapse. In that event, the Company does not expect it could meet its accelerated payment obligations.

The Company is involved in on-going discussions with its bank lenders to extend the existing waivers to the Amended Credit Agreement and the U.K. Credit Agreement beyond their current expiration date of October 12, 2001, to allow the Company more time to develop and seek agreement from its creditors regarding a debt restructuring plan and to refinance and/or restructure the Amended Credit Agreement and the U.K. Credit Agreement. If the Company is

unsuccessful in its negotiations with its existing bank lenders, the lenders will have the right to demand repayment of such loans when the waivers expire, because the Company will then be in default under the Amended Credit Agreement and the U.K. Credit Agreement. There can be no assurance that the Company's existing bank lenders will agree to extend the waivers beyond October 12, 2001 or that the trustee or the holders of any series of Notes will not accelerate the maturity of their Notes or seek legal action to collect the unpaid interest as described above. If either (1) the holders of any series of Notes were to accelerate the maturity of their Notes and unpaid interest on the Notes or seek legal action to collect unpaid interest or (2) the Company were to make any of the July 15, 2001 or August 15, 2001 interest payments, the waivers to the Amended Credit Agreement and the U.K. Credit Agreement would lapse. In its current financial condition, the Company does not expect that it could raise the required funds to repay outstanding borrowings or refinance the Amended Credit Agreement and the U.K. Credit Agreement if the lenders demand repayment of their loans under these agreements.

The Company has retained financial and legal advisors to assist it in conducting the negotiations described above, considering its refinancing and restructuring options and exploring a number of strategic alternatives, including the sale of assets, a merger or sale of the Company and/or a strategic partnership. See "Financial Liquidity and Capital Resources" within "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information regarding the Company's financial condition.

42

&lt;PAGE&gt;

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The 2001 Annual Meeting of Shareholders of Polaroid Corporation was held on May 8, 2001. The owners of 39,701,725 shares, or approximately 85% of the shares of common stock entitled to vote at this meeting, were present either in person or represented by proxy. The following were the voting results for the meeting:

     o      the stockholders elected the nominated slate of directors to hold office until the next annual meeting with the following votes:

&lt;TABLE&gt;
&lt;CAPTION&gt;

|  | VOTED | WITHHELD |
|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; |
| Gary T. DiCamillo | 34,019,159 | 5,682,566 |
| Stephen A. Bernasconi | 34,481,186 | 5,220,539 |
| Stephen B. Kaufman | 34,538,140 | 5,163,585 |
| John W. Loose | 34,498,902 | 5,202,823 |
| Albin F. Moschner | 34,456,799 | 5,244,926 |
| Alfred Poe | 34,449,700 | 5,252,025 |
| Dr. Ralph Z. Sorenson | 34,454,255 | 5,247,470 |
| Carole F. St. Mark | 34,482,830 | 5,218,895 |
| Bernee D.L. Strom | 34,424,586 | 5,277,139 |
| Alfred M. Zeien | 34,416,749 | 5,284,976 |

&lt;/TABLE&gt;

     o      the shareholder proposal concerning the Polaroid Stock Incentive Plan was ratified with 16,374,315 shares voting for, 8,768,845 shares voting against and 14,558,565 shares abstaining.

     o      the stockholders ratified the appointment of KPMG LLP, Independent Public Accountants, as the Company's auditors for 2001 with 37,364,959 shares voting for, 1,925,472 shares voting against and 411,294 shares abstaining.

ITEM 5.   OTHER INFORMATION

Not applicable.

<PAGE>

ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

a) EXHIBITS

<TABLE>
<CAPTION>

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| <S> | <C> |
| 3.1(*) | By-laws of Polaroid Corporation amended and restated as of May 16, 2001. |
| 10.1(*) | Employment Agreement dated as of June 6, 2001 between Polaroid Corporation and William L. Flaherty. |
| 10.2(*) | Change in Control and Severance Agreement dated as of June 6, 2001 between Polaroid Corporation and William L. Flaherty. |
| 10.3(*) | Employment Agreement dated as of July 1, 2001 between Polaroid Corporation and Neal D. Goldman. |
| 12(*) | Ratio of Earnings to Fixed Charges. |
| 15(*) | Letter re Unaudited Interim Financial Information. |

</TABLE>

(*) - Filed herewith.

Exhibits are not included in copies to this Form 10-Q except those copies filed with the Securities and Exchange Commission. A copy of these exhibits will be furnished to stockholders upon written request.

b) REPORTS ON FORM 8-K

During the second quarter of 2001, the Company filed the following:

o       Current Report on Form 8-K dated April 19, 2001, (the Company filed a press release as Exhibit 99.1 announcing the results for the three months ended April 1, 2001);

o       Current Report on Form 8-K dated May 31, 2001, (the Company filed a press release as Exhibit 99.1 announcing two new digital printing strategies and outlining its new business model for instant and digital businesses);

o       Current Report on Form 8-K dated June 7, 2001, (the Company filed a press release as Exhibit 99.1 announcing the appointment of a new chief financial officer);

o       Current Report on Form 8-K dated June 13, 2001, (the Company filed a press release as Exhibit 99.1 announcing a restructuring plan); and

o       Current Report on Form 8-K dated June 20, 2001, (the Company filed an Amended and Restated Rights Agreement dated as of July 1, 2001, between Polaroid Corporation and Fleet National Bank, as rights agent).

<PAGE>

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

POLAROID CORPORATION
(Registrant)

By /s/ William L. Flaherty
----------------------------
William L. Flaherty
Executive Vice President
and Chief Financial Officer

45

</TEXT>
</DOCUMENT>

# EXHIBIT 4

December 16, 2002



United States Bankruptcy Court
District of Delaware
824 Market Street
Wilmington, DE 19801

Re: Polaroid Corporation
    Case No. 01-10864

To the Honorable Judge Peter J. Walsh,

In support of the November 10, 2002 letter to the court from G. Maiorelli I have accomplished an analysis of Polaroid's long-term and short-term debt back to 1997 when all of this debt listed on their 2000 Annual Report started to be incurred. See Exhibit A for this analysis prepared from the 2000 Form 10-K filing with the SEC.

In January of 1997 the 2002 and 2007 notes were sold for $296.6 million to retire the $150 million notes due January 15, 1997 and repurchase the remaining principle of $139.5 million on their 2001 notes.

In February 1999 the 2006 notes were sold to retire the $200 million in notes due March 15, 1999. The remaining $75 million from the 2006 notes was to be used for corporate general purposes.

On December 11, 1998 a Credit Agreement was established, since amended several times with the last amendment being March 21, 2001, with the Morgan Guaranty Trust Company of New York establishing revolving credit up to a maximum of $320 million. This agreement granted the lender a first security interest in the Company's domestic property, equipment, other intellectual property, and general intangibles located at 868 Winter Street, Waltham Massachusetts (known as the Reservoir Site). The original agreement also provided credit to the Company's wholly-owned subsidiary Polaroid (U.K.) Limited to a maximum commitment of $73 million. Both of these credit agreements were to expire on December 31, 2001.

Polaroid's long-term and short-term debt grew from $496.6 million in 1997 to $937.5 million by the close of 2000. What I am unable to understand, is why Polaroid's CEO and Board of Directors issued the new notes for $573.5 million and borrowed under credit agreements $364 million during 1997, 1998, and 1999. If they would have sold a portion of the 29,894,724 shares of Treasury Stock they held as of January 1, 1996, they could have retired all of the outstanding notes and never incurred the credit agreements. See Exhibit B for Treasury Stock Analysis.

By selling less then 50 percent of the Treasury Stock during 1996 and 1997 Polaroid could have obtained approximately $600 million in cash and eliminated all of the

outstanding long-term debt and by this elimination would have saved approximately $240 million in future interest payments for the period of 1997 thru 2000. But instead of selling, the CEO and Board of Directors authorized the purchase of 3,537,765 shares of new Treasury Stock at a cost of $146.5 million.

My understanding is that the retired 1997, 1999, and 2001 notes were issued originally to fund the ESOP, employee stock ownership plans, and undertake a stock repurchase plan to thwart a takeover attempt during the late 1980's, and now with that threat eliminated there was no need to retain approximately 30 million shares of Treasury Stock and absolutely no need to purchase the additional 3.5 million shares for $146.5 million during the period 1996 through 1998.

If the CEO and Board of Directors had elected to sell Treasury Stock during 1996 and 1997, Polaroid would have become a debt free company and would have shown a profit of approximately $109 million after management charged off $367.7 million in restructuring costs during the same time frame. See Exhibit C for sales and earnings for the period 1991 thru 2000.

As a retired Comptroller, I am forced to believe that the CEO and Board of Directors made the decision during 1996 not to become a debt free company, but knowingly continued increasing long-term and short-term debt to a point in time where the Company would no longer maintain a positive cash flow and would have to declare bankruptcy for protection from its creditors. By making this decision, the CEO and Board of Directors were not protecting the interest of the shareholders. Ironically, all the while the management was methodically destroying a very reputable company they were giving themselves big bonuses and incentive awards.

Respectfully yours,

Leonard Lockwood

Leonard Lockwood, Retired
28220 183rd Street
Leavenworth, Kansas 66048-7703

Enclosures: Five (5) each

EXHIBIT A

Long-term and Short-term Debt

(Report in Millions)

1.) Recap of long-term debt as of December 31, 1997
        a.) 2002 & 2007 notes         $296.6
        b.) 1999 notes         200.0
            Total         $496.6

2.) Recap of long-term debt as of December 31, 1998
        a.) 2002 and 2007 notes         $297.4
        b.) 1999 notes         200.0
            Total         $497.4

3.) Recap of long-term & short-term debt as of December 31, 1999
        a.) 2002 & 2007 notes         $298.0
        b.) 2006 notes         275.0
        c.) Amended Credit Agreement         259.0
        d.) U.K. Credit Agreement         8.0
        e.) Uncommitted short-term lines of credit         16.0
            Total         $856.0

4.) Recap of long-term & short-term debt as of December 31, 2000
        a.) 2002 & 2007 notes         $298.5
        b.) 2006 notes         275.0
        c.) Amended Credit Agreement         320.0
        d.) U.K. Credit Agreement         31.0
        e.) Uncommitted short-term lines of credit         13.0
            Total         $937.5

Note: All of the above figures come from Polaroid's Form 10-K filing
        for the Fiscal Year of 2000.

## EXHIBIT B

### Treasury Stock

1.) Treasury Stock held by Polaroid
      a.) January 1, 1996                  29,894,724 shares
      b.) January 1, 1997                  30,608,160 shares
      c.) January 1, 1998                  31,437,933 shares
      d.) January 1, 1999                  30,811,263 shares
      e.) January 1, 2000                  29,895,578 shares

2.) Number of shares traded on the open stock market
      a.) 1996                              43,124,600 shares
      b.) 1997                              58,379,400 shares
      c.) 1998                              90,372,500 shares
      d.) 1999                             171,043,200 shares
      e.) 2000                             136,214,800 shares

3.) Stock price range on the open market

|          | High    | Low     | Close   | Estimated Average |
|----------|---------|---------|---------|-------------------|
| a.) 1996 | $48.50  | $39.12  | $43.50  | $40.00            |
| b.) 1997 | 60.31   | 36.25   | 48.68   | 40.00             |
| c.) 1998 | 49.93   | 17.50   | 18.68   | 25.00             |
| d.) 1999 | 30.62   | 16.50   | 18.81   | 20.00             |
| e.) 2000 | 28.43   | 5.12    | 5.81    | 12.00             |

4.) Estimated market value of Treasury Stock
      a.) 1996      29,894,724 shares @ $40.00      $1,195,788,960.00
      b.) 1997      30,608,160 shares @ $40.00       1,224,326,400.00
      c.) 1998      31,437,933 shares @ $25.00         785,948,325.00
      d.) 1999      30,811,263 shares @ $20.00         616,225,260.00
      e.) 2000      29,895,578 shares @ $12.00         358,746,963.00

5.) Treasury Stock Purchased
      a.) 1996      1,057,565 shares for $ 43,600,000.00
      b.) 1997      1,266,600 shares for   57,400,000.00
      c.) 1998      1,213,600 shares for   45,500,000.00

          Total    3,537,765 shares for $146,500,000.00

## EXHIBIT C

Polaroid's Sales & Earnings for Period
January 1, 1991 thru December 31, 2000

(Report in millions)

| Year | Net Sales | Cost of Goods Sold | Marketing, Research Admin. & Engineering | Restructuring & Special | Profit from Operations (Loss) |
|------|-----------|--------------------|------------------------------------------|-------------------------|-------------------------------|
| 1991 | $2,070.6 | $1,082.5 | $ 741.5 | $ ------- | $ 246.6 |
| 1992 | 2,152.3 | 1,178.0 | 760.5 | ------- | 213.8 |
| 1993 | 2,244.9 | 1,296.5 | 763.0 | 44.0 | 141.4 |
| 1994 | 2,312.5 | 1,324.2 | 788.0 | ------- | 200.3 |
| 1995 | 2,236.9 | 1,298.6 | 849.1 | 247.0 | (157.8) |
| 1996 | 2,275.2 | 1,283.8 | 796.6 | 143.0 | 51.8 |
| 1997 | 2,146.4 | 1,229.8 | 752.2 | 323.5 | (159.1) |
| 1998 | 1,845.9 | 1,108.4 | 736.5 | 50.0 | (49.0) |
| 1999 | 1,978.6 | 1,170.5 | 700.5 | ------- | 107.6 |
| 2000 | 1,855.6 | 1,055.9 | 696.4 | (5.8) | 109.1 |
| Total | $21,118.9 | $12,028.2 | $7,584.3 | $801.7 | $704.7 |

| Year | Other Income | Interest Expense | Fed. & State Foreign Taxes | Extraordinary Items & Change in Accounting Principle | Net Earnings (Loss) |
|------|--------------|------------------|----------------------------|------------------------------------------------------|---------------------|
| 1991 | $ 895.0* | $58.4 | $ 399.5 | $ -------- | $683.7 |
| 1992 | 7.8 | 58.5 | 64.1 | -------- | 99.0 |
| 1993 | 8.2 | 47.9 | 33.8 | 119.2 | (51.3) |
| 1994 | 7.0 | 46.6 | 43.5 | -------- | 117.2 |
| 1995 | 8.5 | 52.1 | (61.2) | -------- | (140.2) |
| 1996 | 26.8 | 47.4 | 16.2 | 56.1 | (41.1) |
| 1997 | 15.0 | 47.8 | (65.2) | -------- | (126.7) |
| 1998 | 67.7 | 57.6 | 12.1 | -------- | (51.0) |
| 1999 | (16.8) | 77.4 | 4.7 | -------- | 8.7 |
| 2000 | 34.1 | 85.3 | 20.2 | -------- | 37.7 |
| Total | $1,053.3 | $579.0 | $ 467.7 | $ 175.3 | $ 536.0 |

*Includes Litigation Settlement with Kodak for $871.6 million.

Exhibit D

## Prices from 01/31/96 through 12/29/00

| Date | Volume | Ask/High | Bid/Low | Close | | |
|------|--------|----------|---------|-------|---|---|
| 01/31/96 | 4,339,700 | 48.50 | 44.75 | 44.87 | | |
| 02/29/96 | 5,532,400 | 46.62 | 43.00 | 44.00 | | Estimated |
| 03/29/96 | 3,552,700 | 45.12 | 40.00 | 45.00 | | #40.00 |
| 04/30/96 | 2,619,800 | 45.50 | 42.62 | 45.00 | 43,124,600 | Average |
| 05/31/96 | 2,556,500 | 45.75 | 43.50 | 45.00 | | |
| 06/28/96 | 2,145,400 | 48.37 | 44.62 | 45.62 | | |
| 07/31/96 | 2,568,900 | 46.12 | 41.87 | 42.25 | | |
| 08/30/96 | 1,373,800 | 44.62 | 42.12 | 42.37 | | |
| 09/30/96 | 1,811,200 | 45.00 | 42.12 | 44.00 | | |
| 10/31/96 | 7,638,400 | 45.12 | 39.12 | 40.62 | | |
| 11/29/96 | 5,403,000 | 43.00 | 39.18 | 42.62 | | |
| 12/31/96 | 3,585,800 | 44.87 | 40.25 | 43.50 | | |
| 01/31/97 | 3,347,400 | 47.12 | 42.50 | 44.00 | | |
| 02/28/97 | 3,547,900 | 44.75 | 42.00 | 42.25 | | Estimated |
| 03/31/97 | 4,350,100 | 43.50 | 39.50 | 59.75 | | #40.00 |
| 04/30/97 | 6,207,000 | 48.50 | 36.25 | 48.50 | | Average |
| 05/30/97 | 4,922,800 | 51.87 | 47.37 | 51.00 | 58,379,400 | |
| 06/30/97 | 3,555,200 | 56.37 | 49.43 | 55.50 | | |
| 07/31/97 | 5,846,100 | 60.31 | 53.37 | 59.50 | | |
| 08/29/97 | 3,192,500 | 60.25 | 52.12 | 52.81 | | |
| 09/30/97 | 6,108,700 | 58.12 | 48.37 | 51.18 | | |
| 10/31/97 | 6,192,600 | 52.87 | 43.81 | 44.93 | | |
| 11/28/97 | 4,324,700 | 45.25 | 41.00 | 42.50 | | |
| 12/31/97 | 6,984,400 | 49.62 | 41.75 | 48.68 | | |
| 01/30/98 | 8,105,800 | 49.93 | 39.25 | 41.06 | | |
| 02/27/98 | 4,817,300 | 47.43 | 40.87 | 45.81 | | Estimated |
| 03/31/98 | 5,163,900 | 46.12 | 44.00 | 44.00 | | #25.00 |
| 04/30/98 | 5,546,400 | 45.87 | 39.00 | 44.00 | | Average |
| 05/29/98 | 4,581,900 | 44.25 | 40.43 | 40.56 | 90,372,500 | |
| 06/30/98 | 5,087,200 | 41.00 | 35.12 | 35.56 | | |
| 07/31/98 | 5,128,200 | 38.37 | 32.50 | 33.00 | | |
| 08/31/98 | 6,251,400 | 38.62 | 28.12 | 28.12 | | |
| 09/30/98 | 9,546,500 | 31.00 | 24.06 | 24.56 | | |
| 10/30/98 | 13,258,400 | 28.12 | 18.25 | 26.56 | | |
| 11/30/98 | 10,652,100 | 28.50 | 21.12 | 21.50 | | |
| 12/31/98 | 12,433,400 | 22.43 | 17.50 | 18.68 | | |
| 01/29/99 | 10,806,800 | 22.06 | 16.81 | 17.06 | | |
| 02/26/99 | 20,571,000 | 25.43 | 16.75 | 23.87 | | Estimated |
| 03/31/99 | 11,323,200 | 23.93 | 19.50 | 20.18 | | #20.00 |
| 04/30/99 | 13,354,700 | 22.00 | 19.00 | 20.62 | | Average |
| 05/28/99 | 13,942,500 | 23.75 | 19.87 | 21.12 | | |
| 06/30/99 | 17,817,400 | 27.87 | 19.75 | 27.50 | 171,043,200 | |
| 07/30/99 | 20,393,300 | 30.00 | 20.37 | 23.00 | | |
| 08/31/99 | 15,061,800 | 28.43 | 21.00 | 27.12 | | |
| 09/30/99 | 11,426,100 | 30.62 | 25.62 | 26.12 | | |
| 10/29/99 | 12,155,000 | 28.56 | 19.31 | 22.31 | | |
| 11/30/99 | 8,775,300 | 22.25 | 18.50 | 19.25 | | |
| 12/31/99 | 15,416,100 | 19.50 | 16.50 | 18.81 | | |
| 01/31/00 | 17,485,200 | 27.75 | 17.75 | 23.75 | | |
| 02/29/00 | 12,581,200 | 26.37 | 22.31 | 25.06 | | |
| 03/31/00 | 11,503,800 | 28.43 | 23.18 | 23.75 | | |
| 04/28/00 | 8,556,300 | 24.25 | 19.50 | 20.18 | | |

| | | | | | |
|---|---|---|---|---|---|
| 05/31/00 | 8,543,800 | 21.37 | 17.31 | 19.18 | |
| 06/30/00 | 5,516,400 | 21.18 | 17.43 | 18.06 | |
| 07/31/00 | 10,059,000 | 19.93 | 16.25 | 18.12 | |
| 08/31/00 | 6,809,400 | 18.50 | 16.81 | 17.00 | |
| 09/29/00 | 8,776,900 | 17.37 | 13.43 | 13.43 | |
| 10/31/00 | 21,434,100 | 14.18 | 8.37 | 10.06 | |
| 11/30/00 | 6,308,400 | 10.06 | 7.31 | 7.50 | |
| 12/29/00 | 18,938,300 | 8.57 | 5.12 | 5.81 | |

*136,214,800* (handwritten, vertical)

*Estimated*
*# 12.00*
*Average* (handwritten)

## Exhibit E.



# EXHIBIT 5

**O tfm** *TOTAL FINANCIAL MANAGEMENT*

2 Town House-Ste 2F
Great Neck, NY, 11021
516-487-9734

November 10, 2002

Peter J. Walsh, Chief Judge
824 Market Street
6th Floor
Wilmington, Delaware 19801

Attn: Polaroid Case #01-10864

Dear Sir:

Attached is a copy of a report on the review I performed on the Treasury account of Polaroid over the past 10 years. This report which was created from Polaroid's SEC filings makes it clear that there are serious accounting and SEC disclosure issues at Polaroid that call for the review of an equity committee or court appointed examiner.

It appears that **FRAUD** has been committed both prior to the start and during the bankruptcy proceedings in your court. The government agencies, US Trustee, and the creditors committee who should be directly investigating and bringing suit to recover shareholder property and hold individuals criminally responsible for these actions are apparently not doing so.

I have previously forwarded letters (copies attached) to both yourself and Mr. Kenny of the U.S. Trustees' office requesting action and offering to assist in the placing this matter into reputable independent hands for reorganization and investigation. This company should have been reorganized but was instead sold by your order. I understand that the order when signed was not even complete regarding what assets were included. It is still not clear in public reports after I have tried to obtain the information. In the aforementioned forwarded letters to both yourself and Mr. Kenny of the U.S. Trustees' office I offered to assist in the placing this matter into reputable and recognizable hands for investigation and possibly assist in the reorganization of the Company for the benefit of the shareholders, retirees and unsecured creditors of the company. If possible I will honor that commitment.

That there is fraud by management of "Polaroid" is not the question. The important question I see is, are you going to permit it to be successful by not taking appropriate steps to investigate? It is also likely that if there is an investigation the investigators will find that the banks, buyer, legal, and other professionals are complicit in activities of Polaroid Management who have illegally enriched themselves at the expense of shareholders and others.

I am financial consultant and occasionally act in the capacity of an investment banker. I have extensive experience and education on all aspects of finance. Recently I was awarded, by American Skandia

Technology, the recognition of being 12th in the nation out of a group of 2800 analysts. I have also served on the National Advisory Board of Nissan Motor Corporation. I am enclosing a resume as verification of my credentials.

In support of this request I would also like to point out that on October 12th, 2001 the company filed its initial bankruptcy petition showing a $1.81-billion of assets and $948-million of debts. These figures do not come close to reconciling with the statements and schedules filed in December representing the same date. Those schedules showing assets of only $715-million and debts of $1.087-billion. (this second set of numbers having never been reported to the SEC to the best of my knowledge).

The difference in these sets of numbers in $1.24-billion. I have seen no explanation produced for this shift and for a company of this size and type I do not think you will find one other than fraud. Again I respectfully request the appointment of an equity committee or examiner to review the accounting and related issues at Polaroid.

I hope this letter and the enclosed report of the "Treasury Account" is read and duly acted upon. If there are any questions or explanations I will make myself available. Please advise if you schedule a hearing on this material.

Sincerely yours,

G. Maiorelli

Attachements:

Review of Treasury Account Polaroid Corporation
Past Letters to Judge Walsh & US Trustee Mark Kenny
Resume of George Maiorelli

Review
of

Treasury Account

Polaroid Corporation

## Contents

1. Treasury Stock Colloquium

2. Purpose and Analysis of Report

3. Exhibit-1 Treasury Stock Analysis

4. Exhibit-2 Analysis Net Profit/Stock Incentive Plan

5. Exhibit-3 Net Working Capital/Stock Incentive Plan

6. Exhibit-4 Cash Dividend/Earnings Analysis

7- Exhibit 5 Floating Supply

8. Exhibit 6 Market Value vs Book Value

9- Summary

## Treasury Stock Colloquium

For the purposes of this report Treasury Stock is a corporation's own Stock that was issued and is reacquired for a variety of reasons and remains, for the moment, neither retired nor resold.

The repurchase does not change the complexion of the capital formation, which in essence does not change. In the case in discussion "Polaroid" for instance had an authorization to issued 150 million shares of stock and had issued over 75 million of that authorization. The commencement of the re-purchase of it's own stock for treasury does not change that equation, the total number of issued shares remain the same.

Their are some changes that do take place and they change the legal, financial and fiduciary relationships between the management and the shareholders and creditors.

The purchase of the shares affect working capital, short-term liquidity decreases both assets and shareholders equity. In addition Treasury stock usually does not carry any voting power (This should be investigated in the Polaroid case), dividend, preemptive or liquidation rights necessarily although in the Polaroid case it can be deduced, from reading some of the provisions of the Stock Awards provisions, etc that on a merger or acquisition some provisions were alluded.

The reasons for the acquisition of Treasury Stock are as follows:

1.  To thwart takeover attempts
2.  To establish a market for the company's stock. This usually is cited in cases where the realistic market price is depressed as to its refined book value.
3.  Usage of shares for a stock dividend. (To my knowledge rare)
4.  To issue shares to increase earnings per share
5.  To reduce dividend payments
6.  To buy out one or more stockholders
7.  To use shares to purchase other assets or securities.
8.  To use for stock option, plans, bonus plans and sales to employees

Item 1 Is not of any value to the shareholder since they may have received a better deal from the new company. This would take an evaluation to determine and I do not believe that the management, with fear of being replaced, can offer proper objectivity.

Item 3. This would be rare since the issuance of non-issued shares does not reduce corporate liquidity. I would be willing to listen to arguments, however.

Items 4 and 5 are pretty legitimate but should be used cautiously

Item 6 seems, unless there are tax considerations, rather strange since you would be using stock to buy stock.

Item 7-Rarely used

Item 8- Is a new phenomena perpetuated by the current age of mangers which can be a disaster. Since (the "Polaroid" case in question) it reduces floating supply of open market stock thereby skewing the supply/demand relationship artificially increasing the market price of the stock . If the rewards are parallel to increased revenues and corporate cash then there might be some justification, however it is a large drain on the liquidity of the company. The same results can be achieved by issuing some non-issued stock. **This is especially questionable when the incentive for awarding of the stock is based on the increase in market value of the securities, as was the case in the "Polaroid" matter.**

I also have questions as to the tax ramifications of this type of maneuver. It has come to my attention that possibly expensing the issuance of the stock at market value when if it had been issued out of non issued stock it would be expensed at the book value of the shares, an additional tax liability is avoided. This, however, is another subject for another report.

Purchases of treasury stock can and have dramatically reduced the size of the purchasing firm. An example of this was General Signal Corporation in 1988 (Dyckman, Dukes and Davis).

A touchy subject, when engaging in the use of treasury stock, are the legal prohibitions due to the possible use of insider information. **Transactions involving the artificially manipulation of treasury stock may be in violations of securities laws (rules 10b-5 and 10b-6 of the Securities and Exchange Act of 1934).** Any deceptive act may constitute a violation of this act when engaging in transactions using treasury stock.

The listing of treasury stock on corporations books leads to an enigma.

1.  A Company can not own itself
2.  Purchasing treasury stock is, in reality, a payment for investment interest.
3.  Treasury stock can not be an asset and is essentially unissued stock

The next problem is the accounting for the stock. Should a cost method be used or the Par value method. If the cost method is used are we in fact taking a not only taking a stepped up tax deduction that is artificially created with the company's own asset (cash) or should the Par Value method be used. If we use the par value method then would be better off if we had used to unissued stock rather than endanger the financial viability by continually reducing the liquidity of the company to enhance the wealth of the officers and directors.

This is a delicate proposition that flirts with the fiduciary responsibilities to creditors and shareholders. After all the use of cash to enhance the wealth of a particular group of employees can have and should have legal repercussions.
The use of treasury stock has other restrictions for it involves the assets (usually cash). It does erode creditors and shareholders positions. Some states limit the amount of treasury stock that may be held at any one time. They effectively restrict the appropriation of retained earnings when the treasury stock value appropriates all the retained earnings.

This portion of the report could extend itself to a small book. In the interest of brevity the information on this subject is easily attainable and its application to the "Polaroid" case are obvious.

## Overview of Exhibits

This report is to outline the considerations of current events in the securities industry that are creating difficulty for the Investment Advisory Community, as well as psychological and pecuniary damage that has been imposed by corporate management's abandonment of ethical, moral and fiduciary responsibilities to the shareholders, employees and creditors. Hopefully it will encourage the securities enforcement community to fully investigate the matter of "Polaroid" even if it requires the assistance of outside resources. I would suggest a firm like the Guiliani Partnership or Clayton, Dublier & Rice be assigned because of their displayed integrity.

It is imperative that justice be meted our quickly for to delay enforcement only exacerbates the damage to the victims. Lack of any remuneration to the victims can only precipitate a collapse of confidence and indicates to us that crime does pay after all.

The difficulty, as I see it, is that the reporting system of the SEC is archaic and the design of the reports permits irresponsible and self serving individuals to create an envelope of smoke allowing mischievous mangers to obfuscate their real intent. As one client recently stated to me "Even if I did read the SEC filings I would not understand it".

What must happen is a reorganization of the SEC reports allowing non-legal professional, as well as professionals to cleary understand and follow the sequence of events, as well a clear description of the possible affects on the shareholders, employees and creditors in both the short and longer term by any management actions..

The recommendations I would proffer would make this report longer than required and is not pertinent to the current issue, "Polaroid".

This information offered, hopefully, will suggest both compelling circumstantial and empirical evidence that may be a catalyst to a full examination of the records.

It further will suggest the strong possibility that the, despite their public pronouncements, "The program of Stock Appreciation Awards" and other related programs were not designed for the long term benefits of the Shareholders or Retirees. This was their stated intent, however at no time was an attempt made to change or mitigate the damages to the shareholder value do to the poor performance of "Polaroid's" Management. It will suggest that duplicity was utilized to obfuscate the shareholders and investment community.

**It is hoped that the "Company" is rightfully returned to the non-affiliated owners who will employ the commensurate professionals to correct the obvious failures and lack of fiduciary responsibilities by its previous Directors and Management. The Ad Hoc shareholders committee will assist in procuring the professional team that will be required.**

## Polaroid

I would like to preface my observations by stating that after spending well over 150 hours of time on this project, it should receive the time and attention that it deserves. It will require the attention of professionals possessing more current experience in both the Accounting field, and Securities regulations. It has been to many years since I preformed audits, and I do not have possession, or the means for obtaining the possession of the internal records required to do an investigative report nor the appropriate manpower.

It should however really be assigned to an independent examiner.

By observance and reviewing ten (10) years of documents proffered to the SEC, I can comfortably say that there is a strong indication that several possible inappropriate actions should be investigated.

- That a case for the conversion of assets for the benefit other than the shareholders should be investigated.

- That there a strong indication that reports to the Securities and Exchange Commission were not filed candidly or not at all. (Reference the second petition for bankruptcy protection not reported to the "SEC" promptly)

- That the agenda of management was long-standing and in opposition of the best interests of the shareholders, despite the published reports proffered to the SEC.

- The lack of openness has made it nearly impossible for the Investment Advisor and definitely impossible for the average investor to make knowledgeable decisions.

- That at least an apparent misfeasance or malpractice on the Part Company's management or at the most criminal acts may have been committed.

In order to be succinct with this report I will go through each on of the enclosed six (6) Exhibits with an explanation of the report and possible explanations for the behavior.


## Exhibit-1 Treasury Stock Account Analysis

Treasury Stock normally arises from two sources. The first is the repurchase of it's own stock in the public market for basically two reasons.

> 1. To support the market value of the stock if it is deemed to be undervalued. This usually occurs if the market value is either at or below book value.

> 2. A donation of stock back to the Company. (Extremely rare occurrence)

The Treasury Account is not customarily used as a transfer, exchange or conduit account. To do so would tend to make for a difficult audit trail. This account should reflect transactions that clearly reflect what the nomenclature of the account means.

The balances in this account in periods prior to 1991 are unaccountable due to the lack of financial information in the "SEC" data bank. It has been conjectured that this was predominately accumulation in the 1980-1990 period as a possible deterrent to a possible hostile takeover attempt by another company.

This was circumlocutory conclusion from the following:

- An interview with a former officer of the Company who indicated that there was some discussion about a possible tender offer from a notable public corporation.

- That the Shareholders Stock Appreciation Program was not commenced until about 1988 at the earliest.

- That there were no distributions out of the Treasury Account to Officers or Directors in 1991.

This is not conclusive as only the internal records would either confirm or exclude this conclusion. It does, however, compel us to examine those pre-1991 records and to investigate further.

During the period of 1991 through 1998, the total shares held in the Treasury Stock account increased by 23%. The actual shares purchased were 9.1 million, which represents 12% of the total shares outstanding. The actual shares of the Company held in the Treasury Stock Account, at its peak in 1998 amounts to 42%. of total issued shares.

This is exclusive the shares held in trust by the State Street Bank.

We can only conclude that through attrition effective control of the Company had been transferred from the shareholders to management.

The actual dollar purchase during the period in the report was 311 million dollars. The bulk of the shares and dollars were to fund the distribution of the shares to the Stock Incentive Plan participants.

In addition there were distributions to the Employment Stock Option Plan (ESOP) in total of 96.2 million dollars out of this account commencing in 1998. The enigma here is that up to this point distributions were not being handled in the Treasury Stock Account. Perhaps, due to deteriorating liquidity, the borrowing window was being narrowed.

Of special note is that the cash value of the account as of 6/30/2001 is within 85.4 million of the starting value on 1/1/1991.

## Exhibit-2 Analysis of Net Profit/ Stock Incentive Distributions

This approach was used to determine whether there was justification for the excessive distributions to officers and directors warranted by strong profitability. This exhibit indicates that despite continued losses thorough out the period, in excess of a quarter of billion dollars, distributions showed no apparent pause.

The spread indicates that the cash flow was impacted severely by the shenanigans of management.

It can be concluded that the objective of the Stock Incentive Plan was merely a facade and had no bearing on officers and directors decisions. An obvious aborting of fiduciary responsibilities to the shareholders as required by law.

## Exhibit-3 Affect of Incentive Program on Working Capital

Some of the deleterious effects of using cash to procure treasury mentioned in the Treasury Stock Colloquium at the onset of this report can be observed with this simple analysis.

During the period reviewed the erosion of liquidity is apparent and onerous. How can officers continually permit this to happen when it could have been prevented by taking the simple step of foregoing stock awards until the profitability and cash flow of the Company was sufficient to absorb an expenditure of this kind without jeopardizing the position of the creditors and shareholders.

This is a dereliction of fiduciary responsibility?

This report does not include other distributions during that period for example a 2.2 million dollar distribution indicated by the SEC filing as profit Sharing during the 10/12/01-5/05/02 period while they were in chapter 11.

In summary, the net working capital ratio of the company declined from 2.40 to 1.04 during the period while the officers and directors enhanced their own fortunes to the tune of 129.8 million.

### Exhibit-4 Cash Dividends/Earning Analysis

This report indicates that during the period in question the officers and directors also continued to offer dividends to shareholders to the tune of a quarter of a billion dollars plus. Would not a responsible management curtailed this practice rather than increase the debt(by about 600 million dollars) of the Company?

The report indicates, as is observable that despite continued losses, the liquidity of the company was eroded by this practice. It certainly warrants an investigation into motivation.

### Exhibit 5-Floating Supply Analysis

This is a hub of this report. It can readily observed that with every decrease in floating supply, which was caused by a corresponding increase in the repurchase of common shares, a corresponding increase in market price was effectuated. Since management was rewarded by the maintenance of the market price there was no incentive to use prudence. I was not until after March 1999 that the **Ponzi Plan** began to unravel. If we follow the trail of the money it is obvious that to sustain this plan continued borrowings were necessary and they sure did. In the period from 1992-1999 the debt structure increased by at least 600 million dollars.

Based on even a cursory examination of the facts this says:

**Transactions involving the artificially manipulation of treasury stock may be violations of securities laws (rules 10b-5 and 10b-6 of the Securities and Exchange Act of 1934).**

### Exhibit-6 Market Value/ Book Value

This schedule is illustrative of all the admonitions of the results of utilizing the treasury account without regard to the possible results that could incur to the creditors and shareholders.

In 1993 the book value of a share of "Polaroid" was $10.17 with each increasing increment in the shares held in Treasury, it slowly declined to $4.97 in the year 2000. The price did indeed increase, using this maneuver, until 1997 when the weight of decreasing liquidity was probably recognized by the institutional Investor. This forced the company to increase it's borrowings to support the a management program of never ending repurchase of Treasury Stock and distributions regardless a fiduciary responsibility to protect the interests of the aforementioned parties.

The price to book relationship also peaked in 1997 at 6.97. It was in 1997 that management chose to repurchase the maximum number of shares as Exhibit-1 illustrates. Subsequent to 1997 the Price book relationship began to decline ending at .98 in at the end of the year 2000.

As a result 1998 the percentage of the company house in the treasury account 42% of total issued shares of stock. This does not include shares held in trust by State Street Bank and other affiliated groups.

The rape of the Company also started in 1997 with a peak distribution of shares amounting to 983,510. The company lost 126.7 million dollars that year and even at an average of $37. per share for the previous four years the value of that number of shares would contribute 36.6 million to the loss excluding other programs. These figures are not intended to be perfectly accurate but illustrative of what occurred.

What is interesting is that despite this massive erosion of the Company the distributions continued with well over two million shares being distributed by its conclusion.

It is worthy of noting the repurchase program ceased in 1999. If I had to guess the creditors' lines of credit,

which had supported this venture, had been close to tapped out. An examination of total debt in 1992 shows a debt structure of 1.2 billion dollars (to properly examine the number we would have to go back to the period just prior to the billion dollar purchase of treasury prior to 1992) to a total 1.8 billion dollar reported debt at the end of 1998.

## Polaroid Corporation
## Treasury Stock Analysis
($ in Millions, Shares Actual)

Exhibit-1

| Year | Shares | Beginning Balance | Repurchase of Shares In Shares | In Dollars | Pre-Distribution Dollar Balance | Distributions Shares | Stock Incentive Plan | ESOP | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|
| 1991 | 25,357,689 | $1,053.1 | 1,150,800 | $30.6 | $1,083.7 | 0 | 0 | 0 | $1,083.7 |
| 1992 | 26,508,489 | 1,083.7 | 2,257,911 | 63.5 | 1,147.2 | 7,065 | (50.1) | $0.0 | 1,147.1 |
| 1993 | 28,759,335 | 1,147.1 | 0 | 0 | 1,147.1 | 137,930 | (1.6) | 0.0 | 1,145.5 |
| 1994 | 28,621,405 | 1,145.5 | 941,300 | 30.6 | 1,176.1 | 132,777 | (1.6) | 0.0 | 1,174.5 |
| 1995 | 29,429,928 | 1,174.5 | 1,217,561 | 40.2 | 1,214.7 | 752,765 | (9.3) | 0.0 | 1,205.4 |
| 1996 | 29,894,724 | 1,205.4 | 1,057,565 | 43.6 | 1,249.0 | 344,129 | (4.2) | 0.0 | 1,244.8 |
| 1997 | 30,608,160 | 1,244.8 | 1,266,600 | 57.4 | 1,302.2 | 983,510 | (22.8) | 0.0 | 1,279.4 |
| 1998 | 31,437,933 | 1,279.4 | 1,213,600 | 45.5 | 1,324.9 | 192,197 | (9.7) | (23.7) | 1,291.5 |
| 1999 | 30,811,263 | 1,291.5 | 0 | 0 | 1,291.5 | 826,000 | (0.6) | (31.2) | 1,259.7 |
| 2000 | 29,895,578 | 1,259.7 | 0 | 0 | 1,259.7 | 915,685 | (4.6) | (41.3) | 1,213.8 |
| 2001 | | $1,213.8 | 0 | 0 | $1,213.8 | | (75.3) | ? | $1,138.5 |
| | | | 9,105,337 | $311.4 | | 4,092,058 | ($129.8) | ($96.2) | |

**Summary**

| | |
|---|---|
| Total Repurchases | $311.4 |
| | |
| Treasury Balance  1/1/91 | -1053.1 |
| Treasury Balance  6/30/2002 | 1138.5 |
| | 85.4 |
| Stock Incentive Awards | 129.8 |
| Esop Distributions | 96.2 |
| | |
| Totals | $311.4 |

Note 1-The distributed shares for the 1999 and 2000 years were extrapolated from the shares remaining in the Treasury Account as presented by the firm in it's 10k Balance sheet

Note 2- The 10q for the June 30,2001 period omitted total shares remaining in the Treasury Account

Note 3- The original cap adopted by the company in 1990 for the issuance of shares under the stock Incentive plan was 3 million shares. In March 1997, the Company amended the 1993 plan and authorized an additional 3.5 million shares for a total of 6.5 million.

Note 4-The number of common shares reserved for granting future awards for officers and key employees was as follows:

| | |
|---|---|
| 1997 | 3,224,105 |
| 1998 | 1,119,699 |
| 1999 | 517,108 |

Polaroid Corporation
Analysus of Net Profit/Stock Incentive Plan          Exhibit-2
Years 1992-2001
(in Millions)

| Year | Net Profit | Stock Incentative Distributions | Pre-Distibution Profit/-loss | |
|------|-----------|--------------------------------|------------------------------|---|
| 1992 | 99.0 | $0.1 | 99.1 | |
| 1993 | (51.3) | 1.6 | -49.7 | |
| 1994 | 117.2 | 1.6 | 118.8 | |
| 1995 | (140.2) | 9.3 | -130.9 | |
| 1996 | (41.1) | 4.2 | -36.9 | |
| 1997 | (126.7) | 22.8 | -103.9 | |
| 1998 | (51.0) | 9.7 | -41.3 | |
| 1999 | 8.7 | 0.6 | 9.3 | |
| 2000 | 37.7 | 4.6 | 42.3 | |
| 2001 | (109.9) | $75.3 | -34.6 | Note |
| | ($257.8) | $129.8 | -127.8 | |

Note-Information is incomplete as company data became opaque

Polaroid Corporation
Net Working Capital/Stock Incentive Program
Years 1992-2001
(In millions)

Exhibit-3

| | Current Assets | Current Liabilities | Net Working Capital | Ratio | Stock Incentive Distributions |
|---|---|---|---|---|---|
| 1992 | 1,350.8 | 561.8 | 789.0 | 2.40 | $0.1 |
| 1993 | 1,413.7 | 580.1 | 833.6 | 2.44 | 1.6 |
| 1994 | 1,448.7 | 601.9 | 846.8 | 2.41 | 1.6 |
| 1995 | 1,457.5 | 719.0 | 738.5 | 2.03 | 9.3 |
| 1996 | 1,386.4 | 763.1 | 623.3 | 1.82 | 4.2 |
| 1997 | 1,419.3 | 862.7 | 556.6 | 1.65 | 22.8 |
| 1998 | 1,293.4 | 933.0 | 360.4 | 1.39 | 9.7 |
| 1999 | 1,116.9 | 750.2 | 366.7 | 1.49 | 0.8 |
| 2000 | 1,118.6 | 793.3 | 325.3 | 1.41 | 4.6 |
| 2001 | 939.5 | 901.6 | 37.9 | 1.04 | $75.3 |
| | | | | | 129.8 |

**Polaroid Corporation**
**Cash Dividends/Earnings**
Years 1992-2001                                                    Exhibit-4

|        | Dividend | Outstanding Shares | Cash Outlay | Earnings | Ratio |
|--------|----------|--------------------|-------------|----------|-------|
| 1992   | $0.60    | 75.4               | $45.24      | $99.00   | 0.8   |
| 1993   | 0.60     | 46.8               | 28.1        | (51.3)   | -0.9  |
| 1994   | 0.60     | 45.9               | 27.9        | 117.2    | 0.4   |
| 1995   | 0.60     | 45.6               | 27.3        | (140.2)  | -0.3  |
| 1996   | 0.60     | 44.8               | 27.3        | (41.1)   | -1.1  |
| 1997   | 0.60     | 44.4               | 26.6        | (126.7)  | -0.4  |
| 1998   | 0.60     | 44.1               | 26.5        | (51.0)   | -0.9  |
| 1999   | 0.60     | 44.7               | 26.8        | 8.7      | 5.1   |
| 2000   | 0.60     | 45.5               | 27.3        | 37.7     | 1.2   |
| 2001   | S0.00    | 0                  | 0.          | 0.0      | 0     |

$263.06   ($147.7)

**Polaroid Corporation**
**Floating Supply Analysis**
**Years 1992-2001**

Pre-1992
Authorized Sh: 150,000,000
Issued and Ou  75,400,000    (note 1)                                        Exhibit 5

|                |               |             |               | (note-2)              |         |
| -------------- | ------------- | ----------- | ------------- | --------------------- | ------- |
|                | Shares        |             | Shares        | Average               |         |
| Beginning Date | Outstanding   | Ending Date | Outstanding   | Floating Supply       | Price   |
|                |               |             | 46,810,985    |                       |         |
| 2/11/1994      | 46,810,985    | 2/3/1995    | 45,864,622    | 46,337,804            | 32.12   |
| 2/3/1995       | 45,864,622    | 3/15/1996   | 45,638,840    | 45,751,731            | 30.87   |
| 3/15/1996      | 45,638,840    | 3/7/1997    | 44,822,502    | 45,230,671            | 42.00   |
| 3/7/1997       | 44,822,502    | 3/9/1998    | 44,430,639    | 44,626,571            | 43.00   |
| 3/9/1998       | 44,430,639    | 3/15/1999   | 44,100,466    | 44,265,553            | 45.00   |
| 3/15/1999      | 44,100,466    | 3/15/2000   | 44,718,674    | 44,409,570            | 23.00   |
| 3/15/2000      | 44,718,674    | 4/15/2001   | 45,967,822    | 45,343,248            | 27.00   |
| 4/15/2001      | 45,967,822    | 8/6/2001    | 47,036,000    | 46,501,911            | 4.86    |

Note 1- Derived from the Company records

Note 2- Excludes shares of stock controlled by State Street Bank. Accourding to form SC 13G,filed
with the SEC, amounted to 2.1 million shares.

Also excluded shares held by unidentibiable institutions.

## Polaroid Corporation
## Market Value vs Book Value
### Years 1992 - June 30, 2002

Exhibit 6

| Year | Non-Affiliate Shares | Treasury Stock | Total Shares | Dollar Equity | Per Share Book Value w/Treasury | Book Value w/o Treasury | Spread | Market Price* | Price/book | |
|------|---------------------|----------------|--------------|---------------|----------------------------------|-------------------------|--------|---------------|------------|---|
| 1993 | 46,810,985 | 28,621,911 | 75,432,896 | $767,300,000 | 10.17 | 16.39 | 6.22 | 32.12 | 3.16 | Note-1 |
| 1994 | 45,864,622 | 28,621,405 | 74,486,027 | 864,400,000 | 11.60 | 18.85 | 7.24 | 30.87 | 2.66 | |
| 1995 | 45,638,840 | 29,429,926 | 75,068,766 | 717,700,000 | 9.56 | 15.73 | 6.17 | 42.00 | 4.39 | Note-2 |
| 1996 | 44,822,502 | 29,894,724 | 74,717,226 | 658,200,000 | 8.81 | 14.68 | 5.88 | 43.00 | 4.88 | |
| 1997 | 44,430,639 | 30,608,160 | 75,038,799 | 484,400,000 | 6.46 | 10.90 | 4.45 | 45.00 | 6.97 | |
| 1998 | 44,100,466 | 31,327,084 | 75,427,550 | 399,100,000 | 5.29 | 9.05 | 3.76 | 23.00 | 4.35 | |
| 1999 | 44,718,674 | 30,708,876 | 75,427,550 | 389,000,000 | 5.16 | 8.70 | 3.54 | 27.00 | 5.24 | |
| 2000 | 45,967,822 | 29,459,728 | 75,427,550 | 375,200,000 | 4.97 | 8.16 | 3.19 | 4.86 | 0.98 | |
| **2001 | 47,855,390 | | 75,427,550 | $175,600,000 | 2.33 | | | | | |

Note-1 Market Price is as reported in 10K prior to filing

Note-2 Company suspended its repurchase program in December
which was approved by the Board in January
It is of special significance that the practice seems to
have continued despite that published notice in the 10K

* Market Price is abstracted from the 10K cover page
as reported by the Company

** The information tendered by the Company is insufficient to report and o report any difinitive
changes.
However there seems to be an unusual decrease in additional paid-in capital

account which suggest the need for an audit.

**Special Note:**
Shares held by non-affiliates is as recorded by the Company in their 10K. It will differ slightly from the year end data probably due to the differential in time.

## <u>Summary</u>

I sincerely hope this report is a catalyst that encourages the expeditious movement to rescind the recent sale of the assets, of Polaroid's assets to an unknown entity, which, if the truth were known, has the hand, and footprint of previous management. Although it is a different subject, the delayed deal with some of the secured creditors is rooted in the very reports forwarded to the SEC by the Company. If a further explanation were required I would be pleased to tender it.

Only the employment of some outside specialists who can possibly reorganize the Company on a non self-serving basis can the damage to the shareholders and the retirees be mitigated.

Some may take the position that this was merely a mismanagement problem. I could buy that if we did not have **four (4) different** Chief Financial Officers at the helm during the period under discussion. One, which had a short, lived career and was paid an unconscionable amount of money for the period of service (should raise questions).

There is no question that I have that an in congruency has been establishment between the goals of management and the fiduciary responsibility demanded by law to the shareholders, creditors and retirees.

The enclosed superficial analysis using scant information should be compelling enough to demand and encourage a full-blown audit.

I encourage them and will respond if it is within my range of experience and knowledge.

# Otfm  *TOTAL FINANCIAL MANAGEMENT*

2 Town House-Ste 2F
Great Neck, NY, 11021
516-487-9734

June 24, 2002

Honorable Peter J. Walsh, Chief Judge
824 Market Street
6th Floor
Wilmington, Delaware 19801

Re: Polaroid Case #01-10864

Dear Sir:

I have been taught, as part of my religious education, that if I behave as if I have faith, faith will be given to me. This case has started to test my belief that ultimately justice will prevail over injustice.

With that in mind I am, once again, tendering the following thoughts concerning the above matter.

I am quite sure you have been inundated with a plethora of information, data and arguments as to why the sale of Polaroid's assets should be halted at this time.

The only solution is quite simple. Either there is truth to the allegations of under valuation, non-reporting of assets and deliberate filing of false documentation to the courts, or it is a spurious argument and should be discarded.

This is the only clear solution, for to due otherwise might perpetuate a clear miscarriage of justice to the shareholders, creditors and those who invested in the stock of the Company in their retirement funds. This I am quite sure would not be the intent of the courts.

### The solution I am offering is as follows:

A- Delay the sale of the assets for if the assets are not valued properly, either by design, misconduct or any other reason, not delaying the sale might produce a grave miscarriage of justice, possibility worse than Enron.

B. Employ the services of a reputable firm which has the following:

    1. Investigative capabilities and experience
    2. Respected Accounting experience
    3. A history of asset evaluation
    4. Access to appraisal experts

I have been in touch with such a firm, "The Giuliani Partners" in New York City, 5 Times Square, NY. NY 10036, my contact was Jenna Mancini Mancini and Gwen Sheehan at 212-931-7300.

She indicated that a letter would be required to evaluate the project.

C. Employ a firm to act as Investment Banker and assist in the development of a plan that would be fair to all parties involved. This would and should involve the restructuring of debt, finding a synergistic partner, if required and possibly create a new debt or equity interest in the company.

I have previously reported that I have a company that has such an interest and would be delighted to make the introduction, however if a substitute firm would do as well.

Hopefully this letter is taken seriously so that a cleansing of the air can take place and some truth may be found.

Sincerely yours,


G. Maiorelli


cc: Mark S. Kenny
    Honorable Ralph Giuliani
    Jenna Mancini

**GEORGE MAIORELLI**
**2 Town House Apt 2F**
**Great Neck, New York 11021**
**516-487-9734**

## BUSINESS HISTORY

| | |
|---|---|
| Total Financial Services -Asset Management | 1990/present |
| JC Associates-Principal -Financial Consulting | 1982 /present |
| Matrix Group- President | 1987/1989 |
| Janus Financial Services-Founder-Chief Financial Officer | 1986/1987 |
| Saxmore Industries-Leasing Auto/Equipment | 1979-1982 |
| Sound Move Motors-Chairman/President | 1970-1979 |
| Fearn Motors Inc -Controller/Business Manager | 1962-19720 |
| Oscar Germain-Accountant/Auditor | 1962 |
| Charles F. Rittenhouse-Auditor | 1958-1961 |
| Chilean Nitrate Sales Corporation-Assistant Treasurer Accountant | 1948-1958 |

## SPECIAL BUSINESS POSITIONS

| | |
|---|---|
| Regional Nissan/Datsun Dealer Advisory Board-Chairman | 1976/1977 |
| National Nissan/Datsun Dealer Advisory Board-Director | 1976-1977 |
| Nissan/Datsun Dealer Alliance-Treasurer | 1975/1978 |
| Nissan/Datsun National Advisory Board-Advisor to the Chairman on matters concerning distribution | 1977-/1978 |
| Town House Tenants Association-Vice President | 1985 |
| Consultant to Chairman, Dr. Jesse Chase, of Washington D.C. | 1980 |
| Society for the Prevention of Venereal Diseases among Teenagers | |
| Matrix Group-Founder of continuing Education for CPA Group- | |

Notes: 1.  As a member of the National Advisory Board-negotiated an 11 million-dollar settlement for the dealers of Long Island concerning irregularities in distribution.

2. As Controller -In three(3) years brought entire chain of dealerships into a self-financing as to automobile inventories

3. *Recognition Award by American Skandia Information and Technology Corporation as placing 12th in the Nation in their annual securities analysts competition involving 2800 participants.*

### POLITICAL HISTORY

| | |
|---|---|
| *Member of Conservative Party County Committee-* | *1966-1992* |
| *Candidate for County Chairman Board of Assessors* | *1973* |
| *Assembly District Leader-18th A.D.* | |
| *Delegate to Judicial County Convention* | |
| *Campaign Manager for North Hempstead Candidates* | *1972* |
| *Chairman-North Shore Club* | |
| *Delegate to the Judicial Conference* | *1970-1971* |
| *Councilmatic Candidate* | *1969* |

### EDUCATION

*East Coast University-Master of Arts.Major-Finance ,Specialization-Fundamental/Technical, Cyclical Analysis Markets and Securities*
*Pace University-Bachelor of Business Administration-Major-Finance-Minor in Accounting*
*LaSalle University-Certificate in Accounting*
*Reynolds and Reynolds-Electronic Data Processing*
*Harbridge House-Business Management*
*Phi Delta Kappa-American University*

### MILITARY

*United States Army-Honorable Discharge*
*Schools- Chief of Section Training-105 mm Howitzers*
*Chemical Biological and Bacteriological Training*
*Radiological Instruments Training*

*Major Job Function-Troop Information and Education*

*Miscellaneous-Have substituted for Professor of Accounting-Long Island University-Brooklyn Center & CW Post*

# EXHIBIT 6

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

*In re*                                   :    Chapter 11
                                          :
POLAROID CORPORATION, *et al.*            :    Case Number 01-10864 (PJW)
                                          :
                                          :    Jointly Administered
          Debtors                         :    *Re : Docket No. 2325*

## ORDER

The Court having considered the United States Trustee's Application to Appoint Perry M.

Mandarino, CPA, as Examiner of the above-captioned jointly administered cases, it is hereby

ORDERED that the appointment is approved.

Dated: Wilmington, Delaware
    Feb. 24, 2003

                                 Honorable Peter J. Walsh
                                 Chief United States Bankruptcy Judge

DOCKET# 2365

DATE 2-24-03

# EXHIBIT 7

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Polaroid Corporation., et al.,

Debtors.

(Chapter 11)

Case Nos. 01-10864 (PJW)
(Jointly Administered)

**Related Docket No. 2450**

## ORDER AUTHORIZING THE RETENTION OF TRAXI
## LLC AS FINANCIAL ADVISORS TO THE EXAMINER
## NUNC PRO TUNC TO FEBRUARY 24, 2003

UPON the annexed motion (the "Motion")[1] of the Examiner to the above-captioned debtors and debtors-in-possession (the "Debtors") seeking entry of an order under 11 U.S.C. §§ 327 and 328 authorizing the Examiner to retain Traxi LLC ("Traxi") as financial advisors to the Examiner in these Chapter 11 cases nunc pro tunc to February 24, 2003, to render such services as described in the Motion and as further set forth in the engagement letter (the "Engagement Letter") between the Examiner and Traxi annexed hereto as Exhibit A; and upon the affidavit of Anthony J. Pacchia (the "Pacchia Affidavit"), a Partner of Traxi, which is annexed to the Motion as Exhibit B, wherein it appears that Traxi does not hold or represent any interest adverse to the Examiner, the Debtors, their estates or any class of creditors or equity security holders with respect to the matters upon which Traxi is to be engaged, and that Traxi is a "disinterested person" within the meaning of Sections 101(14) and 327 of the Bankruptcy Code; and it appearing that the retention of Traxi is in the best interest of the creditors, equity security holders and other interests of the estates of each

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

of the Debtors; and it appearing that no further notice of the relief requested in the Motion is required; and sufficient cause appearing therefor; it is hereby

**ORDERED,** that the Motion is granted; and it is further

**ORDERED,** that pursuant to Sections 327 and 328 of the Bankruptcy Code, the Examiner is hereby authorized to retain Traxi as his financial advisors, effective as of February 24, 2003, to assist the Examiner in the conduct of the Examination, including:

(a) assisting the Examiner in his review of the financial information prepared by the Debtors, the Official Committee of Unsecured Creditor's, the secured lenders of the Debtors and other parties-in-interest;

(b) assisting the Examiner in his review of the Debtors' periodic operating and cash flow statements for both pre- and post-petition periods;

(c) assisting the Examiner in the discovery process, as required;

(d) assisting the Examiner in the preparation of the Examiner's report;

(e) at the direction of the Examiner, preparing analyses and conduct research related to accounting and valuation issues;

(f) to the extent necessary, providing expert testimony; and

(g) providing such other advisory services related to the Examiner's fulfillment of his duties consistent with the tasks outlined in (a) - (e) above; and it is further

**ORDERED,** that Traxi LLC shall be compensated in accordance with the procedures set forth in Sections 330 and 331 of the Bankruptcy Code, applicable Bankruptcy Rules, Local Rules of the Court and such procedures as may be fixed by order of this Court.

Dated: ~~April 15~~ 2003
Wilmington, Delaware

Peter J. Walsh
Chief United States Bankruptcy Judge

2

**EXHIBIT A**

Dated as of ___ . _____, 2003, effective as of February ___, 2003

Perry M. Mandarino, CPA
Examiner -- Polaroid Corporation, et al.
212 W 35th St., 4th Floor
New York, NY 10001

RE: Polaroid Corporation, et al.

Dear Mr. Mandarino:

This letter will confirm our understanding that Traxi LLC ("Traxi") has been engaged as financial advisor to you in your capacity as examiner (the "Examiner") of Polaroid Corporation ("Polaroid") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors" or "Company") in connection with the Company's pending Chapter 11 cases. In this capacity, Traxi will provide such financial advisory services as you and Traxi may mutually agree to during the term of this engagement.

Traxi will assist the Examiner in completing the services required pursuant to the February 10, 2003 Order appointing Perry M. Mandarino Examiner. Among the services Traxi is expected to provide is **assisting the Examiner**:

(a)  in his review of the financial information prepared by the Debtors, the Official Committee of Unsecured Creditor's, the secured lenders of the Debtors and other parties-in-interest;

(b)  in his review of the Debtors' periodic operating and cash flow statements for both pre- and post-petition periods;

(c)  in the discovery process, as required;

(d)  in the preparation of the Examiner's report;

(e)  at the direction of the Examiner, preparing analyses and conduct research related to accounting and valuation issues;

(f)  by providing expert testimony, to the extent necessary; and

(g)  by providing such other advisory services related to the Examiner's fulfillment of his duties consistent with the tasks outlined in (a) - (e) above.

The estates of the Debtors will agree to pay Traxi as compensation for its services to the Examiner the following hourly fees:

| | |
|---|---|
| Partners | $400-$550 |
| Managers/Directors | $275-$400 |
| Associates/Analysts | $125-$275 |

In addition to any fees payable to Traxi hereunder, the Company shall, upon request from time to time, reimburse Traxi for its reasonable travel and other out-of-pocket expenses in connection with this engagement (including all fees and disbursements, if any, of counsel).

The Examiner recognizes and confirms that, in advising the Examiner and performing its engagement hereunder, Traxi will be using and relying on data, material and other information ("Information") furnished to Traxi by the Examiner and that Traxi may rely upon the Information so furnished without independent verification.

Traxi's exclusive client in this engagement is the Examiner; provided, however, that neither the Examiner nor any of its members or counsel shall be responsible for any fees, costs, expenses, or indemnity obligation relating to Traxi. The Examiner acknowledges that the Examiner is Traxi's exclusive client, and that work done by Traxi in respect of this engagement is entitled to such attorney-client privileges and protection under the work-product doctrine as provided by applicable law.

No waiver, amendment or other modification of this letter agreement shall be effective unless in writing and signed by each party to be bound thereby.

This agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and each of which shall be deemed an original.

We are pleased to accept this engagement and look forward to working with you. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this letter, which shall thereupon constitute a binding agreement.

Very truly yours,

TRAXI LLC

By: _____

       Anthony J. Pacchia
       Partner

Accepted and Agreed as of the date hereof:

By: _____

    Perry M. Mandarino, CPA
    Examiner

# EXHIBIT 8

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  | (Chapter 11) |
|---|---|
| In re: | |
|  | Case Nos. 01-10864 (PJW) |
| Polaroid Corporation, et al., | (Jointly Administered) |
|  | |
| Debtors. | **Related Docket No. 2451** |

## ORDER AUTHORIZING THE RETENTION OF PROSKAUER ROSE LLP
## AS COUNSEL FOR THE EXAMINER NUNC PRO TUNC TO FEBRUARY 24, 2003

**UPON** the annexed motion (the "Motion")[1] of the Examiner of the above-

captioned debtors and debtors-in-possession (the "Debtors"), seeking entry of an order under 11

U.S.C. §§ 327 and 328 authorizing the Examiner to retain and employ Proskauer Rose LLP

("Proskauer") as the Examiner's counsel in these Chapter 11 cases nunc pro tunc to the February

24, 2003; and upon the annexed affidavits of Michael E. Foreman (dated March 24, 2003 and

April 14, 2003, respectively), a partner of Proskauer (the "Foreman Affidavits"); and the Court

being satisfied that, except as otherwise set forth in the Foreman Affidavits, Proskauer does not

represent any interests adverse to the Examiner, the Debtors, their estates or any class of

creditors or equity security holders with respect to the matters upon which Proskauer is to be

retained, and Proskauer is a "disinterested person" within the meaning of Sections 101(14) and

327 of the Bankruptcy Code; and it appearing that the retention of Proskauer is in the best

interest of the creditors, equity security holders and other interests of the estates of each of the

Debtors; and, notice of the Motion is good and sufficient and no further notice of the relief

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

requested in the Motion is required except as provided herein; and sufficient cause appearing therefor; it is

    **ORDERED,** that the Motion is hereby granted; and it is further

    **ORDERED,** that in accordance with Sections 327 and 328 of the Bankruptcy Code, the Examiner is hereby authorized and empowered to retain Proskauer as counsel upon the terms and conditions set forth in the Motion and the Foreman Affidavits,[2] effective as of February 24, 2003; and it is further

    **ORDERED,** that compensation to Proskauer for services rendered and reimbursement of expenses incurred in connection therewith, shall only be paid in accordance with procedures approved by this Court and/or further orders of this Court obtained upon application submitted in accordance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the Local Rules of this Court and any administrative professional fee guideline orders entered by this Court.

Dated: *April 5* 2003
  Wilmington, Delaware

            PETER J. WALSH
            Chief United States Bankruptcy Judge

---

[2]  The scope of Proskauer's retention is outlined in the Supplemental Affidavit of Michael E. Foreman dated April 14, 2003, annexed hereto and made part hereof.

# Exhibit A

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | (Chapter 11) |
| Polaroid Corporation, et al., | Case No. 01-10864 (PJW) |
| Debtors. | (Jointly Administered) |

## AFFIDAVIT OF MICHAEL E. FOREMAN

STATE OF NEW YORK )
             ss.:
COUNTY OF NEW YORK )

MICHAEL E. FOREMAN, being duly sworn, deposes and says:

1. I am a partner of the firm of Proskauer Rose LLP ("Proskauer"), located at 1585 Broadway, New York, New York, 10036-8299.

2. This affidavit is submitted in connection with the proposed retention of Proskauer, nunc pro tunc to February 24, 2003, as counsel to Perry M. Mandarino, CPA in his capacity as the examiner (the "Examiner") for the Polaroid Corporation ("Polaroid") and the other above-captioned debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"), and in compliance with Section 327(a) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PROPOSED SCOPE OF SERVICES TO BE RENDERED

3.     Proskauer shall render legal services relating to the Examiner's fulfillment of his duties as outlined in those certain orders dated February 10, 2003 and February 24, 2003, respectively, of the Honorable Peter J. Walsh, Chief United States Bankruptcy Judge appointing Perry M. Mandarino as the Examiner, which services shall include, but shall not be limited to, the following:

- Taking all necessary actions to assist the Examiner in his examination and advising the Examiner with respect to his powers and duties;

- representing the Examiner at all hearings on matters pertaining to his affairs as the Examiner;

- preparing, in conjunction with or on behalf of the Examiner, all reports, pleadings, applications and other necessary documents in the discharge of the Examiner's duties;

- counseling and representing the Examiner in connection with the numerous bankruptcy-related matters arising during the administration of the Examiner's duties in these cases; and

- performing all other legal services that are desirable and necessary for the efficient and economic administration by the Examiner of his duties in these Chapter 11 cases.

4.     Unless otherwise stated in this affidavit, I have personal knowledge of the facts set forth herein. To the extent that any information disclosed herein requires amendment or modification, upon Proskauer's completion of further analysis or as additional party-in-interest information becomes available to it, a supplemental affidavit will be submitted to the Court reflecting such amendment or modified information.

5.     Proskauer has the necessary background and expertise to address effectively and efficiently many of the potential legal issues that may arise and actions that may be required to be taken in the context of representing the Examiner in these Chapter 11 cases in

the areas outlined above. Proskauer has extensive experience in handling issues and matters as they relate to large and complex Chapter 11 cases including representation of Advanced Glassfiber Yarns LLC, Provell, Inc., The Museum Company, Inc., Tandycrafts, Inc., Lechters N.Y.C., Inc., MMH Holdings, Inc., Trism, Inc., Golden Books Family Entertainment, Inc., Lone Star Industries, Inc., LJ Hooker Corporation, Inc., Todd Shipyards Corporation, Al Copeland Enterprises, Inc. (Popeye's and Church's Fried Chicken), Vestron, Inc., Berkey Inc., Rose's Stores, Inc., Ithaca Industries, Inc., Reeves Industries, Inc., Buster Brown Apparel, Inc., the Chapter 11 Trustee of Allegheny Health, Education and Research Foundation and numerous other corporations. In addition, Proskauer has represented creditors' committees in Logo Athletic, Inc., Apex One, Inc., Scoreboard, Inc., Park Lane Hosiery Company, Cibro Petroleum Products Inc., Consolidated Steel Inc., Berks Jewelers, Island Helicopter and Neptune World Wide Movers. Moreover, Proskauer's application is pending before Bankruptcy Judge Jerry W. Venters of this Court to be appointed special corporate and litigation counsel to Superior TeleCom Inc. Thus, Proskauer has the requisite expertise on matters that are likely to arise during the representation of the Examiner in these Chapter 11 cases. Accordingly, Proskauer believes, and the Examiner agrees, that Proskauer both is well-qualified and able to represent the Examiner in an efficient and timely manner.

## PROSKAUER'S RATES AND BILLING PRACTICES

6. In consideration for the services to be rendered to the Examiner in the matters described above, Proskauer proposes to be compensated at its regular hourly rates that are now in effect (and as may be revised from time to time) together with all reasonable expenses. The Examiner understands that Proskauer will charge the bankruptcy estates of the Debtors for Proskauer's fees and expenses. Proskauer recognizes that it will be required to

3

submit applications for interim and/or final allowances of compensation pursuant to Sections 330 and 331 of the Bankruptcy Code and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court, and any order entered by this Court establishing procedures for payment of interim compensation and reimbursement of expenses to professionals.

7.    Proskauer's current customary hourly rates, subject to change from time to time, are $470 to $690 per hour for partners, $390 to $525 per hour for senior counsel, $210 to $425 per hour for associates, and $100 to $180 per hour for paraprofessionals.

8.    Proskauer will use its best efforts not to duplicate any work undertaken by Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C. ("PSZYJ&W"), co-counsel to the Examiner, and Proskauer and PSZYJ&W have undertaken efforts with the Examiner to ensure against unnecessary, duplicative legal services.

## PROSKAUER'S CONNECTIONS WITH PARTIES IN INTEREST IN MATTERS UNRELATED TO THE CHAPTER 11 CASES

Proskauer does not represent other parties-in-interest in these Chapter 11 cases

9.    To the best of my knowledge, Proskauer does not represent any entity or person other than the Examiner in these Chapter 11 cases. If this Court approves the proposed retention of Proskauer by the Examiner, Proskauer will not accept any engagement or perform any services in these Chapter 11 cases for any entity or person other than the Examiner. However, Proskauer has represented, currently represents, and in the future likely will represent entities that are claimants, interest holders, or other parties in interest herein with respect to the Examiner, the Debtors, its creditors and equity security holders in matters unrelated to the

Debtors and their Chapter 11 cases. Proskauer, which employs approximately 590 attorneys, has a large and diversified legal practice that encompasses the representation of many financial institutions and corporations. Some of those entities are or may consider themselves to be creditors, equity security holders or parties-in-interest in the Debtors' Chapter 11 cases.

      B.     Proskauer is a "disinterested person"

      10.    To the best of my knowledge, formed after due inquiry, and except as set forth in the following paragraphs, Proskauer is not a creditor or insider of the Debtors and is not connected with the Examiner, the Debtors, their creditors, other parties-in-interest, the United States Trustee, or any person employed by the Office of the United States Trustee and Proskauer does not, by reason of any direct or indirect relationship to, connection with or interest in the Debtors, their creditors, other parties-in-interest, the United States Trustee, or any person employed by the Office of the United States Trustee hold or represent any interest adverse to the Examiner, the Debtors, their estate or any class of creditors or equity holders, with respect to the matters upon which it is to be engaged.

      11.    In preparing this affidavit, Proskauer conducted a conflicts search with respect to significant or potentially significant parties-in-interest in these Chapter 11 cases, as set forth in Exhibit 1 annexed hereto and made a part hereof. Insofar as I have been able to ascertain, and except as stated below, I know of no conflict of interest that has or would preclude Proskauer's representation of the Examiner.

      12.    Of the persons set forth in Exhibit 1, Proskauer represents, and may continue to represent, the parties-in-interest described in Exhibit 2 hereto in matters unrelated to the Examiner, the Debtors, their creditors and equity security holders, none of which by itself

would be deemed material in relation to the overall business of Proskauer. Thus, I believe that Proskauer's continued representation of such entities in matters entirely unrelated to the Debtors and the examination to be conducted by the Examiner is not adverse to the interests of any class of creditors, or equity security holders in respect of the matters for which Proskauer will be engaged, nor will such services impair Proskauer's ability to represent the Examiner in these Chapter 11 cases.

13.     Moreover, from time to time, Proskauer will undertake to conduct periodic supplemental examinations to determine whether it has any new connections or other relationships with parties-in-interest in these Chapter 11 cases. Proskauer will file supplemental affidavits regarding its retention if any additional relevant information comes to its attention.

14.     In addition, although unascertainable at this time after due inquiry, due to the magnitude of the Debtors' potential universe of creditors and Proskauer's clients, Proskauer may represent certain other creditors or equity security holders of the Debtors, or certain parties owing monies for services rendered and disbursements incurred, in discrete matters entirely unrelated to the Debtors and their estates, but in this regard, Proskauer's work for these clients will not include representation on any matters relating to the Debtors' Chapter 11 cases and the scope of the examination to be conducted by the Examiner.

15.     Except as stated above, to the best of my knowledge, neither Proskauer nor I represent any interest adverse to the Examiner, the Debtors, their estate or any class of creditors or equity holders.

16.     In light of the foregoing, I believe that Proskauer does not hold or represent any interest materially adverse to the Examiner, the Debtors, their estates or any class

of creditors or equity security holders of the Debtors as identified to Proskauer, with respect to the matters for which Proskauer will be engaged. Accordingly, I believe Proskauer is a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code as modified by Section 1107(b) of the Bankruptcy Code.

[SIGNATURE PAGE FOLLOWS]

Michael E. Foreman
A Member of the Firm
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3000

Sworn to before me this
2⁴ᵗʰ day of March, 2003

Notary Public

Sanjay Thapar
Notary Public, State of New York
Registration No. 02TH6061506
Qualified in Nassau County
Commission Expires July 16, 2003

## EXHIBIT 1

### Debtors

Polaroid Corporation
784 Memorial Drive, LLC
Inner City, Inc.
International Polaroid Corporation
Mag-Media Ltd.
PGI Graphics Imaging LLC
PMC, Inc.
Polaroid Asia Pacific International, Inc.
Polaroid Asia Pacific Limited
Polaroid Digital Solutions, Inc.
Polaroid Dry Imaging LLC
Polaroid Eyewear FarEast, Inc.
Polaroid Eyewear, Inc.
Polaroid Foundation
Polaroid ID Systems, Inc.
Polaroid Latin America Corporation
Polaroid Malaysia Limited
Polaroid Memorial Drive LLC
Polaroid Online Services, Inc.
Polaroid Partners, Inc.
Polint, Inc.
PRD Capital, Inc.
PRD Investments, Inc.
Sub Debt Partners Corp.

### Foreign Affiliates

beschrankter Haftung
Darfilm Ticaret ve Sanayi A.S.
Nippon Polaroid Kabuskiki Kaisha
Photographic Supplies S.R.C.
Polaroid (Belgium) N.V.
Polaroid (Europa) B.V.
Polaroid (France) S.A.
Polaroid (Italia) S.p.A.
Polaroid (Norge) A/D
Polaroid A.G.
Polaroid A/S
Polaroid Aktiebolag
Polaroid Australia Pty. Limited
Polaroid Canada, Inc.

i

Polaroid Commerce GmbH
Polaroid Contracting CV
Polaroid de Argentina S.A.
Polaroid de Brasil, LTDA
Polaroid de Mexico S.A. de C.V.
Polaroid de Venezuela S.A.
Polaroid del Peru S.A.
Polaroid Espana, S.A.
Polaroid Eyewear (France) EURL
Polaroid Eyewear (Italia) S.r.L.
Polaroid Eyewear (Nederlands) B.V.
Polaroid Eyewear (Sweden) AB
Polaroid Eyewear A.G.
Polaroid Eyewear Espana S.A.
Polaroid Eyewear GmbH (Australia)
Polaroid Eyewear UK Limited
Polaroid Far East Limited
Polaroid Gesellschaft m.b.H.
Polaroid Gesellschaft mit
Polaroid Graphics Imaging B.V.
Polaroid Hungary K ft.
Polaroid India Private Limited
Polaroid Industry China Limited
Polaroid International B.V.
Polaroid Nederland B.V.
Polaroid of Shanghai Limited
Polaroid Oy
Polaroid Polska Sp.zo.o.
Polaroid Singapore Private Limited
Polaroid Trading B.V.
Polaroid U.K. Limited
PRD Management Limited
PRD Overseas Limited

## Officers and Directors

Afred M. Zeien
Albin F. Moschner
Alfred Poe
Bernee D.L. Strom
Carl L. Lueders
Carole F. St. Mark
Donald M. Halsted, III
Gary T. Dicamillo
Harvey M. Greenberg

Ian J. Shiers
John R. Jenkins
John W. Loose
Neal D. Goldman
Paul E. Lambert
Ralph E. Gomory
Ralph Z. Sorenson
Sandra B. Lawrence
Stephan P. Kaufman
Stephen A. Bernazzani

## Secured Creditors

ABN Amro Bank N.V.
Deutsche Bank AG, New York and/or Cayman Island Branches
Mellon Bank
Erste Bank New York
Fleet National Bank (f/k/a BankBoston, N.A.)
Foothill Capital (L.A.)
Foothill Income Trust, L.P.
Morgan Guaranty Trust Company of New York
PNC Bank, National Association
Senior Debt Portfolio (Boston Management and Research)
Textron Financial Corporation
The Sumitomo Bank, Limited, New York Branch
Transamerica Business Credit Corporation
Wachovia Bank, N.A.

## Bond Trustee

State Street Bank and Trust Company

## Underwriters/Premium Financing

ABN AMRO Chicago Corporation
ABN AMRO Incorporated
Credit Lyonnais Securities (USA) Inc.
Deutsche Bank Securities Inc.
First Chicago Capital Markets, Inc.
J.P. Morgan Securities Inc.
Lehman Brothers Inc.
PNC Capital Markets, Inc.

## Trade Creditors

Agfa Corporation
Aqualon Company
Arnold Logistics
Arthur Andersen LLP
Associates Fleet Services
Bay State Temp Agency Inc.
BBI Marketing Services Inc.
Berkley Industries
Bunim Murray Productions
CDW Computer Centers Inc.
Compaq
Concentrix Corp
Demand Management Inc
Diamond Packaging
Dintec USA LLC
DSM Chemie Linz
Eastman Chemical Financial Corp
Enron Energy Services
Executive Destinations Inc.
Fraser Engineering Co Inc
Fuji Photo Film Co Ltd
Fuji Photo Film Inc. (Edi)
Hayworth C/o Corporate Interiors
Hazardous Abatement Services
Houghton Chemical Corp
Infographix Inc.
Ipsos-ASI Inc
Jefferson Smurfit Corp
KPMG Peat Marwick LLP
Lacamas Laboratories Inc.
Lee Marketing Services
Mail & Business Services
Mancini Sheet Metal Inc.
Markson Rosenthal & Co Inc
Mckinsey & Company, Inc
Mechtronics Corp
Minton Optic Industry Co Ltd
New England Electronic Cable
Office Products N A
Paine Associates
Plastics Color & Compounding Inc
Porter Novelli Inc
PPG Industries Inc

iv

Pretec Electronics
Printing Service
Safety-Kleen (Ne)
SFX Entertainment
Siemens Business Services Inc.
Sigma Systems Inc.
Sodexho Marriott Management Svcs
Supercam Data Inc.
Tech Ridge Inc
Tekom Technologies Inc
The Jack Morton Company
The Rogers Company
Tinplate Partners International Inc.
Transilwrap Company Inc
Troy Manufacturing Co
Unicco Service Company
US Relocation
Vertalis LLC
Wako Chemicals USA Inc
Westvaco Corp
Whalley Computer Associates Inc
WS Aiken Inc

## Major Vendors

3M
Allen Bradley Company
Arcsoft Inc.
AT&T
Atlantek Inc
B F Goodrich Chemical Group Co
BOC Gases
Campanelli Investment Properties
Century Electronics Manufacturing
Charkit Chemical Corporation
Commerce One
Commonwealth Maintenance
Concord Camara Hk Limited
Corpsoft Inc
Dielectrics Industries Inc
Donovan Eng & Const Co Inc
Dow Chemical Co
Dupont Teijin Films US LP
DVC Group Inc
Eastman Kodak Co

Felix Schoeller Technical Papers
Fidelity Institutional
G & M Trucking & Rigging Inc
Hart Engineering Corp
Holland Mark
Information Resources Inc
Int'l Computer Associates Inc
ISP Technologies Inc
Lacerta Group Inc
Leo Burnett Company Inc
Mid-west Automation Systems Inc.
National Retail Services
New England Wooden Ware Corp
Nucam Corporation
Oracle Corporation
Orange County Arc
Premier Corrugated Box Co Inc
Premier Image Techology Corp
Rexam Custom (Edi)
Rexam Graphics
RJR Packaging Inc
Rock-Tenn Co Inc
SEAC
Starteck Inc
Tad Resources International Inc
Tocco
US Merchants
Wayland Business Center
Xirlink Inc

## Major Executory Contracts

Enron Energy Services Operations, Inc.
International Specialty Products

## Major Stockholders

Mellon Financial Corporation
OppenheimerFunds, Inc.
Polaroid Employee Stock Equity Plan
Polaroid ESOP Stock Fund
Polaroid Retirement Savings Plan
State Street Bank and Trust Company
State Street Gobal Advisors

## Professionals

Arthur Andersen LLP
Bingham Dana
Donlin, Recano & Company
Dresdner Kleinwort Wasserstein
Kekst & Company
KPMG Peat Marwick LLP
Merrill Lynch & Co.
Simpson Thacher & Bartlett
Zolfo Cooper, LLC

## Major Bondholders

Aid Association for Lutherans (AAL)
AIM High Yield Fund
AIM High Yield Fund II
American Reliable Insurance Company
Apollo Corporate Bond Fund
Aragon Investments, Ltd.
Bank of Montreal
Barclays Global Investors
BGI US High Yield Bond Index Fund
BlackRock High Yield Trust
Brownstone Investment Group
C.I. Acquisition, Inc.
Canadian Imperial Holdings
Central National Bank
Cincinnati Financial Corp.
Citadel Equity Fund Limited
Clearstream Banking S.A.
Country Investors Life Assurance Company
Country Life Insurance Company
Financial Holding Corporation
First Eagle SoGen Global Fund
Fortis Benefits Insurance Company
Fortis Insurance Company
Generalux Corporate High Yield
Golden American Life Insurance Company
Goldman Sachs Global Bond Fund
Goldman Sachs High Yield Fund
Greek Catholic Union of the U.S.A
Guardian Life Insurance Company
Hartford Fire Insurance Company

Hartford Investment management Co.
Hawkeye Capital, L.P.
Hinsbrook Bank & Trust Company
IAA Trust Company
J.P. Morgan Private Banking
Lincoln National Life Insurance Company
Los Angeles Fire & Police System
Magnetite Asset Investors, LLC
Managed High Income Fund
Merced Partners, L.P.
Mid-American National Bank & Trust
Mutual of America Life Insurance Company
New American High Income Fund
New Mexico State Investment Council
Nicholas Income Fund
Northwestern Mutual Life Insurance Company
Ostrander Capital Management Corp.
Protective Life Annuity Insurance Company
Protective Life Insurance Company
Salomon Brothers High Yield Bond Fund
Scudder Insurance Asset Management (SIAM)
Sky Trust Company
Smith Barney Diversified Strategic Income Fund
Smith Barney High Income Fund
SudKA-SZA-Fonds
Titanium CBI I Limited
Tour Societe Generale Paris
United Life Insurance Company


## Major Lessors


QRS Corporation
R & B Realty
R D Raab & Company
RA Pearson Company
Rachel Turoscy
Radford Warehouse Inc
Reactimex Sa De Cv
Reilly Industries Inc.
Rexam Coated Film & Products
Rexam Corp
Rockwell Automation
Rockwell International Corp
Rodney Metals

Russelectric
Rutgers Organics Corporation
Salsbury Chemicals Inc
Scangraphic Prepress Tech
SCI Manufacturing
SDL Inc
Seal Sands Chemicals Ltd
Sensormatic Electronics Corp
Shaw Contract Flooring
Siemens AG
Sierra Imaging Inc
Spaulding & Slye

## Others

Bank One (Chicago)
Houlihan Lokey Howard & Zukin
Miller Buckfire
OEP
OEP Imaging (n/k/a Polaroid Corporation)
One Equity Partners

54455-001\DOCS_DE:67271.1

## EXHIBIT 2

| MATCHED ENTITY | RELATIONSHIP TO PROSKAUER | NATURE OF WORK BEING PERFORMED |
|---|---|---|
| ABN Amro Bank N.V. | Current Client Affiliate | Labor & Employment, Securities and Broker Dealer |
| ABN Amro Chicago Corporation | Current Client Affiliate | Labor & Employment, Securities and Broker Dealer |
| ABN Amro Incorporated | Current Client Affiliate | Labor & Employment, Securities and Broker Dealer |
| American Reliable Insurance Company | Current Client Affiliate | Labor & Employment |
| Arnold Logistics | Current Client Affiliate | Labor & Employment |
| Arthur Andersen LLP | Current Client Affiliate | Corporate |
| AT & T | Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution, Tax and Real Estate, |
| Bank of Montreal | Current Client Affiliate | Litigation & Dispute Resolution, Corporate and Tax |
| Canadian Imperial Holdings | Current Client Affiliate | Corporate |
| Compaq | Current Client Affiliate | Labor & Employment and Litigation & Dispute Resolution |
| Credit Lyonnais | Current Client and Current Client Affiliate | Labor & Employment and Real Estate, Corporate and Broker/Dealer |
| Credit Lyonnais Securities (USA) Inc. | Current Client and Current Client Affiliate | Labor & Employment and Real Estate, Corporate and Broker/Dealer |
| Deutsche Bank AG, New York and/or Cayman Island Branches | Current Client Affiliate | Labor & Employment, Corporate and Tax |
| Dresdner Kleinwort Wasserstein | Current Client Affiliate | Corporate |
| Eastman Kodak Company | Current Client Affiliate | Litigation & Dispute Resolution |
| Fortis Insurance Company | Current Client Affiliate | Labor & Employment |
| Fuji Photo Film Co. | Current Client Affiliate | Personal Planning |
| Fuji Photo Film Inc. | Current Client Affiliate | Personal Planning |
| Goldman Sachs Global Bond Fund | Current Client Affiliate | Labor & Employment, Real Estate and Tax |
| Goldman Sachs High Yield Fund | Current Client Affiliate | Labor & Employment, Real Estate and Tax |

10

| | | |
|---|---|---|
| Guardian Life Insurance Company | Current Client Affiliate | Labor & Employment and Litigation & Dispute Resolution |
| Houlihan Lokey Howard & Zukin | Current Client and Current Client Affiliate | Litigation & Dispute Resolution and Tax, |
| Information Resources Inc | Current Client Affiliate | Labor & Employment |
| Ipsos-ASI Inc | Current Client Affiliate | Corporate |
| Jefferson Smurfit Corp | Current Client Affiliate | Labor & Employment |
| J.P. Morgan Private Bank | Current Client and Current Client Affiliate | Labor & Employment, Corporate, Personal Planning, Tax and Real Estate |
| J.P. Morgan Private Bank | Current Client and Current Client Affiliate | Labor & Employment, Corporate, Personal Planning, Tax and Real Estate |
| KPMG Peat Marwick LLP | Current Client and Current Client Affiliate | Labor & Employment and Litigation & Dispute Resolution |
| Lehman Brother Inc. | Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution, Corporate, Real Estate and Personal Planning |
| Lincoln National Life Insurance Company | Current Client Affiliate | Labor & Employment and Health Care |
| McKinsey & Company, Inc. | Current Client | Labor & Employment |
| Mellon Bank | Current Client Affiliate | Corporate |
| Mellon Financial Corporation | Current Client Affiliate | Corporate |
| Merrill Lynch & Co | Current Client and Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution, Corporate, Real Estate and Tax |
| Morgan Guaranty Trust Company of New York | Current Client Affiliate | Labor & Employment, Corporate/Securities and Real Estate |
| Mutual of America Life Insurance Company | Current Client Affiliate | Broker/Dealer, Corporate |
| Northwestern Mutual Life Insurance Company | Current Client | Labor & Employment |
| OEP | Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution and Corporate |
| OEP Imaging Inc. | Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution and Corporate |

11

| | | |
|---|---|---|
| One Equity Partners | Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution and Corporate |
| Oppenheimer Funds Inc. | Current Client Affiliate | Labor & Employment |
| Porter Novelli Inc | Current Client Affiliate | Labor & Employment and Litigation & Dispute Resolution |
| Protective Life Annuity Insurance Company | Current Client Affiliate | Labor & Employment |
| Protective Life Insurance Company | Current Client | Labor & Employment |
| Salomon Brothers High Yield Bond Fund | Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution, Real Estate, Corporate, Personal Planning and Tax |
| Salsbury Chemicals Inc | Current Client Affiliate | Labor & Employment |
| SEAC | Current Client Affiliate | Corporate |
| Seal Sands Chemicals Limited | Current Client Affiliate | Labor & Employment |
| Sensormatic Electronics Corp. | Current Client and Current Client Affiliate | Corporate |
| SFX Entertainment Inc | Current Client Affiliate | Labor & Employment, Litigation & Dispute Resolution and Corporate |
| Siemens AG | Current Client Affiliate | Litigation & Dispute Resolution |
| State Street Bank and Trust Company | Current Client Affiliate | Labor & Employment |
| State Street Global Advisors | Current Client Affiliate | Labor & Employment |
| Textron Financial Corporation | Current Client Affiliate | Tax |
| The Sumitomo Bank, Limited, New York Branch | Current Client | Labor & Employment and Tax |
| United Life Insurance Company | Current Client Affiliate | Real Estate |
| Wachovia Bank, NA | Current Client | Corporate and Real Estate |

54455-001\DOCS_DE:67271.1

# EXHIBIT B

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | (Chapter 11) |
| Polaroid Corporation, et al., | Case No. 01-10864 (PJW) |
| | (Jointly Administered) |
| Debtors. | |

## SUPPLEMENTAL AFFIDAVIT OF MICHAEL E. FOREMAN

STATE OF NEW YORK   )
                       ss.:
COUNTY OF NEW YORK  )

     MICHAEL E. FOREMAN, being duly sworn, deposes and says:

     1.    I am a partner of the firm of Proskauer Rose LLP ("Proskauer"), located at 1585 Broadway, New York, New York, 10036-8299.

     2.    This affidavit supplements my affidavit dated March 24, 2003 ("the March Affidavit") filed in support of the proposed retention of Proskauer, nunc pro tunc to February 24, 2003, as counsel to Perry M. Mandarino, CPA in his capacity as the examiner (the "Examiner") for the Polaroid Corporation ("Polaroid") and the other above-captioned debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"). A hearing on the motion of the Examiner (the "Motion") for an order authorizing retention of Proskauer Rose LLP as counsel to the Examiner nunc pro tunc to February 24, 2003 is currently scheduled for April 15, 2003 at 3:00 p.m.

## PROPOSED SCOPE OF SERVICES TO BE RENDERED

3. After consultation with the Office of the United States Trustee for the District of Delaware, the Examiner seeks to retain Proskauer, and Proskauer agrees, to render the following legal services relating to the Examiner's fulfillment of his duties as outlined in those certain orders dated February 10, 2003 and February 24, 2003, respectively, of the Honorable Peter J. Walsh, Chief United States Bankruptcy Judge appointing Perry M. Mandarino as the Examiner:

- Conducting depositions and discovery on behalf of the Examiner;

- addressing all legal issues as they may relate to the taking of depositions and conduct of discovery, including such legal issues that arise as a result of or in connection with such discovery;

- representing the Examiner at all court hearings on matters pertaining to his appointment as the Examiner and the discharge of his duties;

- preparing, in conjunction with or on behalf of the Examiner, pleadings, applications and other necessary legal documents in the discharge of the Examiner's duties;

- counseling and representing the Examiner in connection with all bankruptcy-related matters arising during the discharge of the Examiner's duties;

- performing all other legal services requested by the Examiner in connection with the scope of his examination and the discharge of his duties.

[INTENTIONALLY LEFT BLANK]

## ATTORNEYS WORKING ON THIS MATTER

4.    Proskauer will utilize the services of the following attorneys in the conduct of its day-to-day representation of the Examiner:

| *ATTORNEYS BY DEPARTMENT* | *CURRENT BILLING RATES* |
|---|---|

(a)    Bankruptcy Attorneys

| | |
|---|---|
| Michael E. Foreman, Partner | $565/hour |
| Sanjay Thapar, Associate | $385/hour |
| Paul Kemnitzer, Associate | $210/hour |

(b)    Litigation Attorneys

| | |
|---|---|
| Leon P. Gold, Partner | $660/hour |
| James K. Landau, Associate | $425/hour |

5.    Proskauer has reviewed the scope of its proposed engagement with the Examiner, and has and will continue to take all efforts to avoid unnecessary and inappropriate duplication among its attorneys, including in connection with the participation in meetings and conference calls.

6.    Michael E. Foreman, a partner in Proskauer's Bankruptcy and Reorganization Group, will be primarily responsible for counseling and representing the Examiner in all bankruptcy-related matters in connection with the discharge of the Examiner's duties in these cases. Sanjay Thapar, who graduated from Hofstra University School of Law in 1997, and Paul Kemnitzer, who graduated from New York Law School in 2002, will assist in this aspect of Proskauer's representation.

7.    Leon P. Gold, a partner in Proskauer's Litigation and Dispute Resolution Department, will be primarily responsible for counseling and representing the Examiner in the

conduct of discovery and depositions, and all related discovery matters in connection with the discharge of the Examiner's duties in these cases. James K. Landau, who graduated from Boston University School of Law in 1985 will assist in this aspect of Proskauer's representation.

8.    James D. Meade, a partner in Proskauer's Corporate Department with expertise in general corporate, securities and related matters, will provide counsel to the Examiner on such legal issues if and as they arise during the course of the examination. In addition, a junior-level corporate associate may be used to review certain corporate documents from a strictly legal perspective where such attorney's review will provide the benefits of efficiency and economy.

9.    Robert J. Cleary, a partner in Proskauer's Litigation and Dispute Resolution Department who is a former federal prosecutor and has served as the United States Attorney in two different judicial districts (the District of New Jersey and the Southern District of Illinois), will provide limited services as may be necessary to assist in the Examiner's co-ordination of his activities with federal and state agencies, including the Securities and Exchange Commission and the Office of the United States Trustee.

[SIGNATURE PAGE FOLLOWS]

Michael E. Foreman
A Member of the Firm
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3000

Sworn to before me this
14 day of April, 2003

Notary Public

Sanjay Thapar
Notary Public, State of New York
Registration No. 02TH6061506
Qualified in Nassau County
Commission Expires July 16, 2003

6220/49369-001 NYWORD/119152 v2

# EXHIBIT 9

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POLAROID CORPORATION, *et. al*, | ) | Case No. 01-10864 (PJW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | **Related Docket No. 2458** |

### ORDER UNDER SECTION 327(a) OF THE BANKRUPTCY CODE AUTHORIZING THE EMPLOYMENT AND RETENTION OF PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C. AS COUNSEL FOR PERRY M. MANDARINO, AS DULY APPOINTED AND ACTING EXAMINER

Upon the application of Perry M. Mandarino, as duly appointed and acting

examiner for the above-captioned debtors and debtors in possession (the "Debtors"), for

Application Pursuant To Federal Rule of Bankruptcy Procedure 2014(a) For Order Under

Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Pachulski,

Stang, Ziehl, Young, Jones & Weintraub P.C., as Counsel for Perry M. Mandarino, as duly

appointed and acting examiner (the "Application"), and upon the Affidavit of Laura Davis Jones,

Esquire, a shareholder of the Firm, in support thereof (the "Jones Affidavit"); and the Court

being satisfied based on the representations made in the Application and in the Jones Affidavit

that said attorneys represent no interest adverse to Debtors' estates with respect to the matters

upon which they are to be engaged, that they are disinterested persons as that term is defined

under Section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the

Bankruptcy Code, and that their employment is necessary and would be in the best interests of

Debtors' estate, and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Application is granted; and it is further

ORDERED that in accordance with section 327(a) of the Bankruptcy Code,
Examiner is authorized to employ and retain the Firm as Counsel, *nunc pro tunc* to February 24,
2003, on the terms set forth in the Application and the Jones Affidavit; and it is further

ORDERED that the Firm shall be entitled to allowance of compensation and
reimbursement of expenses, upon the filing and approval of interim and final applications
pursuant to the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court and such
other orders as this Court may direct.

Dated: *April 1v*, 2003

_____
United States Bankruptcy Judge

# EXHIBIT 10

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re:                                   :
                                             Chapter 11
POLAROID CORPORATION, ET     :
AL.,                                         Case Nos. 01-10864 (PJW)

                                         :
         Debtors.                           Jointly Administered
                                         :  **Related Docket No. 2475**
-------------------------------------------------x
```

## ORDER REGARDING ACCESS BY THIRD PARTIES TO
## MATERIAL OBTAINED BY THE EXAMINER

WHEREAS, Perry M. Mandarino, CPA, the examiner (the "Examiner") was

appointed in the above-captioned Chapter 11 bankruptcy cases by orders of this Court dated

February 10, 2003 and February 24, 2003 (collectively, the "Examiner Orders"), copies of

which are annexed hereto as Exhibits A and B, to conduct an examination of certain

accounting practices (the "Examination") of the above-captioned debtors and debtors-in-

possession (collectively, the "Debtors") and the scope of the Examination is outlined in the

Examiner Orders; and

WHEREAS, the Examiner Orders authorize the Examiner, among other

things, to conduct discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"); and

WHEREAS, the Examiner has sought and will continue to seek discovery

from various persons and entities (each a "Producing Party") both informally and pursuant

to Bankruptcy Rule 2004; and

WHEREAS, certain parties-in-interest in these bankruptcy cases (each a "Principal Party")[1] have requested access to discovery material that has been or will be provided to the Examiner pursuant to Bankruptcy Rule 2004 (the "Rule 2004 Material") or otherwise, (collectively with the Rule 2004 Material, the "Produced Material") during the course of the Examination; and

WHEREAS, certain other parties-in-interest in these bankruptcy cases that are not Principal Parties (each an "Other Party")[2] may request access to the Produced Material; and

WHEREAS, the Examiner seeks to undertake the Examination in the most expeditious, efficient and economical means possible, and further seeks to establish a process that appropriately balances the interests of all parties-in-interest;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.     Except as set forth in sub-paragraph 2(b) below, each Producing Party shall provide two sets of any Produced Material[3] sufficiently marked to identify the Producing Party, one set shall be delivered to the Examiner c/o Proskauer Rose LLP, Attn: James Landau,

---

[1]     See Attached Exhibit C for a list of Principal Parties.

[2]     A party or person shall be deemed an "Other Party" after it has provided a notice in writing to the Examiner c/o Traxi LLC, 212 W 35th Street, 4th Floor, New York, New York 10001, with a copy to Proskauer Rose LLP, Attn: James K. Landau, Esq. 1585 Broadway, New York, New York 10036, requesting that it be permitted access to Produced Materials pursuant to the terms of this Order.

[3]     Produced Material may be provided in either (i) electronic format (on CD-ROM or 3.5" disk, with (a) each document saved as a single document file, (b) the name of each file sufficient to identify the document contained therein, and (c) an index for the documents provided on the CD ROM or disk) or (ii) hard copy bates stamped.

Esq., 1585 Broadway, New York, New York 1003600, and the second set shall be delivered to the Debtors c/o Skadden, Arps, Slate, Meagher & Flom LLP, Attn: Gregg M. Galardi, Esq., One Rodney Square, Wilmington, DE 19899.[4]

      2.    a.    Each Producing Party shall respond to the discovery requests submitted by the Examiner, whether formal or informal, in the manner provided by the applicable Federal Rules of Bankruptcy Procedure (including the applicable Federal Rules of Civil Procedure to the extent incorporated thereby). Without limiting the foregoing, and except as set forth in subparagraph c below, each Producing Party shall provide to the Examiner a privilege log complying with Rule 45(d)(2) of the Federal Rules of Civil Procedure with respect to any materials withheld from production on the grounds of privilege. Producing Parties may produce documents to which they are asserting a privilege to the Examiner in lieu of a privilege log and those documents shall be treated as set forth in subparagraph c below.

            b.    All Produced Materials submitted by any Producing Party shall be deemed confidential without the requirement that any such Produced Materials be designated as such. Notwithstanding the foregoing, the Examiner may make such Produced Materials available to any Requesting Party (as defined in paragraph 3(b) below) in accordance with paragraph 3 of this Order.

            c.    FTI Consulting has asserted that all of the Produced Materials that it is producing to the Examiner ("FTI Privileged Material") are privileged. As FTI

---

[4]     In the event the Examiner requests document production from Mr. Stephen J. Morgan, he will be required to produce only one set of documents to the Examiner.

Consulting is producing the FTI Privileged Material to the Examiner, no privilege log shall be required in connection with such materials. The production of FTI Privileged Material to the Examiner shall not be a waiver of privileged status. The Examiner and Requesting Parties reserve all of their rights to contest whether the FTI Privileged Material is properly categorized as privileged and FTI Consulting and its counsel reserves their right to object to any such contest.

        3.        The following procedures and conditions shall apply to all Produced Material, including the FTI Privileged Material and any other Produced Material that a Producing Party claims is privileged, that is received by the Examiner:

        a.        Within five business days of his receipt of Produced Material, the Examiner shall provide to the Principal Parties and the Other Parties a notice (the "Production Notice") containing (i) a copy of the document production request, if applicable, (ii) the date of production by a Producing Party and (iii) the name of the attorney(s) and/or contact person(s) for the Producing Party.

        b.        After the receipt of the Production Notice, any party seeking access to any such Produced Material (including any privilege log delivered in connection therewith) (a "Requesting Party") shall provide a written request to the attorneys for the Producing Party or, if the Producing Party does not have counsel, to the Producing Party, substantially in the form annexed hereto as Exhibit D (the "Request Notice"), with simultaneous notice to (i) the Examiner and his counsel Proskauer Rose LLP, Attn: James Landau, Esq., 1585 Broadway, New York, New York, 10036, Facsimile No. 212-969-2900 and (ii) the Debtors'

counsel, Skadden, Arps, Slate, Meagher & Flom, Attn: Gregg M. Galardi, Esq., One Rodney Square, P.O. Box 636, Wilmington, DE 19899-0636, Facsimile No. 302-651-3001.

        c.     A Requesting Party shall be required to submit a separate Request Notice with respect to each Production Notice.

        d.     Each Request Notice shall include a representation and agreement by the Requesting Party that the Produced Material is being sought and shall be used solely in connection with the Examination. Each Request Notice shall also constitute a representation that the Requesting Party shall not disclose the Produced Material to any third party (other than its affiliates, employees, officers, directors, representatives, attorneys, advisors or associates involved in the Examination on behalf of such Requesting Party; each a "Requesting Party Representative"), without the Producing Party's consent, except that the Produced Material may be disclosed to any other person that the Requesting Party knows is bound by the confidentiality provisions of this Order. Each Requesting Party Representative shall be formally apprised by the Requesting Party of its obligation to maintain the confidentiality of the Produced Material under the terms of this Order and not to use it other than for the purpose described above and, in any event, the Requesting Party shall be responsible for any breach of this Order by any of its Requesting Party Representatives.

        e.     Any Requesting Party that has access to the Produced Material is barred from purchasing, selling or otherwise trading in the debt (including claims) or stock of the Debtors or Polaroid Holdings Corporation, and any of their respective direct or indirect subsidiaries; provided, however, that (i) the foregoing limitation shall be applicable solely to a

Requesting Party who requests and receives Produced Material through the Examiner or a Producing Party pursuant to this Order, (ii) the foregoing limitation shall not apply to any Requesting Party which conducts its own discovery as permitted by paragraph 12 of this Order, and (iii) access to Produced Material by any professional or agent of the Official Committee of Unsecured Creditors, the Lenders, the Appearing Shareholders, or the Appearing Retirees shall not be deemed to constitute access by any individual members of the Official Committee of Unsecured Creditors, the Lenders, the Appearing Shareholders or the Appearing Retirees unless or until they are provided with any such Produced Material or with a summary of such Produced Material that contains non-public information, except that, this Order shall not limit the rights of parties authorized to conduct transactions pursuant to any other orders of this Court.

    4.    The Examiner's obligation to provide the Produced Material to a Requesting Party shall be subject to the following additional conditions:

    a.    The Producing Party (or its designee) or the Debtors (each an "Objecting Party") shall have the right to object to the Request Notice within ten days of its receipt thereof. Each such objection shall be substantially in the form annexed hereto as Exhibit E ("Objection Notice"), and shall be served on the Requesting Party, the Producing Party, the Examiner and the Debtors.

    b.    In the event the Examiner receives an Objection Notice in a timely manner, he shall not comply with the Requesting Party's request unless and until any such Objection Notice has been withdrawn in writing or has been resolved by a final order of this Court. It shall be the sole responsibility of the Requesting Party to resolve the objections set

forth in the Objection Notice with the Objecting Party. In the event the Requesting Party and the Objecting Party cannot resolve the objection(s) between themselves, the Requesting Party may seek the assistance of this Court to resolve the dispute in accordance with applicable discovery law on notice to the Examiner, the Debtors, and the Producing Party.

c. The Examiner shall have no obligation to resolve any objections as between the Requesting Party and the Objecting Party.

d. Any party that receives a Request Notice and does not timely submit an objection thereto as required by this Order shall be deemed to have waived any objection to the production of the Produced Material to that Requesting Party and the Examiner's compliance with that Requesting Party's Request Notice. The Examiner shall have no liability to any party as a result of his compliance with this Order.

e. Advance payment by a Requesting Party for all actual costs and expenses for copies of any Produced Material is a condition precedent to the Examiner's obligation to provide access to or copies of Produced Materials to the Requesting Party, which shall be provided within a reasonable period of time after receipt of payment therefor. So long as all outstanding objections to a Request Notice are resolved or overruled by this Court, a Requesting Party shall be permitted to make arrangements, upon reasonable notice to the Examiner, to review the Examiner's copy of Produced Material (at the location of the Examiner's choosing) at no cost to the Requesting Party.

f. The Examiner, in his sole discretion after consultation with the Principal Parties, shall determine how access to Produced Material that is not otherwise subject

to an unresolved Objection Notice shall be provided to a Requesting Party, in a manner consistent with the other provisions of this Order. Access by Requesting Parties to any such document shall be subject to the terms of this Order.

        g.     Nothing contained in this Order shall in any way limit or prejudice the Examiner's rights to seek rulings from this Court with respect to any Request Notice, Objection Notice, or any other issues arising from or relating to this Order, and in such instance he shall not be required to comply with a Request Notice except upon further Order of this Court.

        5.     The Examiner will file a notice with the Bankruptcy Court for request for documents or each deposition that he intends to take pursuant to Bankruptcy Rule 2004, identifying the date, place and time of such production or depositions. The Examiner, the Debtors and the deponent shall have no obligation to coordinate the date, place or time of such depositions with any other party. The Examiner retains the right to change the date, place or time of any deposition at any time without seeking or obtaining prior approval of any other party. In the event the Examiner does change the date, place or time of any previously noticed deposition, the Examiner shall file an amended notice of the deposition with the Bankruptcy Court, promptly after a rescheduled date, time or place of a deposition becomes known to the Examiner.

        6.     Each deposition or examination that is being conducted or taken by the Examiner pursuant to Bankruptcy Rule 2004 shall be subject to the following additional procedures and conditions:

a.      Each of the Debtors, Polaroid Holdings Corporation, the Official Committee of Unsecured Creditors, the Agent, the Appearing Shareholders, the Appearing Retirees and Stephen J. Morgan, may designate no more than one representative (each a "Representative") who shall have the right to be present at such depositions on their behalf. No person, entity or party-in-interest (including the Representatives), other than the Examiner or the deponent (or their counsel), shall have the right to ask questions or make any objections, for any reason whatsoever, at, or otherwise to participate in, any deposition that is being conducted by or on behalf of the Examiner.

b.      Any Representative that seeks to have questions asked at a deposition shall have the right to submit written questions to the Examiner c/o Traxi LLC 212 W 35th Street, 4th Floor, New York, New York 10001, and his counsel Proskauer Rose LLP, Attn: James Landau, Esq., 1585 Broadway, New York, New York 10036. The questions must be received at least five (5) business days prior to the date of the deposition.[5] The Examiner in his sole and absolute discretion may choose or not choose to ask the deponent the questions submitted by any Representative.

c.      Requests for deposition transcripts that constitute Rule 2004 Material shall be governed by the terms of this Order applicable to other requests for Rule 2004 Material; provided, however, that a Request Notice that requests access to a copy of a deposition transcript shall be presumptively valid and shall not be objectionable unless the entire transcript

---

[5]      If a deposition is scheduled on less than five (5) business days notice, the Representative may submit questions within a reasonable period of time after the Examiner files a deposition notice.

(if the objection to such request pertains to the entire transcript) or the applicable portion of such transcript (if the objection pertains only to such portion of the transcript) shall have been designated as confidential at the time of the deposition.

7. This Order shall be effective immediately and shall remain in effect unless and until modified by further Order of this Court.

8. Requesting Party who receives Produced Material shall not share or discuss the Produced Material, or its contents or information, with any other person or party unless such other party has also received such Produced Material as a Requesting Party pursuant to this Order. Once the Examiner or a Requesting Party shares or discusses the Produced Material or its contents or information, with any other person or party, such other person or party shall be subjected to all provisions of this Order (including, without limitation, any provisions relating to Protected Materials). Professionals for the Official Committee of Unsecured Creditors and the Lenders may share Produced Material, or its contents or information, with their member constituents; provided, however, any constituent who receives such information shall be subjected to all provisions of this Order (including, without limitation, any provisions relating to Protected Materials).

9. The Examiner shall have the option, at his sole and absolute discretion and after five (5) business days written notice to the producing party, but is not required to share the Produced Materials with the Securities and Exchange Commission, the United States Department of Justice or other federal and state agencies (each a "Governmental Agency"). If any Producing Party objects to such disclosure, it shall set forth its objection in writing, and the Examiner will

not share the Produced Materials, subject to such objection, with the Governmental Agency unless the Producing Party agrees in writing to such production or this Court enters an order requiring such disclosure or production. The Examiner will notify the applicable Governmental Agency of such objection.

        10.    Neither the Examiner nor any other party receiving Produced Materials pursuant to this Order shall use any such Produced Materials in any manner except in accordance with the procedures set forth in this paragraph. Nothing in this Order shall prohibit or otherwise prevent the Examiner and his attorneys, agents and other representatives from using the Produced Materials in connection with the Examination, without prior notice to the parties, including, but not limited to, in connection with informal interviews and in Rule 2004 examinations, so long as the Examiner uses reasonable efforts to advise the other participants in such interviews or examinations that the Produced Materials are and should be treated as confidential. If the Examiner or a Requesting Party intends to use all or any portion of the Produced Materials in any pleading, hearing or other matter before the Bankruptcy Court except as set forth above, such Examiner or Requesting Party, as the case may be, shall provide prior written notice of such intention to the attorneys for the Producing Party, which notice shall specifically identify by document production number the Produced Materials to be used, with copies of such notice to the Examiner and Debtor's counsel at the addresses set forth in paragraph 3(b) of this Order. The Producing Party shall have five (5) business days to object in writing to the use of the Produced Materials by the Examiner or Requesting Party on the grounds of confidentiality or privilege. If such an objection is interposed by the Producing Party, the

Examiner or Requesting Party, as the case may be, may not use any such Produced Material to which objection has been interposed, but may either (a) seek expedited resolution of such objection from the Bankruptcy Court (and all such parties consent to such disputes being resolved on an expedited basis), or (b) seek permission of the Bankruptcy Court (on notice to the Producing Party) to file such Produced Material under seal. This Order shall be without prejudice to the Examiner's and any Requesting Party's rights to request an order of this Court permitting any Produced Material to be filed as part of the public record of the Examination, on appropriate prior notice to the Producing Party which produced such Protected Materials. Unless otherwise ordered by this Court, within 30 days after this Court enters a final decree closing the Debtors' Chapter 11 cases, the Examiner shall destroy all Produced Material (or, upon the request of any Producing Party, return the Produced Material to such Producing Party).

11.    Parties in interest may seek relief from the provisions of this Order at any time, upon reasonable notice to the Examiner, the Debtors and any other party proposed to be affected by such relief.

12.    Nothing contained in this Order shall prevent any party-in-interest from seeking discovery from the Debtors or any other Producing Parties pursuant to applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and/or order(s) of the Court.

13.    Each Request Notice or Objection Notice, and the statements and representations made therein shall be subject to all provisions of Title 11 of the United States Code, 11 U.S.C. §§ et seq., the Federal Rules of Civil Procedure and the Bankruptcy Rules, including Rule 9011.

14.     Nothing in this order shall prevent the Examiner and any Producing Party from entering into protective orders.

15.     Nothing in this order shall supersede the Examiner Orders attached hereto as Exhibits A and B. In the event of any conflict between the Examiner Order and this Order, the provisions of the Examiner Order shall control.

Dated: April /5, 2003
        Wilmington, Delaware

_____
Peter J. Walsh
Chief United States Bankruptcy Judge

Exhibit "A"

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| POLAROID CORPORATION, *et al.* | : | Case Number 01-10864 (PJW) |
| | : | |
| | : | Jointly Administered |
| Debtors | : | *Related Docket Nos. 1564, 1597, 1598, 1616, 1642, 1928 and 2261* |

## ORDER DIRECTING APPOINTMENT OF EXAMINER PURSUANT
## TO SECTIONS 1104 AND 1106 OF THE BANKRUPTCY CODE

Upon the October 30, 2002, November 17, 2002 and December 16, 2002 letters from Leonard Lockwood to the Court (docket numbers 1564, 1642 and 1928) and the November 10, 2002 letter from George Maiorelli to the Court (docket number 1598) requesting among other things the entry of an order pursuant to section 1104(c) of the Bankruptcy Code directing the appointment of an examiner (the "Requests"); and upon the responses thereto filed by Primary PDC, Inc., f/k/a Polaroid Corporation (the "Debtors"), the Official Committee of Unsecured Creditors (the "Committee"), the United States Trustee and other parties in interest; and the Court having considered the Requests at the hearing held on January 16, 2003; and the Court having found that the appointment of an examiner with the powers and duties set forth herein is in the interests of the estate; and after due deliberation and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  The Requests are granted to the extent set forth below.

2.  Pursuant to sections 1104(c), 1104(d) and 1106(b) of the Bankruptcy Code, the United States Trustee is directed to appoint, subject to the Court's approval, one disinterested person with significant forensic accounting experience to serve as examiner in these cases (the "Examiner"), who shall have the following duties, rights and powers:

(a) with respect to the period between one year before the filing of the Debtors' chapter 11 petitions and one year after the date of such filings, investigate whether the accounting methods, accounting practices or accounting irregularities alleged in the Requests materially undervalued the assets of the Debtors and/or resulted in an inappropriate liquidation of the Debtors' assets (the "Investigation");[*]

(b) meet and confer with the Debtors, the Committee and other parties in interest, and their respective advisors and attorneys regarding the Investigation;

(c) have reasonable access to the Debtors' facilities, offices, books and records, officers, management, employees, advisors, attorneys and accountants during regular business hours, in connection with the performance of the Investigation;

(d) conduct any necessary examinations pursuant to Federal Rule of Bankruptcy Procedure 2004; and

(e) electronically file a report with the Court which shall set forth the Examiner's findings, which report shall be available to all parties in interest through the Court's CM/ECF system.

3. The Debtors and their officers, directors, management, employees and professionals, OEP Imaging Corporation ("OEP"), n/k/a Polaroid Corporation, and its officers, directors and professionals, and the Committee and its members and professionals shall cooperate with the Examiner and (a) provide to the Examiner access to all documents and information that the Examiner deems relevant to discharge his or her duties in connection with the Investigation, subject to the rights of the Debtors, OEP, the Committee and any other party in interest to object to such document requests on any and all grounds, and (b) subject to the

[*]  Paragraph 2(a) above shall not be read as a limitation on the Examiner's authority to take into consideration matters bearing on the Debtors' business and financial affairs which predate or postdate the two year period as defined above.

2

availability of space and personnel, provide to the Examiner at the Debtors' headquarters a secure office with telephone, secretarial and other appropriate office services.

4. The Examiner shall have the standing of a "party in interest" with respect to the matters that are within the scope of the Investigation, and shall be entitled to appear and be heard at hearings held in these cases.

5. The examiner shall use best efforts to coordinate with the United States Department of Justice (DOJ), SEC, and other federal agencies in order to avoid unnecessary interference with, or duplication of, any investigations conducted by such federal agencies.

6. The examiner shall report promptly to the DOJ any evidence of past or present criminal activity, and to the SEC any evidence of past or present civil securities law violations. The examiner shall also convey to the DOJ and SEC other information requested by those agencies.

7. The Examiner shall appear at the omnibus hearing scheduled for February 18, 2003 at 9:30 a.m. to provide the Court with the Examiner's estimate of the amount of time required to perform the Investigation. In forming such estimate, the Examiner shall review at a minimum the Requests, the transcripts of the January 16, 2003 hearing and the exhibits admitted into evidence at the January 16, 2003 hearing. Nothing herein shall be construed to limit the Examiner's access to other documents filed of record in these cases.

Dated: Wilmington, Delaware
February _16_, 2003

Honorable Peter J. Walsh
Chief United States Bankruptcy Judge

3

Exhibit "B"

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

*In re*                              :    Chapter 11
                                     :
POLAROID CORPORATION, *et al.*       :    Case Number 01-10864 (PJW)
                                     :
         Debtors                     :    Jointly Administered
                                     :    *Re: Docket No. 2325*

### ORDER

The Court having considered the United States Trustee's Application to Appoint Perry M.

Mandarino, CPA, as Examiner of the above-captioned jointly administered cases, it is hereby

ORDERED that the appointment is approved.

Dated: Wilmington, Delaware
       Feb. 24, 2003

                                   _____
                                   Honorable Peter J. Walsh
                                   Chief United States Bankruptcy Judge

DOCKET# 2365

DATE 2-24-03

**Exhibit "C"**

**PRINCIPAL PARTIES SHALL INCLUDE EACH OF THE FOLLOWING AND THEIR PROFESSIONALS, INCLUDING ATTORNEYS, FINANCIAL ADVISORS AND ACCOUNTANTS.**

1. The Debtors

2. The Official Committee of Unsecured Creditors

3. JP Morgan Chase Bank (the "Agent"), as agent for the pre-petition secured lender group (the "Lenders")

4. The following individuals shall be referred to as the "Appearing Shareholders":

   Leonard Lockwood
   George Maiorelli
   William Cardinale

5. The following individuals shall be referred to as the "Appearing Retirees":

   Arthur Derek Jarrett
   G. Michael Gignac, Jr.
   John D. Gignac

5. OEP Imaging Corporation

6. Securities and Exchange Commission

7. The Office of the United States Attorney for the District of Delaware

8. Stephen J. Morgan

By Facsimile & U.S. Mail
Facsimile No.: _____
_____ (Producing Party)
_____ (Representative)
_____ (Representative Firm)
_____ (Address)

Re: *In re* Polaroid Corporation, *et al.* Nos. 01-10864 (PJW)

Dear _____ (Producing Party):

We represent _____ (Requesting
Party), a party in interest in these Chapter 11 cases. Pursuant to the Order Regarding Access by
Third Parties to Materials Obtained by the Examiner, dated March __, 2003 ("Order"),
_____ (Requesting Party) requests **[insert either (i), (ii) or (iii)]** (i)
access to the Rule 2004 Material that _____ (Producing Party) produced
to the Examiner on _____, (ii) the right to attend the deposition of
_____ (deponent) to take place on _____ (iii) access to a copy of
the deposition transcript and exhibits thereto of the deposition of _____
(deponent) taken on _____.

_____ (Requesting Party) represents and agrees that the Rule
2004 Material requested herein is sought and shall be used only by _____
(Requesting Party) and in connection with the investigation of claims that relate to the acts,
conduct, or property or to the liabilities and financial condition of the Debtors, or to any matter
which may affect the administration of the Debtors' estates. _____ (Requesting
Party) understands and affirms that the representations contained in this Request Form are
subject to and in compliance with the Order, Rule 11 of the Federal Rules of Civil Procedure and
Bankruptcy Rule 9011.

_____

By:

**Exhibit "E"**

By Facsimile & U.S. Mail
Facsimile No.: _____
_____ (Requesting Party)
_____ (Representative)
_____ (Representative Firm)
_____ (Address)

Re: *In re* Polaroid Corporation, *et al.* Nos. 01-10864 (PJW)

Dear _____ (Requesting Party):

We represent _____ (Objecting Party), in connection with Produced Material that was provided to the Examiner. Pursuant to the Order Regarding Access by Third Parties to Materials Obtained by the Examiner, dated March __, 2003 ("Order"), _____ (Objecting Party) objects to _____ (Requesting Party) request, dated _____, **[insert either (i), (ii) or (iii)]** for (i) access to the Produced Material that _____ (Producing Party) produced to the Examiner on _____, (ii) the right to attend the deposition of _____ (deponent) to take place on _____, (iii) for a copy of the deposition transcript and exhibits thereto of the deposition of _____ (deponent) taken on _____. The basis of the objection(s) is as follows:

_____.

_____ (Objecting Party) understands and affirms that the representations contained in this Objection Form are subject to and in compliance with the Order, Rule 11 of the Federal Rules of Civil Procedure and Bankruptcy Rule 9011. An objection based on a correct assertion that Rule 2004 Material was produced to the Examiner pursuant to a confidentiality agreement or protective order shall not be a basis for sanctions under Rule 11 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9011.

_____

By: